**LEWIS BRISBOIS BISGAARD & SMITH LLP**
BRIAN SLOME, SB# 238134
E-Mail: Brian.Slome@lewisbrisbois.com
KENNETH C. FELDMAN, SB# 130699
E-Mail: Ken.Feldman@lewisbrisbois.com
LINDSEY M. BALL, SB# 299707
E-Mail: Lindsey.Ball@lewisbrisbois.com
550 West C Street, Suite 1700
San Diego, California 92101
Telephone: 619.233.1006
Facsimile: 619.233.8627

Attorneys for Defendants, Bona Law P.C., Jarod Bona, David Codell, Aaron Gott, Luke Hasskamp, and Luis Blanquez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN P. MANOOKIAN,<br>Plaintiff,<br>vs.<br>BONA LAW P.C., JAROD BONA, DAVID CODELL, AARON GOTT, LUKE HAASKAMP, AND LUIZ BLANQUEZ;<br>Defendants. | Case No. 21CV0562 WQH BLM<br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**<br>**FED RULES CIV. P. R. 12(b)(6)**<br>**Date: July 19, 2021**<br>**Hon. Judge William Q. Hayes**<br>**"NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT"** |

**TO THE HONORABLE COURT, PLAINTIFFS HEREIN, AND THEIR RESPECTIVE COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that pursuant to Fed. R. Evid. 201, Defendants BONA LAW P.C., JAROD BONA, DAVID CODELL, AARON GOTT, LUKE HASSKAMP, AND LUIS BLANQUEZ ("Defendants") hereby request that the Court take judicial notice of the following documents, attached as Exhibits 1 through 17, in support of Defendant's Motion to Dismiss:

/ / /

**EXHIBITS FOR JUDICIAL NOTICE**

1. Attorney Disciplinary History by Tennessee Supreme Court Board of Professional Responsibility for attorney Brian Manookian BPR No. 0264553
2. Order of Temporary Suspension filed Sept. 21, 2018 Tennessee Supreme Court No. M2018-01711-SC-BAR-BP
3. Order Denying First Verified Petition dated Nov. 21, 2018, Tennessee Supreme Court No. M2018-01711-SC-BAR-BP Published Report and Recommendation dated Nov. 21, 2018
4. Order Denying Second Petition filed Feb. 27, 2019 Tennessee Supreme Court No. M2018-01711-SC-BAR-BP
5. Order Dissolving Temporary Suspension dated May 17, 2019 Tennessee Supreme Court No. M2019-00630-SC-BAR-BP
6. Order of Temporary Suspension filed Oct. 11, 2019 Tennessee Supreme Court No. M2019-00630-SC-BAR-BP
7. Order of Temporary Suspension filed Oct. 17, 2019 Tennessee Supreme Court No. M2018-00630-SC-BAR-BP
8. Manookian's Complaint against Tennessee State Bar filed by Bona Law on April 29, 2019 Case No. 3:19-cv-00350 (M.D. Tenn.)
9. Manookian's Complaint against Bona Law filed March 30, 2021 Case No. 3:21-cv-00562 (S.D. Calif.)
10. Manookian's Opposition to the Motion to Dismiss filed by Bona Law Case No. 3:19-cv-00350 (M.D. Tenn.)
11. Federal District Court Order filed February 28, 2020 with Memorandum, Case No. 3:19-cv-00350 (M.D. Tenn.)
12. Federal District Court Order filed September 4, 2020 Case No. 3:19-cv-00350 (M.D. Tenn.)

13. Manookian's Motion for Entry of Judgment filed by Bona Law on March 30, 2020, Case No. 3:19-cv-00350 (M.D. Tenn.)
14. United States Court of Appeals for the Sixth Circuit Order filed September 10, 2020, Case No. 20-5979 (6th Cir.)
15. Manookian's Response to Order to Show Cause filed by Bona Law on October 1, 2020, Case No. 20-5979 (6th Cir.)
16. United States Court of Appeals Order filed January 5, 2021 Case No. 20-5979 (6th Cir.)
17. Select Actions, Court of Appeals for Sixth Circuit, Case No. 20-5979 (6th Cir.)

    Docket Entries, United States District Court, Middle District of Tennessee, Case No. 3:19-cv-00350 (M.D. Tenn.)

DATED: June 14, 2021 LEWIS BRISBOIS BISGAARD & SMITH LLP

By: */s/ Brian Slome*

Brian Slome
Kenneth C. Feldman
Attorneys for Defendants, Bona Law P.C., Jarod Bona, David Codell, Aaron Gott, Luke Hasskamp, And Luis Blanquez



**EXHIBIT "1"**



Board of Professional Responsibility
Ex. 1
001

ATTORNEY LOGIN

Board of Professional Responsibility
of the Supreme Court of Tennessee

Search

ABOUT THE BOARD FOR THE PUBLIC FOR LEGAL PROFESSIONALS NEWS & PUBLICATIONS

# Attorney Details

**Name:**
Manookian, Brian Philip

**Address:**
PO Box 150229
Nashville, TN 37215-0229

**BPR Number:**
026455

**Status:**
Suspended (10/11/2019)

**Office County:**
Davidson

**Licensed in TN Since:**
2007

**Law School:**
Vanderbilt University - Vanderbilt Law School

## Public Information:

**No Public Information Available**

## Informational Releases for Public Discipline:

| Date | Title |
|---|---|
| 08/06/2020 | Third Supplemental Petition for Discipline filed - #2017-2805-5-WM |
| 10/11/2019 | Order Reinstating Temporary Suspension |
| 10/11/2019 | Davidson County Lawyer Temporarily Suspended |
| 05/24/2019 | Second Supplemental Petition for Discipline filed - #2107-2805-5-WM |
| 05/17/2019 | Reinstated |
| 05/17/2019 | Davidson County Lawyer Reinstated |
| 11/21/2018 | Davidson County Lawyer Remains On Temporary Suspension |
| 09/21/2018 | Order of Temporary Suspension |
| 09/21/2018 | Davidson County Lawyer Temporarily Suspended |
| 03/22/2018 | Supplemental Petition for Discipline filed - #2107-2805-5-WM |
| 12/18/2017 | Petition for Discipline filed - #2017-2805-5-WM |

## Names Used:

https://www.tbpr.org/attorneys/B8BDE691-45B2-E411-80D5-0050568F14C6[6/14/2021 10:26:17 AM]

**Name**

Brian Philip Manookian

* Information accurate as of Monday, June 14, 2021 12:00 PM UTC

ABOUT THE BOARD

FOR THE PUBLIC

FOR LEGAL PROFESSIONALS

NEWS & PUBLICATIONS

LINKS OF INTERESTS

# Mission Statement

To assist the Court in protecting the public from harm from unethical lawyers by administering the disciplinary process; to assist the public by providing information about the judicial system and the disciplinary system for lawyers; and, to assist lawyers by interpreting and applying the Court's disciplinary rules.

© 2021 Board of Professional Responsibility of the Supreme Court of Tennessee.

PRIVACY STATEMENT | DISCLAIMER

# EXHIBIT "2"

FILED
09/21/2018
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE

**IN RE: BRIAN PHILLIP MANOOKIAN, BPR #026455**
An Attorney Licensed to Practice Law in Tennessee
(Davidson County)

---

**No. M2018-01711-SC-BAR-BP**
BOPR No. 2018-2914-5-WM-12.3

---

**ORDER OF TEMPORARY SUSPENSION**

This matter is before the Court on a Petition of the Board of Professional Responsibility of the Supreme Court of Tennessee, by and through Disciplinary Counsel, for the temporary suspension of Brian Phillip Manookian from the practice of law, pursuant to Tenn. Sup. Ct. R. 9, § 12.3. The Petition has been authorized by the Chair of the Board of Professional Responsibility and is supported by the exhibits attached thereto.

Based upon the Petition and the supporting exhibits, the Court finds that Brian Phillip Manookian, Respondent, poses a threat of substantial harm to the public as detailed by the exhibits to the Petition.

IT IS THEREFORE, CONSIDERED, ORDERED, ADJUDGED AND DECREED BY THE COURT THAT:

1. Brian Phillip Manookian is hereby temporarily suspended from the practice of law as provided in Tenn. Sup. Ct. R. 9, § 12.3.

2. Brian Phillip Manookian shall comply with Tenn. Sup. Ct. R. 9 in all respects and particularly as provided in Tenn. Sup. Ct. R. 9, § 28, regarding the responsibilities of suspended attorneys.

3. Brian Phillip Manookian may make application for dissolution or modification of this Order as provided in Tenn. Sup. Ct. R. 9, § 12.3.

4. The Board of Professional Responsibility shall cause notice of this suspension of Brian Phillip Manookian to be published as required by Tenn. Sup. Ct. R. 9, § 28.11.

PER CURIAM

**Exhibit 2** **EXHIBIT 1**

**EXHIBIT "3"**

FILED
11/21/2018
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE

**IN RE: BRIAN PHILLIP MANOOKIAN, BPR #026455**
An Attorney Licensed to Practice Law in Tennessee
(Davidson County)

---

**No. M2018-01711-SC-BAR-BP**
BOPR No. 2018-2914-5-WM-12.3

---

**ORDER DENYING VERIFIED PETITION FOR DISSOLUTION OR AMENDMENT OF ORDER OF TEMPORARY SUSPENSION**

On September 21, 2018, this Court entered an Order of Temporary Suspension pursuant to Tenn. Sup. Ct. R. 9, § 12.3, suspending the law license of Brian Phillip Manookian for posing a threat of substantial harm to the public. On September 28, 2018, Mr. Manookian filed a Verified Petition for Dissolution or Amendment of Order of Temporary Suspension. On October 2, 2018, Mr. Manookian filed his Petition-Motion for Instanter Ruling Regarding the Procedural Defects of the Tennessee Board of Professional Responsibility's Petition for Temporary Suspension. On October 4, 2018, the Board filed a Response to Petition for Dissolution. On October 5, 2018, Mr. Manookian filed his Reply to Petitioner's Response to Respondent's Petition for Dissolution or Amendment of Order of Temporary Suspension. On October 5, 2018, the Board filed its Response to Petition-Motion for Instanter Ruling and Hearing and the Declaration of Phillip North. On October 16, 2018, Mr. Manookian filed his Amended and Restated Petition-Motion, and Memorandum of Law in Support thereof, for Instanter Ruling Pursuant to Tennessee Rule of Appellate Procedure 22(b) and the Declaration of John P. Konvalinka. On October 17, 2018, this Court entered its Order directing the Board to file a supplemental declaration under penalty of perjury and staying the thirty-day requirement imposed pursuant to Tenn. Sup. Ct. R. 9, § 12.3(c). On October 23, 2018, the Board filed its Response to Amended and Restated Petition-Motion for Instanter Ruling and the Supplemental Declaration of Phillip North. On October 31, 2018, Mr. Manookian filed his Reply to the Board of Professional Responsibility's Response to Amended and Restated Petition-Motion for Instanter Ruling. On November 1, 2018, this Court entered an Order denying Mr. Manookian's Amended Motion for Instanter Ruling and the Board's request to lift the stay entered on October 17, 2018. On October 11 and 19, 2018, a hearing was held before a three-member panel of the Board of Professional Responsibility. On November 7, 2018, the Panel entered its Report and Recommendation finding Mr. Manookian failed to establish good cause to dissolve the temporary suspension. A copy of the Report and Recommendation is attached hereto and incorporated herein by reference.

**Exhibit 3**

**EXHIBIT 5**

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED BY THE COURT THAT:

1.      The Report and Recommendation of the panel is approved as the Court's Order, and the Verified Petition for Dissolution or Amendment of Order of Temporary Suspension filed on September 21, 2018, is denied.

2.      Mr. Manookian shall remain temporarily suspended from the practice of law as provided in Tenn. Sup. Ct. R. 9, § 12.3.

3.      The stay of the thirty-day requirement imposed pursuant to Tenn. Sup. Ct. R. 9, § 12.3(c), contained in this Court's Order of October 17, 2018, is dissolved and, effective ten days after entry of this Order, Mr. Manookian shall cease representing existing clients.

4.      Mr. Manookian shall comply with Tenn. Sup. Ct. R. 9 in all respects and particularly as provided in Tenn. Sup. Ct. R. 9, § 28.

5.      Pursuant to Tenn. Sup. Ct. R. 9, § 28.1, this Order shall be effective upon entry.

6.      Taxing of costs pursuant to Tenn. Sup. Ct. R. 9, § 31.3(d), is reserved pending submission of a Panel Judgment on the Board's Application for Assessment of Costs.

7.      The Board of Professional Responsibility shall cause notice of this discipline to be published as required by Tenn. Sup. Ct. R. 9, § 28.11.


PER CURIAM


**Exhibit 3**

Ex. 3
006

FILED
11/21/2018
Clerk of the
Appellate Courts

FILED
2018 NOV -7 PM 3:33
BOARD OF PROFESSIONAL
RESPONSIBILITY
RW EXEC SEC

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| **IN RE: BRIAN PHILLIP MANOOKIAN** | ] | |
| **BPR #026455** | ] | M2018-01711-SC-BAR-BP |
| An Attorney Licensed to | ] | BOPR No. 2018-2914-5-WM-12.3 |
| Practice Law in Tennessee | ] | |
| (Davidson County) | ] | |

## REPORT AND RECOMMENDATION

This matter came to be heard on October 11 and October 19, 2018 before a panel designated by the Board of Professional Responsibility to hear the Petition of Brian Phillip Manookian for dissolution or amendment of an Order of Temporary Suspension. The panel members were Dana Dye, John Kitch, and Joe Looney.

### Procedural History

Disciplinary Counsel for the Board of Professional Responsibility filed a Petition for Temporary Suspension of Mr. Manookian's license to practice law on September 19, 2018 with ten (10) attached exhibits. Based on the Petition and attachments, the Supreme Court entered an Order temporarily suspending Mr. Manookian from the practice of law on September 21, 2018. Mr. Manookian's Petition for dissolution or amendment of the Order of Temporary Suspension was filed on September 28, 2018 and a Response was filed by the Board on October 4, 2018. Mr. Manookian filed a Reply to the Response on October 5, 2018 and on October 16, 2018 filed an Amended Petition for Dissolution. On October 17, 2018, the Supreme Court entered an Order requiring the Board to file a supplemental declaration under penalty of perjury in compliance with Supreme Court Rule 9, Section 12.3(a) and stayed the thirty-day requirement imposed upon Mr. Manookian pursuant to Rule 9, Section 12.3 (c) as it pertains to existing clients, pending further orders of the Court.

Exhibit A

Supreme Court Rule 9, Section 12.3(d)

The procedure for hearing a Petition for dissolution or amendment is set out in Section 12.3 (d) of Rule 9.

> *(d) The attorney* ***may for good cause request dissolution or amendment of any such order of temporary suspension*** *by filing in the Nashville office of the Clerk of the Supreme Court and serving on Disciplinary Counsel a Petition for Dissolution or Amendment. Such petition for dissolution shall be set for immediate hearing before the Board or a panel. The Board or panel shall hear such petition forthwith and file its report and recommendation to the Supreme Court with the utmost speed consistent with due process. There shall be no petition for rehearing. Upon receipt of the foregoing report, the Court may modify its order if appropriate or continue such provision of the order as may be appropriate until final disposition of all pending disciplinary charges against said attorney. (emphasis added)*

The parameters of the panel's authority are contained in subsection (d). In his original Petition for Dissolution or Amendment, Mr. Manookian raised a number of procedural issues and sought to present proof that the Order of Temporary Suspension was improvidently granted and should be set aside. Respectfully, the panel has no authority to go behind the Order of Temporary Suspension either to determine whether the granting of the Order violated procedural due process or to re-examine whether Mr. Manookian posed a "threat of substantial harm to the public" at the time the Order was granted. These are issues entirely within the purview of the Supreme Court. The role of this panel is not to second-guess the Court's determination.

Rather, the panel's role is limited to assessing whether Mr. Manookian has shown good cause for dissolution or amendment of the Order of Temporary Suspension. Thus, the burden of proof is on Mr. Manookian to demonstrate that he does not now pose a threat of substantial harm to the public and to show good cause why the Panel should recommend that the Order be dissolved or

modified. At a Section 12.3(d) hearing, the burden is not on the Board to prove that the Order should stand.

Proof Elicited at the Hearings

On October 11, 2018, the panel heard sworn testimony from Brian Manookian, Davidson County Circuit Judge Hamilton Gayden, and Phillip North. Fourteen (14) exhibits were admitted into the hearing record.

Mr. Manookian testified that he was licensed to practice law in Tennessee in 2007. He is half of a two-attorney firm which employs two paralegals. His cases are primarily plaintiff medical malpractice and most are taken on a contingency fee basis. (TR Vol. 1: 38-40) Mr. Manookian has had disciplinary complaints in the past which were dismissed and currently has two active Petitions for Discipline pending. (TR Vol. 1: 41, 80-81)

Addressing the allegations contained in the Petition for Temporary Suspension, with regard to the Chase case referenced in the Board's Petition (Exhibit 1 to the Petition), Mr. Manookian maintains that he did nothing wrong, that prior BPR complaints related to the case were dismissed, and that he will be appealing the final order in that case which was entered in September after affidavits for attorneys' fees were submitted. (TR Vol. 1: 47-48) He disputes that Judge Binkley's findings regarding "a knowing, willful, and intentional course of conduct to deceive and defraud this Court...and to gain personal advantage" should be considered in determining whether he poses a threat of substantial harm to the public. (TR Vol.1: 93-94)

With regard to his zealous pursuit of a Motion for Default in the Shao case on the day that his opposing counsel died (Exhibit 2 to the Petition), Mr.

Manookian disputes and dismisses out of hand the reprimand of the trial judge, pointing out that another trial judge in a separate case involving the same attorney had declined to reprimand him for the same conduct, i.e. actively seeking a default judgment on the day of opposing counsel's death. (TR Vol. 1: 111, 127)

Mr. Manookian testified that he had no problems with anger or with anger management. He admitted that there were times when he had lost his temper but he felt that such losses of temper were justified by the circumstances. (TR Vol. 1:55) With regard to his email to opposing counsel, C.J. Gideon, (Exhibit 3 to the Petition), Mr. Manookian testified that he was only trying to be supportive of Mr. Gideon's daughter in her new job. He testified that he did not recall the substance of the trial judge's ruling in imposing sanctions related to the email communication other than "I do recall him calling me a gangster." (TR Vol. 1: 66) [In fact, the trial court went to some pains to explain the threat and intimidation implicit in revealing to an opposing attorney unsolicited detailed personal information about the attorney's family members.] Upon cross-examination, Mr. Manookian admitted that parts of the email might be inappropriate but contended that the email as a whole could not reasonably be considered threatening. (TR Vol. 1: 81-82) The email communication is as follows:

> *Clarence,*
>
> *I hear [Mr. Gideon's daughter] is working at [name of company]. What a fantastic opportunity; particularly given her history of academic failure and alcohol and substance abuse.*
>
> *I happen to have some very close friends at (name of company).*
>
> *I will make it a point to see what I can do regarding her prospects there.*

*I am reminded that it is good for us to keep apprised of each other's lives and the things we can do to influence them.*

It is unclear why, if Mr. Manookian's communication was intended as a gesture of good will, he would begin by referencing the daughter's alleged "history of academic failure and alcohol and substance abuse." However, Mr. Manookian produced a copy of an email to his partner (Hearing Exhibit 13) in support of his claim that he was simply trying to be of assistance to the Gideon family.

Similarly, Mr. Manookian testified that his email to opposing counsel, Phillip North, (Exhibit 4 to the Petition) was simply an effort to get Mr. North to respond to Mr. Manookian's prior email. The communication to Mr. North, which Mr. Manookian copied to nineteen (19) other individuals (TR Vol. 1:60), is as follows:

*Phillip,*

*I see that my email and attachments are being repeatedly opened at the IP address associated with the consumer Comcast cable account for 109 Menees Lane, Madison, Tennessee.*

*That address is the residential property where you have consistently lived with your parents (other than for a brief period of time from 1984-1986 where you rented unit 602 at the Capitol Towers on Gay Street) until the North Family Trust essentially gifted you the property for $10.00. Upon investigation, this gifted piece of property in North Nashville, given to you for $10 by your parents, represents the sole piece of real property you own at 68 years of age.*

*Further confirming that you have read my email, records additionally reflect that Mona Dale Cornwell North—the woman for whom you left your wife and two minor daughters (Nicki and Neely)—has registered a Jeep Grand Cherokee (VIN 1C4RJFLG4JC274818, TN License Plate E66307) at the same address your parents gave you and where my email is being viewed.*

*Please simply reply and confirm your brother Steve North's voice.*

Mr. Manookian testified that he was simply trying to get Mr. North to respond to a prior email. He testified that he is able to identify the location from which an email is viewed and that he regularly uses a people-find computer software program which provides detailed public information about an individual such as the information he included in his email to Mr. North. (TR Vol. 1: 51-52, 62-63) He testified that he and Mr. North have a very contentious relationship and that Mr. North had filed scurrilous personal information about him in the Shao case. (TR Vol. 1: 73) He stated that he did not intend for the communication to be threatening and could not see how a reasonable person could construe it as threatening. He did acknowledge that parts of the email were inappropriate and that it probably should not have been sent. (TR Vol. 1:84-85) In support of his claim that the email was not construed as threatening, Mr. Manookian testified that he and Mr. North had appeared for depositions and been in court together since the allegedly offending email. (TR Vol. 1: 72) He asserted that he posed no physical threat to Phillip North.

With regard to the court sanctions imposed against him in the Diamond Consortium case (Exhibit 5 to the Petition), Mr. Manookian testified that the case had settled favorably to his client and that the BPR Petition for Discipline related to his conduct in that case had been pending for more than a year. (TR Vol. 1: 79) He further testified that his prior counsel had withdrawn and that he had been given sixty (60) days within which to hire new counsel. He objected to the trial judge's characterization of his conduct as fraudulent, in bad faith, and "an abuse of the judicial process" and took the position that such ruling was irrelevant to the matters at hand.

Mr. Manookian testified that the 2013 case of Semanchik & Nashville Armory v. Manookian (Exhibits 6 and 7 to the Petition) was simply a falling out between business partners and emphasized that the BPR complaint that arose

out of the case had been dismissed. He testified that he had not opposed the permanent injunction entered against him and that he had not violated the injunction. He considered the injunction to be irrelevant to whether he posed a substantial threat of harm to the public. (TR Vol. 1:69-70)

With regard to the 2012 finding of the divorce court that he had physically assaulted his wife (Exhibit 8 to the Petition), Mr. Manookian denied both that an assault had occurred and denied that it was relevant to these proceedings. He produced as evidence an expunction order (Hearing Exhibit 7) with regard to a companion criminal domestic assault charge that was dismissed. (TR Vol. 1: 43)

Mr. Manookian testified that his 2004 altercation with David Binkley, a college friend, (Exhibit 9 to the Petition) was simply a fight, that he and Mr. Binkley were now friends, and that, in fact, he had represented Mr. Binkley since the 2004 incident. (TR Vol. 1: 42) He disputed the relevance of the fight to these proceedings.

Mr. Manookian admitted that he had been sanctioned by the federal district court in the Diamond case, by Judge Brothers in the Shao case, and by Judge Binkley in the King case. He acknowledged that Judge Ashe had suspended him from practicing in the Davidson County Circuit Court for a period of sixty (60) days. He pointed out that no court had sanctioned him more than once.

Throughout his testimony, Mr. Manookian's position was that he had done no wrong. His good cause for dissolution of the Supreme Court's Order of Suspension is that the Order never should have been granted.

The Honorable Hamilton Gayden testified telephonically. Judge Gayden confirmed that he had served as a Davidson County trial judge for forty-four (44) years. (TR Vol. 1:97) He testified that he had known of Mr. Manookian for 7-8 years but had only known him well for approximately three (3) years. Judge Gayden testified that Mr. Manookian is intelligent and a good lawyer, sometimes a little overly aggressive but not offensively so. In Judge Gayden's opinion, Mr. Manookian was an asset to the bar and posed no threat to the public. (TR Vol. 1: 98) On cross-examination, Judge Gayden testified that he recuses himself from Mr. Manookian's cases because Mr. Manookian is representing his daughter in a custody matter in Texas. (TR Vol. 1:100)

Also testifying was Phillip North, who confirmed that he had been admitted to the bar in 1975 and was in private practice in Davidson County. (TR Vol. 1: 108) Mr. North testified that he had several cases in which the Manookian law firm was involved. Both he and Mr. Manookian are involved in the Shao case, representing opposing clients. Mr. North testified that he perceived Mr. Manookian's 8/4/18 email as a threat, particularly in light of Judge Brothers' prior admonition to Mr. Manookian after the C.J. Gideon 8/19/17 email, of which Mr. North was aware. (TR Vol. 1: 109) Mr. North testified that he was concerned both for himself and for his family. (TR Vol. 1: 117) In response to the email, Mr. North hired a security company to upgrade his home security system, gave photographs of Mr. Manookian to the security guards at the building where he works, alerted his neighbors and family members, encouraged his wife to take a gun safety course and get a permit to carry a gun, and took a refresher gun course on his own. (TR Vol. 1:120-121) He also cancelled social events so that his wife would not be at home by herself. (TR Vol. 1:134) On cross-examination, Mr. North admitted that he had only recently filed a police report regarding the email and admitted that he had been present for two depositions involving Mr. Manookian since receipt of the email. He explained that both depositions were

in secure facilities with other people present and that Mr. Manookian's behavior during the depositions had been "okay." (TR Vol. 1:132-133)

Mr. North acknowledged that his and Mr. Manookian's relationship had been contentious for a while. He testified that he had filed multiple Motions for sanctions against Mr. Manookian in the Shao case (including a Motion for sanctions based on the 8/4/18 email) to address what North described as Mr. Manookian's downward-spiraling conduct. (TR Vol. 1:111-116)

Judge Brothers has recused himself from hearing Motions in the Shao case involving Mr. Manookian based on Mr. Manookian's Motion for recusal. The pending Motions were, therefore, heard by Judge Ashe, whose Order was entered on 9/28/18 (Hearing Exhibit 23). The Order details the litigation history of the Shao case and quotes Judge Brothers' prior reprimands with regard to Mr. Manookian's conduct. Judge Ashe's Order suspended Mr. Manookian from the practice of law in Davidson County Circuit Courts for sixty (60) days, required him to pay the attorneys' fees and expenses of Mr. North and Mr. Gideon, and further required him to complete a three (3) hour ethics course focusing on civility and professionalism. Noting that Mr. Manookian had failed to respond to prior reprimands and explicit orders from the Court, Judge Ashe concluded:

> *His [Mr. Manookian's] actions not only damage his reputation as a professional, but also blemish the legal profession and the integrity of the Court. It is this Court's hope Mr. Manookian will rethink his tactics and consider the great honor, and corresponding responsibility, attached to a law degree.*

Report and Recommendations

As referenced earlier, Mr. Manookian raises numerous due process issues including the following:

A. His law license was suspended without notice and a hearing.

B. His Petition for Dissolution or Amendment of the Order of Temporary Suspension was not heard immediately but was heard nine (9) full business days after his Petition was filed.

C. The Board's failure to support its original Petition for Temporary Suspension by sworn affidavit is fatal and cannot be cured by the Court's 10/17/18 Order, requiring the Petition to be summarily dismissed.

D. The agreement of BPR counsel to extend the deadline for Mr. Manookian's response to a pending Petition for Discipline essentially estops the Board from taking any disciplinary action against him during the extension.

E. The Supreme Court's consideration of the orders and findings of the various trial courts amounts to impermissible "judicial notice" of such findings.

F. The Board of Professional Responsibility's dismissal of certain complaints against Mr. Manookian in the past acts as an estoppel to prevent the Board from including such past conduct as part of its complaint that Mr. Manookian poses a substantial risk of harm to the public.

G. The Board has presented no proof that Mr. Manookian poses a physical threat to any individual.

The panel does not find that it has authority under Rule 12.3 (d) to rule on either the due process claims of Mr. Manookian nor does its purview extend to ruling on the merits of the pending Petitions for Discipline against Mr. Manookian.

The panel must determine whether Mr. Manookian has shown good cause why the Order of Temporary Suspension should be dissolved or amended. The panel finds that Mr. Manookian has not shown good cause. Beyond a general

denial of all wrong-doing, Mr Manookian has not addressed his conduct in any substantive way.

It is Mr. Manookian's position that speech alone, even rude and insulting speech, cannot present a substantial threat of harm to the public. This position is wrong, particularly with regard to an attorney's speech. Mr. Manookian's words, however, go beyond being merely rude and insulting and cross the line into threatening and intimidating. The practice of law, by its nature, involves conflict and contention. That is why the Rules of Professional Conduct for practitioners of the law require that an attorney's conduct be circumscribed within the boundaries of civility, decorum, and respect for both the process and the person. Keeping within the boundaries of professional conduct is critical for the proper functioning of the judicial system.

Mr. Manookian has had these boundaries pointed out to him repeatedly by multiple trial court judges to no avail. The importance of the trial court orders that were exhibited to the Petition for Temporary Suspension and were entered into the hearing record is that they clearly establish that Mr. Manookian was on notice as to what is and is not acceptable conduct. The efforts of the trial courts have ranged from constructive criticism to injunctions and costly sanctions, but none have deterred Mr. Manookian's behavior.

The argument that Mr. Manookian's emails to Mr. Gideon and to Mr. North were not designed to be threatening to the families of the recipients nor intimidating to the recipients themselves is simply not believable. There is no other reason for the defamatory, insulting and creepily personal information about the attorneys' family members to be included in professional communication between colleagues. An attorney often accepts a degree of

hostility in contentious litigation but he or she should not have to accept that spouses or children will be subject to insult and threat.

Mr. Manookian has not acknowledged that there is anything wrong with his conduct. Consequently, he has taken no steps to assure the panel that the conduct will not be repeated. He did not indicate that he intends to take any steps to address what he considers to be minimally inappropriate behavior—admittedly rude and insulting but, according to Mr. Manookian, not threatening to the public or to the judicial system which serves the public.

Absent any showing of acknowledgment, contrition, responsibility, or remediation, the recommendation of the hearing panel is that the Order of Temporary Suspension not be dissolved or amended.

Respectfully submitted this 7th day of Nov., 2018.

DANA DYE, Chairman

JOHN D. KITCH, Panel Member

JOE M. LOONEY, Panel Member

# EXHIBIT "4"

Ex. 4
018

FILED
02/27/2019
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE

**IN RE: BRIAN PHILLIP MANOOKIAN, BPR #026455**
An Attorney Licensed to Practice Law in Tennessee
(Davidson County)

---

**No. M2018-01711-SC-BAR-BP**
BOPR No. 2018-2914-5-WM-12.3

---

**ORDER DENYING PETITION FOR DISSOLUTION OF ORDER OF TEMPORARY SUSPENSION**

On September 21, 2018, this Court entered an Order of Temporary Suspension pursuant to Tenn. Sup. Ct. R. 9, § 12.3, suspending the law license of Brian Phillip Manookian for posing a threat of substantial harm to the public. On September 28, 2018, Mr. Manookian filed a Verified Petition for Dissolution or Amendment of Order of Temporary Suspension. On November 21, 2018, this Court entered its Order Denying Verified Petition for Dissolution or Amendment of Order of Temporary Suspension. On January 22, 2019, Mr. Manookian filed a second Petition for Dissolution of Order of Temporary Suspension. On January 30, 2019, a hearing was held before a three-member panel of the Board of Professional Responsibility. On February 15, 2019, the Panel entered its Hearing Panel Recommendation on Second Petition for Dissolution and the Hearing Panel Report finding Mr. Manookian failed to establish good cause to dissolve the temporary suspension.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED BY THE COURT THAT:

1. The Hearing Panel Recommendation on Second Petition for Dissolution and the Hearing Panel Report are approved as the Court's Order, and the Petition for Dissolution of Order of Temporary Suspension filed on January 22, 2019, is denied.

2. Mr. Manookian shall remain temporarily suspended from the practice of law as provided in Tenn. Sup. Ct. R. 9, § 12.3.

3. Mr. Manookian shall comply with Tenn. Sup. Ct. R. 9 in all respects and particularly as provided in Tenn. Sup. Ct. R. 9, § 28.

**EXHIBIT 8**

**Exhibit 4**

4.      Pursuant to Tenn. Sup. Ct. R. 9, § 28.1, this Order shall be effective upon entry.

5.      Assessment of the Board's costs pursuant to Tenn. Sup. Ct. R. 9, § 31.3, is reserved pending submission of a Panel Judgment on the Board's Application for Assessment of Costs.

6.      The Board of Professional Responsibility shall cause notice of this discipline to be published as required by Tenn. Sup. Ct. R. 9, § 28.11.

7.      Because this Court is denying Mr. Manookian's Petition, his February 20, 2019 "Motion for Extension of Time in Which to File Objection and Brief on the Hearing Panel's Report and Recommendation" is denied as moot.

PER CURIAM

**EXHIBIT "5"**

FILED
05/17/2019
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE

**IN RE: BRIAN PHILLIP MANOOKIAN, BPR #026455**
An Attorney Licensed to Practice Law in Tennessee
(Davidson County)

---

**No. M2019-00630-SC-BAR-BP**
BOPR No. 2018-2914-5-WM-12.3

---

**ORDER GRANTING PETITION FOR DISSOLUTION OF ORDER OF TEMPORARY SUSPENSION**

On September 21, 2018, this Court entered an Order of Temporary Suspension pursuant to Tenn. Sup. Ct. R. 9, § 12.3, suspending the law license of Brian Phillip Manookian for posing a threat of substantial harm to the public. On September 28, 2018, Mr. Manookian filed a Verified Petition for Dissolution or Amendment of Order of Temporary Suspension. On November 21, 2018, this Court entered its Order Denying Verified Petition for Dissolution or Amendment of Order of Temporary Suspension. On January 22, 2019, Mr. Manookian filed a Petition for Dissolution of Order of Temporary Suspension. On February 27, 2019, this Court entered its Order Denying Petition for Dissolution of Order of Temporary Suspension. On April 9, 2019, Mr. Manookian filed a Petition for Dissolution of Order of Temporary Suspension. On April 26, 2019, a hearing was held before a three-member panel of the Board of Professional Responsibility. On May 6, 2019, the Panel entered its Report and Recommendations on Third Petition for Dissolution of Order of Temporary Suspension recommending the dissolution of Mr. Manookian's temporary suspension with conditions. A copy of the Report and Recommendations on Third Petition for Dissolution of Order of Temporary Suspension is attached hereto under seal, and incorporated herein by reference.

From all of which the Court approves the panel's Report and Recommendations on Third Petition for Dissolution of Order of Temporary Suspension and adopts the same as this Court's Order.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED BY THE COURT THAT:

1. The Report and Recommendations on Third Petition for Dissolution of Order of Temporary Suspension is approved as the Court's Order, and the Order of Temporary Suspension entered September 21, 2018, is hereby dissolved subject to Mr. Manookian's ongoing compliance with the conditions set forth in the Report and

**EXHIBIT 11**

Recommendations on Third Petition for Dissolution of Order of Temporary Suspension until further orders of the Court.

2. Pursuant to Tenn. Sup. Ct. R. 9, § 28.1, this Order shall be effective upon entry.

3. Assessment of the Board's costs pursuant to Tenn. Sup. Ct. R. 9, § 31.3, is reserved pending submission of a Panel Judgment on the Board's Application for Assessment of Costs. Mr. Manookian shall pay to the Clerk of this Court the costs incurred herein, for all of which execution shall issue if necessary.

4. The Board of Professional Responsibility shall cause notice of this Order to be published as required by Tenn. Sup. Ct. R. 9, § 28.11.

PER CURIAM

**EXHIBIT "6"**

# BOARD OF PROFESSIONAL RESPONSIBILITY
OF THE
# SUPREME COURT OF TENNESSEE

Ex. 6

10 CADILLAC DRIVE, SUITE 220
BRENTWOOD, TENNESSEE 37027
TELEPHONE: (615) 361-7500
(800) 486-5714
FAX: (615) 367-2480
E-MAIL: ethics@tbpr.org
Website: www.tbpr.org

**RELEASE OF INFORMATION**
**RE: BRIAN PHILLIP MANOOKIAN, BPR #026455**
**CONTACT: RUSSELL WILLIS**
**BOARD OF PROFESSIONAL RESPONSIBILITY**
**615-361-7500**

October 11, 2019

## DAVIDSON COUNTY LAWYER TEMPORARILY SUSPENDED

On October 11, 2019, the Supreme Court of Tennessee reinstated the temporary suspension of Brian Phillip Manookian from the practice of law upon finding that Mr. Manookian poses a threat of substantial harm to the public. Section 12.3 of Supreme Court Rule 9 provides for the immediate summary suspension of an attorney's license to practice law if an attorney poses a threat of substantial harm to the public.

Mr. Manookian is immediately precluded from accepting any new cases, and he must cease representing existing clients by November 10, 2019. After November 10, 2019, Mr. Manookian shall not use any indicia of lawyer, legal assistant, or law clerk nor maintain a presence where the practice of law is conducted.

Mr. Manookian must notify all clients being represented in pending matters, as well as co-counsel and opposing counsel of the Supreme Court's Order suspending his law license. Mr. Manookian is required to deliver to all clients any papers or property to which they are entitled.

This suspension remains in effect until dissolution or modification by the Supreme Court. Mr. Manookian may for good cause request dissolution or modification of the suspension by petition to the Supreme Court.

Manookian 2914-5 rel5.doc

FILED
10/11/2019
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE

**IN RE: BRIAN PHILLIP MANOOKIAN, BPR #026455**
An Attorney Licensed to Practice Law in Tennessee
(Davidson County)

---

**No. M2019-00630-SC-BAR-BP**
BOPR No. 2018-2914-5-WM-12.3

---

## ORDER REINSTATING TEMPORARY SUSPENSION

This matter is before the Court on a Petition of the Board of Professional Responsibility of the Supreme Court of Tennessee, by and through Disciplinary Counsel, for reinstatement of the temporary suspension of Brian Phillip Manookian from the practice of law, pursuant to Tenn. Sup. Ct. R. 9, § 12.3. The Petition was authorized by the Chair of the Board of Professional Responsibility and is supported by the affidavit of attorney Thomas Wiseman.

On September 21, 2018, Mr. Manookian was temporarily suspended from the practice of law by this Court, pursuant to Tenn. Sup. Ct. R. 9, § 12.3, based on a finding that he posed a threat of substantial harm to the public. Mr. Manookian sought dissolution of the temporary suspension by filing a Verified Petition for Dissolution or Amendment of Order of Temporary Suspension; on November 21, 2018, this Court entered an Order denying Mr. Manookian's petition. Mr. Manookian filed a second request for the same relief by filing a Petition for Dissolution of Order of Temporary Suspension; on February 27, 2019, this Court entered an Order denying this petition as well.

On April 9, 2019, Mr. Manookian filed a Petition for Dissolution of Order of Temporary Suspension. On May 17, 2019, this Court entered an Order granting Mr. Manookian's petition, dissolving the temporary suspension of Mr. Manookian's law license. The May 17, 2019 order dissolved the temporary suspension subject to Mr. Manookian's ongoing compliance with conditions set forth in the panel's Report and Recommendations on Third Petition for Dissolution of Order of Temporary Suspension.

On June 24, 2019, the Board filed the instant petition for reinstatement of the temporary suspension of Mr. Manookian's law license. On July 19, 2019, this Court referred the matter to a panel for a formal hearing on whether the Court should reinstate Mr. Manookian's temporary suspension. The matter was specifically referred to the Panel that had heard Mr. Manookian's second and third petitions for dissolution on January 30, 2019, and April 26, 2019, respectively. The Court also ordered the Board to submit to

this Court by August 18, 2019, the Panel's report and recommendation as to whether the temporary suspension should be reinstated.

On August 6, 2019, the Board filed a supplemental petition to reinstate the temporary suspension of Mr. Manookian's law license, along with an accompanying exhibit. By order entered by this Court on August 15, 2019, this supplemental petition was referred to the same Panel for review and formal hearing. Also on August 15, 2019, this Court granted the Panel's request for an extension of time until August 30, 2019, for filing its report and recommendation, because the hearing could not be set until August 23, 2019. On August 23, 2019, this Court granted the Panel's second request for extension for filing its report and recommendation until September 20, 2019, due to a medical emergency of one of the Panel members. On September 18, 2019, this Court granted the Panel's third request for extension for filing its report and recommendation until October 15, 2019, because Mr. Manookian claimed he had suffered a medical emergency.

The Panel conducted its hearing on reinstatement of the temporary suspension on September 26, 2019. The Panel filed its report and recommendation on October 7, 2019.[1]

On October 4, 2019, Mr. Manookian filed a "Motion to Dismiss Supplemental Petition to Reinstate Temporary Suspension and Objection to Report and Recommendation." Mr. Manookian argues that the petition and report and recommendation fail to provide a sufficient factual basis to reinstate a temporary suspension pursuant to Rule 9, section 12.3. He also argues that two members of the Panel should have recused themselves because they are defendants in a federal lawsuit that Mr. Manookian has filed against them.

On October 9, 2019, Mr. Manookian filed a supplement to his motion to dismiss in which he reiterates his argument of bias of the Panel members. Additionally, he argues that Rule 9, section 12.3, is unconstitutional on its face and as applied to Mr. Manookian as depriving him of his due process rights under the 14th Amendment. Upon review of Mr. Manookian's motion and attached exhibits, as well as the supplement to his motion, the Court respectfully DENIES the motion.

On October 4, 2019, Mr. Manookian also filed a motion to place under seal the Panel's report and recommendation. The motion states that the Panel does not oppose the motion. Mr. Manookian filed a supplemental motion as well, asking the Court to also place under seal page 19 of his October 4, 2019 "Motion to Dismiss..." and the last page of Exhibit A to that motion.

---

[1] Although the report and recommendation was filed with this Court on October 7, 2019, the report states that it was signed and submitted on October 3, 2019. It appears that Mr. Manookian received the report and recommendation shortly thereafter, based on the three responsive motions he filed on October 4, 2019.

Upon review, the Court GRANTS Mr. Manookian's request to place under seal page 19 of his October 4, 2019 "Motion to Dismiss..." and the final page of Exhibit A to that motion. The Court DENIES without prejudice Mr. Manookian's motion to place the Panel's report and recommendation under seal, based on the lack of specificity in the motion. Mr. Manookian has ten days from the filing of this Order in which to file a motion seeking redaction of the Panel's report and recommendation, specifying exactly what parts he contends should be redacted, along with the ground and legal basis for each redaction sought.

In its Report and Recommendation, the Panel outlined testimony at the hearing, including testimony by Mr. Manookian, regarding two incidents. In the first incident, the Panel found that Mr. Manookian improperly communicated directly with the client of opposing counsel by sending the client an email designed to intimidate the client and undermine the client's relationship with the client's attorney. In the second incident, the Panel found that Mr. Manookian intentionally sent another opposing counsel an email that contained a photograph of the opposing counsel's wife, personal information regarding his wife, and a photograph of opposing counsel's home, causing opposing counsel to be fearful for the safety of his family. The Panel rejected Mr. Manookian's explanations for these incidents and noted that Mr. Manookian has previously been disciplined for sending threatening and coercive emails regarding the families of opposing counsel. The Panel concluded that Mr. Manookian had violated a condition of the Order granting his Petition for Dissolution of Order of Temporary Suspension.

Based upon the Court's review of the Board's petition to reinstate temporary suspension, the Board's supplemental petition to reinstate temporary suspension, and the supporting affidavit and exhibits for both petitions, as well as the Panel's report and recommendation, the Court adopts the Panel's finding that Brian Phillip Manookian, Respondent, has violated a condition of the Order Granting Petition for Dissolution of Order of Temporary Suspension.

The Court finds as well that Mr. Manookian poses a threat of substantial harm to the public.

For these reasons, the Court determines that it should reinstate the temporary suspension of Mr. Manookian's law license.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

1. The temporary suspension of Brian Phillip Manookian from the practice of law as provided in Tenn. Sup. Ct. R. 9, § 12.3, is hereby reinstated.

2. Brian Phillip Manookian shall comply with Tenn. Sup. Ct. R. 9 in all respects and particularly as provided in Tenn. Sup. Ct. R. 9, § 28, regarding the responsibilities of suspended attorneys.

3. Brian Phillip Manookian may make application for dissolution or modification of this Order as provided in Tenn. Sup. Ct. R. 9, § 12.3.

4. The Board of Professional Responsibility shall cause notice of this suspension of Brian Phillip Manookian to be published as required by Tenn. Sup. Ct. R. 9, § 28.11.

PER CURIAM

**EXHIBIT "7"**

FILED
10/17/2019
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE

**IN RE: BRIAN PHILLIP MANOOKIAN, BPR #026455**
An Attorney Licensed to Practice Law in Tennessee
(Davidson County)

---

**No. M2018-00630-SC-BAR-BP**
BOPR No. 2018-2914-5-WM-12.3

---

**ORDER DENYING PETITION FOR DISSOLUTION
OF ORDER OF TEMPORARY SUSPENSION**

On October 11, 2019, this Court entered an Order Reinstating Temporary Suspension pursuant to Tennessee Supreme Court Rule 9, section 12.3, suspending the law license of Brian Phillip Manookian. That same day, Mr. Manookian, pro se, filed a petition for dissolution of his temporary suspension. On October 15, 2019, the Board filed an answer to Mr. Manookian's petition, arguing that the petition failed to establish good cause for dissolution pursuant to Tennessee Supreme Court Rule 9, section 12.3(d). Mr. Manookian then filed a supplemental petition for dissolution on October 15, 2019, stating that he does not meet any of the bases for temporary suspension under Tennessee Supreme Court Rule 9, section 12.3(a).

In consideration of this petition, the Court notes the number of hearings that Mr. Manookian has had regarding temporary suspension of his law license. The original temporary suspension of Mr. Manookian's law license was imposed on September 21, 2018. He sought dissolution of it a week later, on September 28, 2018. A panel held a hearing on the petition for dissolution on October 11 and 19, 2018, and filed its report and recommendation; thereafter this Court entered an Order denying Mr. Manookian's petition. Mr. Manookian filed a second petition for dissolution on January 22, 2019, and the matter was heard by a panel on January 30, 2019. Following submission of the panel's report and recommendation to the Court, this Court denied the second petition for dissolution as well.

On April 9, 2019, Mr. Manookian filed a third petition for dissolution. A panel held a hearing on this petition on April 26, 2019, and filed its report and recommending reinstatement subject to compliance with certain conditions. On May 17, 2019, this Court granted Mr. Manookian's petition, dissolving the temporary suspension of his law license, subject to Mr. Manookian's ongoing compliance with conditions set forth in the panel's report and recommendation.

The next month, on June 24, 2019, the Board filed a petition for reinstatement of the temporary suspension of Mr. Manookian's law license. This petition asserted that, not long after reinstatement of his law license, Mr. Manookian again engaged in conduct threatening to third parties and opposing counsel.

Despite the concerning nature of the allegations in the Board's petition, instead of immediately reinstating the temporary suspension of Mr. Manookian's law license, this Court exercised its discretion to refer the matter to a panel for a formal hearing. The Panel conducted its hearing on September 26, 2019, and filed its report and recommendation on October 7, 2019. On October 11, 2019, this Court entered an order reinstating the temporary suspension of Mr. Manookian's law license. In the order, the Court adopted the panel's finding that Mr. Manookian violated a condition of his dissolution of temporary suspension. The Court also determined that Mr. Manookian poses a threat of substantial harm to the public.

After reviewing the instant petition for dissolution filed by Mr. Manookian, including the supplemental petition filed on October 15, 2019, the Court finds that Mr. Manookian has not provided any factual basis demonstrating good cause for dissolution of his temporary suspension. Mr. Manookian received multiple hearings in connection with the original temporary suspension, was granted reinstatement with conditions, and received a formal evidentiary hearing in advance of reinstatement of the temporary suspension of his law license. The most recent hearing demonstrated ample basis for determining that Mr. Manookian poses a threat of substantial harm to the public and for reinstatement of his temporary suspension. Therefore, Mr. Manookian's petition for dissolution is summarily DENIED.

Mr. Manookian shall remain temporarily suspended from the practice of law as provided in Tenn. Sup. Ct. R. 9, § 12.3. Mr. Manookian shall comply with Tenn. Sup. Ct. R. 9 in all respects and particularly as provided in Tenn. Sup. Ct. R. 9, § 28.

Both Mr. Manookian and the Board shall proceed with all due speed toward ultimate resolution of the petition for discipline currently pending before the Board.

IT IS SO ORDERED.


PER CURIAM

**EXHIBIT "8"**

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

BRIAN P. MANOOKIAN,

*Plaintiff*,

vs.

FLOYD FLIPPIN, in his official and individual capacities; DANA DYE, in her official and individual capacities; JOHN KITCH, in his official and individual capacities; JOE LOONEY, in his official and individual capacities; ODELL HORTON, JR., in his official and individual capacities; RUTH ELLIS, in her official and individual capacities; JODY PICKENS, in her official and individual capacities; BRIDGET J. WILLHITE, in her official and individual capacities; and JIMMIE MILLER, in her official and individual capacities,

*Defendants*.

Civil Action No. __________
**JURY DEMAND**

## COMPLAINT

For his complaint, Plaintiff Brian P. Manookian alleges the following upon actual knowledge with respect to himself and his own acts, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

The Tennessee Board of Professional Responsibility (BPR)—a quasi-public, quasi-private entity that regulates the practice of law in Tennessee—violated both

federal antitrust laws and the United States Constitution when it "temporarily" and indefinitely suspended Plaintiff Brian Manookian from practicing law more than seven months ago. The central, stated impetus for Mr. Manookian's suspension was his constitutionally protected out-of-court speech—an email to another lawyer—that the BPR claims it "took to be threatening" despite candidly acknowledging that it was not a true threat.

At the time the BPR sought Mr. Manookian's suspension, the BPR had been aware of his purportedly offending speech for approximately a month and a half. It had also opened a routine disciplinary investigation regarding that speech and afforded Mr. Manookian 60 days to respond. Suddenly, however—on September 19, 2018, just days before Mr. Manookian was to respond and almost immediately after Mr. Manookian sued a state court judge for defamation—the BPR changed course by seeking and securing an emergency temporary suspension through an *ex parte* proceeding without Mr. Manookian's involvement. Mr. Manookian's "temporary" suspension has since remained in effect for approximately seven months, and given its indefinite nature, it amounts to a de facto disbarment. Critically, Mr. Manookian's suspension was also approved and maintained by Mr. Manookian's active market competitors in the medical malpractice industry—including an attorney who was opposing counsel in a pending case from which Mr. Manookian was required to withdraw.

Since "temporarily" suspending Mr. Manookian from the practice of law, the BPR has taken extreme measures to keep Mr. Manookian's suspension in place. During the seven months that his suspension has been in effect, the BPR has also refused even to initiate a disciplinary petition against him alleging that he violated any underlying Rule of Professional Conduct. The BPR additionally rejected a conclusion from an approved referral of its own Tennessee Lawyers Assistance Program that Mr. Manookian is a highly skilled and successful lawyer who is fit for duty and poses no threat to the public. Instead, the BPR contends that Mr. Manookian can only show good cause to dissolve his suspension by admitting the BPR's legally baseless accusations—none of which has prompted an underlying petition for discipline—and submitting to the board for mercy. That is, the BPR continues to maintain Mr. Manookian's suspension even though no underlying petition for discipline has been filed against him and even though the BPR's own fitness for duty evaluation determined that Mr. Manookian poses no threat of substantial harm to the public.

In sum: The defendants sanctioned Mr. Manookian for his constitutionally protected, out-of-court speech and retaliated against him for exercising his First Amendment right to petition the government for the redress of grievances. The defendants further deprived Mr. Manookian of due process and equal protection under the law by violating their own procedures, abusing facially unconstitutional procedures, and suspending him in an *ex parte* proceeding in which he was neither

entitled to participate nor permitted to submit admissible evidence. Most prominently, though, defendants' conduct violated the Sherman Act. Defendants agreed to undertake a course of conduct designed to exclude a horizontal competitor from the market for legal services and from the medical malpractice industry in particular. Mr. Manookian's exclusion—unlike most professional suspensions—had an appreciable anticompetitive effect because he is one of approximately twenty competitors in the market for medical malpractice victim representation in Tennessee. That market has significant barriers to entry, and Mr. Manookian was one of the industry's top performers until he was suspended. Accordingly, Mr. Manookian's suspension significantly harms competition in the medical malpractice industry due to his outsized role among a tiny field of competitors in a constrained market.

Based on the foregoing, Mr. Manookian requests that this Court declare: (1) that defendants' conduct and the procedures they abused to retaliate against him for his protected speech are unconstitutional, and (2) that defendants' conduct violates the Sherman Act. Thereafter, this Court should enjoin the defendants from continuing their unlawful acts; it should order the defendants to vacate Mr. Manookian's temporary suspension; and Mr. Manookian should be awarded compensatory and punitive damages, his reasonable attorneys' fees, and costs.

## JURISDICTION AND VENUE

1.     The Court has primary subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, 1343, 1367, 2201, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, because this action arises under the U.S. Constitution and the antitrust laws of the United States.

2.     The Court has personal jurisdiction over each of the defendants because each defendant resides in Tennessee and has substantial, continuous contacts with Tennessee and in this district.

3.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this district, and because defendants Dye, Kitch, and Looney reside within the Middle District of Tennessee. Venue is also proper under 15 U.S.C. § 15 and 22 because at least one defendant can be found in this district.

## PARTIES

4.     Plaintiff Brian Manookian is a U.S. citizen and resident of the State of Tennessee. Before the unlawful conduct alleged in this complaint, Mr. Manookian held an unrestricted license to practice law in the State of Tennessee. He is one of the state's most successful plaintiff's-side medical malpractice lawyers, having obtained collective recoveries for his clients worth more than $20 million in the year before defendants unlawfully suspended him from the practice of law.

5. Defendant Floyd Flippin is the Chair of the Tennessee Board of Professional Responsibility and is responsible for its operations. He is sued in his individual capacity for compensatory and punitive damages and in his official capacity for prospective injunctive and declaratory relief. He may be served with process at his place of business, 1302 East Main Street, Humboldt, Tennessee 38343, or wherever he may be found.

6. Defendant Dana Dye is a member of the Tennessee Board of Professional Responsibility. Defendant Dye served as the Chairperson of Hearing Panels I and II where she voted to deny the reinstatement of Mr. Manookian's law license. She is sued in her individual capacity for compensatory and punitive damages and in her official capacity for prospective injunctive and declaratory relief. She may be served with process at her place of business, 105 West End Avenue, Centerville, Tennessee 37033, or wherever she may be found.

7. Defendant John Kitch is a member of the Tennessee Board of Professional Responsibility. Defendant Kitch served on Hearing Panel I where he voted to deny the reinstatement of Plaintiff's law license. He is sued in his individual capacity for compensatory and punitive damages and in his official capacity for prospective injunctive and declaratory relief. He may be served with process at his place of business, 511 Union Street, Suite 1500, Nashville, Tennessee 37219, or wherever he may be found.

8.      Defendant Joe Looney is a member of the Tennessee Board of Professional Responsibility. Defendant Looney served on Hearing Panels I and II where he voted to deny the reinstatement of Plaintiff's law license. He is sued in his individual capacity for compensatory and punitive damages and in his official capacity for prospective injunctive and declaratory relief. He may be served with process at his place of business, 156 Rector Avenue, Crossville, Tennessee 38555, or wherever he may be found.

9.      Defendant Jimmie Miller is the immediate past chairperson of Tennessee Board of Professional Responsibility and was responsible for its operations at the time of the illegal suspension of Plaintiff's law license. She is sued in her individual capacity for compensatory and punitive damages and her official capacity for prospective injunctive and declaratory relief. She may be served with process at her place of business, 1212 North Eastman Road, Kingsport, Tennessee 37664, or wherever she may be found.

10.     Defendant Odell Horton, Jr. is a member of the Tennessee Board of Professional Responsibility. He is sued in his individual capacity for compensatory and punitive damages and in his official capacity for prospective injunctive and declaratory relief. He may be served with process at his place of business, 6070 Poplar Avenue, Suite 300, Memphis, Tennessee 38119, or wherever he may be found.

11.     Defendant Ruth Ellis is a member of the Tennessee Board of Professional Responsibility. She is sued in her individual capacity for compensatory

and punitive damages and in her official capacity for prospective injunctive and declaratory relief. She may be served with process at her place of business 550 Main Street, Suite 750, Knoxville, Tennessee 37902, or wherever she may be found.

12.     Defendant Jody Pickens is a member of the Tennessee Board of Professional Responsibility. She is sued in her individual capacity for compensatory and punitive damages and in her official capacity for prospective injunctive and declaratory relief. She may be served with process at her place of business 226 Anne Dallas Dudley Blvd., Suite 800, Nashville, Tennessee 37243, or wherever she may be found.

13.     Defendant Bridget J. Willhite is a member of the Tennessee Board of Professional Responsibility. She is sued in her individual capacity for compensatory and punitive damages and in her official capacity for prospective injunctive and declaratory relief. She may be served with process at her place of business 1 W Madison Avenue, Athens, Tennessee 37303, or wherever she may be found.

14.     By prior agreement, each of the defendants may also be served, in their individual capacities, through Rita Webb, the Executive Secretary of the Tennessee Board of Professional Responsibility, and, in their official capacities, through the Office of the Tennessee Attorney General.

15.     Each defendant acted as the principal of or agent for each other defendant as to the acts, violations, and common course of conduct alleged in this complaint.

16.     Defendants and their agents participated personally in the unlawful conduct challenged in this complaint and, to the extent they did not personally participate, they authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts complained of in this complaint.

## SUBSTANTIVE ALLEGATIONS

### Mr. Manookian's Law Practice

17.     Mr. Manookian is a highly skilled and successful lawyer who has practiced law in Tennessee for over a decade. He graduated with honors from Vanderbilt Law School on scholarship in 2007.

18.     Mr. Manookian applied for admission to the Tennessee bar after graduating from law school, he passed the bar examination, and he cleared a thorough character and fitness investigation. The Tennessee Board of Law Examiners certified that Mr. Manookian was "a person of good moral character, of proper age, and well versed in the law and its practice," and based on that conclusion, it issued Mr. Manookian an unrestricted license to practice law in the State of Tennessee.

19.     Upon his admission to the bar, Mr. Manookian was employed by a law firm specializing in the defense of healthcare providers. He gained substantial experience at the intersection of law and medicine, representing hospitals, physicians, and healthcare systems in complex and high-stakes cases in Tennessee and throughout the nation.

20. In 2015, Mr. Manookian co-founded the law firm Cummings Manookian PLC. Since that time, Mr. Manookian's law practice has focused on representing plaintiffs in complex and catastrophic injury cases, particularly in cases of healthcare liability and medical malpractice. The overwhelming majority of his medical malpractice matters are taken on a contingency fee basis, meaning that he is compensated only if he prevails on behalf of his client.

21. By any objective measure, Mr. Manookian has been enormously successful in his practice of law as a plaintiff's-side medical malpractice attorney. He makes up much of the volume of complex medical malpractice claims in the State of Tennessee. Since 2015, Mr. Manookian has secured tens of millions of dollars in actual, paid recoveries for his clients. He has done so in a uniquely difficult area of law, representing victims without financial resources against institutional and large corporate defendants in cases where the outcome is the ultimate indicator of capability. Thus, as one of the most successful lawyers among only approximately twenty existing participants in the market for plaintiffs' medical malpractice representation in the State of Tennessee, Mr. Manookian's suspension has a genuine, significant, and appreciable negative impact on competition.

22. Mr. Manookian's practice and skill have been recognized within the industry and by the public. He has been selected for myriad merit-based awards by publications such as Super Lawyers and the National Law Journal. He is peer-review rated AV Preeminent by Martindale-Hubbell for his legal ability and high ethical

standards. In 2016, Mr. Manookian served as the invited Key Note Speaker for Harvard Law School's annual symposium on legislation. He is frequently cited and quoted by the media as an authority in the area of health care litigation.

23.     Mr. Manookian's success has been the result of hard work, skill, and substantial investment in perfecting his trade and business. He has committed years of education, tens of thousands of hours, and millions of dollars toward that end. His livelihood is the practice of law, and he has a protected property right in both his license to practice law and his right to earn a living.

24.     As of September 18, 2018, Mr. Manookian held an unrestricted license to practice law. He had never been the subject of public discipline for his conduct as a lawyer. Nor had Mr. Manookian had a single formal or informal disciplinary complaint lodged against him by a client. Mr. Manookian's law practice was generating millions of dollars in annual revenue at a firm he founded for the purpose of representing victims of wrongful conduct. His livelihood as an attorney was lucrative, professionally rewarding, and personally satisfying.

**The Tennessee Board of Professional Responsibility**

25.     The BPR is an administrative agency of the judicial branch of the State of Tennessee that is tasked with regulating the legal profession in the State of Tennessee. Among other things, it investigates and adjudicates lawyer disciplinary matters. The BPR is composed of twelve members who are nominated in a private, opaque process and appointed by the Tennessee Supreme Court. Under Tennessee

Supreme Court rules, nine BPR members must be engaged in the active practice of law in the State of Tennessee. Three other "public" members—only one of whom is required to be a non-lawyer—are appointed as well. Rule 9, § 4.1.

26. The BPR is dominated by active market participants in the legal industry who conduct official government business in almost uniformly private "executive sessions" without accountability to either the public or the professionals they regulate. The BPR is neither a judicial system nor a judicial entity. Its members are not state employees, judicial officers, state prosecutors, or legislators. Nevertheless, the BPR and its members are empowered to take adverse disciplinary action against their peers—other lawyers who compete against them—under color of state law.

27. Each defendant is a member of the BPR and a Tennessee-licensed lawyer engaged in the for-profit, private practice of law. Mr. Flippin is the current chairperson of the BPR, and Ms. Miller is the immediate past chairperson of the BPR. Each lawyer member of the board is a direct competitor of Mr. Manookian, and both Mr. Flippin and Ms. Miller are malpractice defense lawyers. Critically, Mr. Flippin also ***had active cases as opposing counsel to Mr. Manookian*** until Mr. Flippin and his colleagues forced Mr. Manookian to withdraw from those cases as a result of his temporary suspension. Thus, Mr. Flippin and Ms. Miller—in addition to their status as market participants and competitors—have a direct and immediate

pecuniary interest in Mr. Manookian's suspension, posing a serious actual conflict of interest and the appearance of one.

28. Many of the BPR's activities are not actively supervised by the State of Tennessee, as sovereign. The defendants and their agents, in their sole discretion, choose whom to investigate, charge, and discipline for what conduct. Some of the BPR's decisions are reviewed by the Tennessee Supreme Court based upon a deferential standard in favor of the BPR and its recommendations after a public, adversarial hearing process and review by a lower judicial tribunal. Other BPR decisions—like Mr. Manookian's temporary suspension—are affirmed directly by the Tennessee Supreme Court and in their entirety on a summary basis without any review of the underlying hearing record or any prior judicial review.

**Summary of the Board's Unlawful Conduct**

29. On September 18, 2018, Mr. Manookian filed and served a defamation lawsuit against Judge Michael Binkley for making false and defamatory remarks about Mr. Manookian at a public hearing in a case not involving Mr. Manookian. Mr. Manookian issued a lawful subpoena to the BPR on the same day.

30. The next day, September 19, 2018, the BPR filed a petition for emergency temporary suspension claiming that Mr. Manookian represents a substantial threat to the public. Such a suspension can be obtained on an ex parte basis without providing the respondent due process of law, but it must be supported by an affidavit attesting to personal knowledge of the facts alleged.

31. According to BPR disciplinary counsel William Moody, the central impetus for Mr. Manookian's temporary suspension was an email that Mr. Manookian had sent to another lawyer that the BPR "took to be threatening." Apart from being protected, out-of-court speech, the BPR had been aware of the email since before it originally opened a complaint into the matter August 8, 2019. In fact, the BPR allowed Mr. Manookian until at least September 21, 2018 to respond. The Board did not consider the email an emergency at the time.

32. The BPR was actually aware that Phillip North—the recipient of the purportedly threatening email—had voluntarily met with Mr. Manookian several times since he received the email that the BPR claims it "took to be threatening." For example, North voluntarily attended a deposition where he was not counsel, a party, or witness and where he knew Mr. Manookian would be present.

33. That is, just a single day after Mr. Manookian sued a judge and issued the BPR a lawful subpoena, the defendants initiated an emergency temporary suspension against Mr. Manookian based on conduct that it was already investigating in the normal course on a non-emergency basis—only to short circuit its normal process and petition for an emergency suspension of Mr. Manookian's license to practice law before Mr. Manookian's response was due.

34. The BPR was aware of the optics that would reflect its unlawful motives. It was also aware that Mr. Manookian's out-of-court speech was entitled to full First Amendment protection. As a result, it attempted to trump up its petition by including

years-old and in some cases decades-old examples of alleged misconduct dredged up from, for example, police records about an altercation between Mr. Manookian and a friend from 2004—years before he was deemed to have good moral character and fitness for the bar—and from Mr. Manookian's divorce records.

**The Sham Impetus: Mr. Manookian's Email to Phillip North**

35. On June 20, 2018, Mr. Manookian was taking a deposition in a medical malpractice case, Shao v. Smith, in Tennessee state court, in which he represented the plaintiff. The defendant, a physician, was represented by lawyer Phillip North. During the deposition, Mr. Manookian received a voicemail from Phillip North's brother, who is a retired county judge, Steve North. The voicemail stated:

> Brian, this is Steve North. I read with interest the article in the Nashville Post with regard to your controversy with Judge Brothers. I have some information that be of some help to you, and if you would give me a call at [number] I would be happy to discuss it with you. Thank you.

36. Judge North was referring to an article about Mr. Manookian's motion for recusal of a current county judge, Judge Thomas Brothers, who was presiding over the Shao case. Mr. Manookian returned Judge North's call the same day. Judge North provided Mr. Manookian concerning information about Judge Brothers that bore on Mr. Manookian's motion for recusal.

37. Mr. Manookian—who had never met Judge North—did not want to proceed based on the information provided to him without first authenticating its

source. As a result, Mr. Manookian sent the voicemail to Phillip North and asked him to confirm that the voice in the recording was his brother, Judge North.

38.     As a business practice at his law firm, Mr. Manookian uses software that determines when emails and attachments have been opened by recipients. Phillip North did not respond to Mr. Manookian's email, but he opened the email and the attached recording repeatedly. Accordingly, Mr. Manookian emailed Phillip North again and asked him a second time to confirm whether Judge North was, in fact, the speaker in the voicemail.

39.     Again, Phillip North did not respond. However, Judge North did. Judge North stated that he had seen Mr. Manookian's characterizations of what Judge North had said and believed that those characterizations were not accurate.

40.     Mr. Manookian was unsure what to think: Judge North—someone he did not know personally—had contacted him to provide information implicating another judge as having engaged in improprieties bearing directly on a pending motion for recusal. Now, however, Judge North appeared to be retracting his claims.

41.     Mr. Manookian replied by recounting details of what Judge North had said, and he copied members of the press in the hopes of either compelling an honest response or relying on the fourth estate to ferret out the accuracy of his statements and vindicate the public interest. He wrote:

Phillip,

I see that my email and attachments are being repeatedly opened at the IP address associated with the consumer Comcast cable account for [address], Madison, Tennessee.

That address is the residential property where you have consistently lived with your parents (other than for a brief period of time from 1984-1986 where you rented unit [number] at [address]) until the North Family Trust essentially gifted you the property for $10.00. Upon investigation, this gifted piece of property in North Nashville, given to you for $10 by your parents, represents the sole piece of real property you own at 68 years of age.

Further confirming that you have read my email, records additionally reflect that Mona Dale Cornwell North -- the woman for whom you left your wife and two minor daughters (Nicki and Neely) -- has registered a Jeep Grand Cherokee ([VIN], TN License Plate [number]) at the same address your parents gave you and where my email is being viewed.

Please simply reply and confirm your brother Steve North's voice.

42.     Thereafter, on August 7, 2018, Phillip North's counsel forwarded the email to the BPR. An investigation was opened in the normal course. A month and a half later, however—nearly immediately after Mr. Manookian filed a defamation lawsuit against a judge and issued the BPR a lawful subpoena regarding that lawsuit—the BPR abruptly stated that Mr. Manookian's emails to the Norths constituted a substantial harm to the public warranting an emergency suspension.

**BPR's Attempt to Falsely Paint Manookian as Violent**

43.     To shore up its allegations, the BPR's petition included various other examples of older, unrelated allegations about Mr. Manookian's conduct that were designed to paint a wildly inaccurate picture of Mr. Manookian. Among them, the

BPR dredged up abandoned allegations made by Mr. Manookian's ex-wife in divorce proceedings several years before; a fight that Mr. Manookian had with a friend in college approximately a decade and a half ago; and a separate email sent to a different colleague, which the BPR had had in its possession for more than a year. Nonetheless, the BPR stated that the central, claimed basis for Mr. Manookian's temporary suspension was the above-described email correspondence with Phillip North.

44.     The BPR failed to disclose that the bulk of its allegations had occurred either before Mr. Manookian was a lawyer; had been known to the BPR for months or years without prompting any action; or were otherwise unproven, withdrawn, dismissed, expunged, or wholly unsubstantiated.

45.     For example, in one case relating to a restraining order in a business dispute, the BPR itself had reviewed the matter and specifically found that "much of the alleged conduct, if proven to be true, would not constitute a violation of the Rules of Professional Conduct." Thus, despite previously clearing Mr. Manookian regarding that matter, it used the same claims against him to retaliate against him for protected speech.

46.     The BPR even went so far as to assert that a 2004 altercation between Mr. Manookian and a friend—while undergraduates—demonstrated that Mr. Manookian has a history of violence. The person with whom Mr. Manookian fought was and is a close personal friend and is now his client. More importantly, the BPR was aware of the incident when Mr. Manookian applied for admission to the bar, and

it determined that Mr. Manookian was of good moral character and fit for duty as a lawyer.

47. Not a single one of the allegations that the BPR made in its petition for temporary suspension involved a complaint by one of Mr. Manookian's clients. Nor did a single one of the BPR's allegations evidence any harm to one of Mr. Manookian's clients. To the contrary, only the BPR's suspension has harmed Mr. Manookian's clients by forcing him to withdraw from their cases and find new counsel.

**The BPR's Suspect Conduct and Motivations**

48. As explained above, the BPR changed course and sought an emergency suspension of Mr. Manookian's license to practice law just a single day after Mr. Manookian sued a judge and issued the BPR a lawful subpoena. Its allegations were also based on existing disciplinary complaints that had been proceeding normally and that the BPR had conceded by its own actions were neither emergent nor exigent.

49. The two defendants who ratified, authorized, and continue to authorize the BPR's course of action—Mr. Flippin and Ms. Miller—are competitors in the same narrow service market as Mr. Manookian. Critically, Mr. Flippin was also opposing counsel to Mr. Manookian in one or more active cases at the time the BPR suspended Mr. Manookian.

50. Mr. Flippin materially benefitted from Mr. Manookian's temporary suspension, because it forced the withdrawal of one of his most formidable adversaries from pending and future cases.

51.     Since securing Mr. Manookian's "temporary" suspension, the BPR has repeatedly defended the suspension from Mr. Manookian's motions to dissolve it. Yet more than seven months later, it has not even initiated an underlying disciplinary complaint regarding the supposed violations that necessitated Mr. Manookian's suspension.

52.     There is abundant evidence that the "substantial harm to the public" that the BPR has alleged to justify Mr. Manookian's suspension does not exist. At the request of the BPR, Mr. Manookian underwent an exhaustive fitness for duty evaluation approved by the Tennessee Lawyers Assistance Program (TLAP). Mr. Manookian was cleared; it found he is a successful and skilled attorney who does not suffer from any form of major mental illness and that there is no objective evidence that he represents a danger to the public. The BPR was thus unwilling to accept the conclusions of the TLAP program to which they themselves refer lawyers. Instead, it demanded the underlying confidential and privileged reports, falsely claimed that Mr. Manookian objected to their production because he wanted to conceal negative aspects of the reports, and baselessly rejected the judgment of trained medical professionals on the basis that TLAP had not been able to review the underlying doctors' reports.

53.     Months after the panel raised questions about the report's findings, TLAP's executive director testified under oath at a dissolution hearing that it had

read both doctors' reports and that its conclusions remained the same: Mr. Manookian does not pose a threat of harm to the public.

54. Despite the fact that Mr. Manookian has been declared fit for duty, the BPR concluded that Mr. Manookian had the duty to show good cause for dissolution of the suspension, and that his fitness for duty is insufficient to meet that burden. In effect, it determined that in order to establish good cause for dissolution, Mr. Manookian would first have to agree with and submit to the BPR's findings that his suspension was justified.

55. The BPR's central, claimed basis for its temporary suspension under the Tennessee Rules of Professional Conduct is that Mr. Manookian poses a "substantial harm to the public" because he poses a threat of physical violence to Phillip North and his family. However, the BPR has not identified a single rule of professional conduct that Mr. Manookian violated, nor has it articulated any legitimate threat to ***the public***. Even if the BPR had demonstrated a true threat to Phillip North—and it did not—such a claim would not have been sufficient to justify a temporary suspension. The BPR's purported basis for temporarily suspending Mr. Manookian's law license for seven months and counting is a sham.

56. A temporary suspension is a drastic measure designed for severe and imminent threats to ***the public***. It is an extraordinary remedy reserved for extraordinary circumstances; indeed, it must be, because it dispenses with traditional

due process protections for an accused lawyer—such as notice and a pre-deprivation hearing—in order to protect the public from imminent harm.

57. Temporary suspensions cannot be used to circumvent the process of a routine disciplinary case and cannot be used to punish—only to protect. A temporary suspension can endure only as long as necessary to safeguard the public from an actual, existing danger, and a hearing on the underlying conduct must proceed expeditiously once the temporary suspension has been granted.

58. The BPR has not even initiated a specific charge against Mr. Manookian in the underlying disciplinary investigations.

59. The types of conduct that justify a temporary suspension invariably involve direct, ongoing harm to the lawyer's clients or felony criminal conduct. Examples include the following:

a. A lawyer's indictment on charges of theft by unlawful taking and theft by failure to make required disposition, and FBI received numerous other complaints against him after his arrest justified a temporary suspension. *Inquiry Comm'n v. Butler*, 514 S.W.3d 535 (Ky. 2017).

b. Lawyer convicted of felony sale of controlled substances within a correctional facility was temporarily suspended pending resolution of appeal pending conviction and sentence. *Miss. Bar v. Jackson*, 904 So. 2d 109 (Miss. 2004).

   c.  Lawyer who pled guilty to second-degree theft by deception was temporarily suspended pending final resolution of ethics proceedings against her. *In re Dade*, 609 A.2d 431 (N.J. 1992).

   d.  Lawyer convicted of manslaughter and assault who had become addicted to drugs and other opiates and also neglected his law practice was temporarily suspended. *In re Strick*, 34 Cal. 3d 891 (1983).

   e.  Lawyer convicted of receipt of child pornography committed sufficiently serious crime to warrant interim suspension pending final disposition of disciplinary proceedings. *In re Briggs*, 984 N.Y.S. 2d 172 (3d Dep't 2014).

60.   In Tennessee, with the sole exception of Mr. Manookian's suspension, temporary suspensions have uniformly involved a clearly articulated, imminent threat to the public. Specifically:

   a.  A lawyer was temporarily suspended March 3, 2017 for theft of client funds to fund a gambling addiction. He was reinstated March 22, 2017.

   b.  A lawyer was temporarily suspended August 16, 2018 because he misappropriated client funds and thus posed a threat of substantial harm to the public.

     c.   A lawyer was temporarily suspended January 16, 2018 because he failed to appear in court, his legal skills had "declined," and he had been abusing drugs.

     d.   A lawyer was temporarily suspended April 6, 2017 because he exchanged legal services for sex and was the subject of an ongoing federal corruption investigation.

     e.   A lawyer was temporarily suspended July 12, 2017 because his behavior and appearance in court gave a reasonable belief that his fitness to practice was impaired by drug abuse.

61.    None of these cases involved a temporarily suspended lawyer as a consequence of his or her out-of-court speech.

62.    The BPR has temporarily suspended Mr. Manookian for seven months and counting, and his "temporary" suspension remains one of indefinite duration. Because Mr. Manookian will not agree that his out-of-court, protected speech did not enjoy First Amendment protection, and because the BPR will not initiate a disciplinary petition regarding any supposed violation underlying his suspension, Mr. Manookian has been de facto disbarred from the practice of law in Tennessee.

63.    Mr. Manookian has exhausted all administrative remedies, including by filing multiple petitions for dissolution of his temporary suspension, which to date have all been denied.

64. The BPR takes the position that all previously determined matters may not be relitigated even under changed circumstances, foreclosing meaningful review.

65. The BPR's administrative process does not allow Mr. Manookian to avert irreparable harm.

66. The BPR's administrative process is inadequate and futile.

67. The BPR is unable to grant an effective remedy or consider the issues presented.

68. The BPR's administrative remedies are plagued by systemic failures as a consequence of their procedural unconstitutionality.

69. Mr. Manookian's challenge to the BPR's administrative procedures themselves are not subject to exhaustion.

70. The BPR's administrative process is tainted by unlawful agency bias and actual conflicts of interest.

**The BPR's Suspension Is Anticompetitive**

71. Defendants' plan and agreement to exclude Mr. Manookian is a horizontal group boycott: an agreement among competitors—in this case, lawyers—to exclude another horizontal competitor from the market. This is per se illegal conduct under Sherman Act, Section 1. Mr. Manookian's exclusion—unlike other exclusions of a single competitor—appreciably harms competition because he is one of only approximately 20 participants in the market for plaintiffs' medical malpractice representation in the State of Tennessee.

72. Mr. Manookian is among the most successful of plaintiff-side medical malpractice lawyers and makes up much of the volume of complex medical malpractice claims. That is, Mr. Manookian's involuntary removal from the market for plaintiff-side medical malpractice cases in Tennessee negatively affected competition itself because: (1) Mr. Manookian makes up a substantial part of this market, (2) Mr. Manookian is one of the highest-quality providers; and (3) there are significant barriers to entry into this market. Thus, plaintiff-side medical malpractice parties now have fewer and lower quality options following Mr. Manookian's suspension.

73. Defendants' exclusion exceeded their authority under the rules of professional conduct, and the Tennessee Supreme Court did not actively supervise defendants' conduct such that it actually considered its anticompetitive character and effects. Indeed, defendants failed to disclose their conflicts of interest and the anticompetitive nature of their conduct to the Tennessee Supreme Court. Accordingly, defendants' conduct is not exempt from the antitrust laws under the state-action immunity.

**The Relevant Market**

74. There are two possible relevant service markets. The first service market is the market for legal services. Any duly licensed Tennessee lawyer is authorized to provide legal representation on any type of matter within the State of Tennessee, provided that the lawyer is competent to do so.

75. The second service market, and the one most relevant here, is the market for plaintiff-side medical malpractice representation. Plaintiffs' medical malpractice representation in Tennessee has distinctive characteristics that separate it from other sectors of law practice.

76. The prosecution of medical malpractice cases requires highly specialized knowledge and experience, as well as massive labor and capital investments beyond that of typical litigation matters. Over the past decade, the Tennessee General Assembly has enacted increasingly high hurdles for plaintiffs seeking to bring claims against health care providers; requirements that range from mandatory pre-suit expert review to proof of localized standards of care and myriad other heightened evidentiary burdens. In practice, these additional statutory obligations ensure that even the most clear-cut cases of medical malpractice are subjected to vigorous, lengthy, and highly-technical defenses based upon both the law and the particularized medical care at issue.

77. As a result of Tennessee's statutory scheme, both defendants and plaintiffs require counsel who are experienced malpractice lawyers to adequately represent their interests. Victims of medical malpractice, in particular, are almost universally unable to afford even the incidental costs associated with initiating and maintaining a suit—expenses such as hiring physician experts to review and opine on their care—much less pay out-of-pocket for an attorney to represent them. Attorneys considering taking on such matters must be prepared to do so a contingent

basis, advancing enormous expenses, with no guarantee of ultimately being compensated for their work.

78.     The market for attorneys specializing in the prosecution of medical malpractice actions is minuscule. At the time of the acts giving rise to this Complaint, Mr. Manookian was one of approximately twenty lawyers in the entire State of Tennessee whose practice of law was dedicated primarily to the representation of victims of medical malpractice—a number that represents less than one-tenth of one percent (.1%) of all Tennessee-licensed attorneys.

79.     Medical malpractice representation thus does not have any close substitutes, and there is limited cross-elasticity of demand for other types of representation. Although a lawyer with a general litigation practice could represent parties in a medical malpractice case, they are unlikely to be capable of doing so with sufficient efficiency and effectiveness.

80.     The barriers to entry to the relevant market are insurmountably high for the overwhelming majority of lawyers. Detailed knowledge of both the substantive, specialized law and of highly localized standards of medical care across a vast number of specialties and procedures is necessary, but not sufficient. Lawyers seeking to represent plaintiffs in medical malpractice actions must also be willing to invest thousands of hours and risk hundreds of thousands of dollars in cases that can drag on for years—investments they may never recoup.

81.     The relevant geographic market is the State of Tennessee. Mr. Manookian is a Tennessee-licensed lawyer with a Tennessee-based practice. Law licenses are state specific; a lawyer licensed in one state cannot freely practice in another state, and to do so requires a different lawyer licensed in that state to serve, at a minimum, as local counsel.

82.     There is little substitutability or cross-elasticity of demand for services of lawyers outside the jurisdiction. Although lawyers are allowed to practice in other jurisdictions if they are sponsored by local counsel, lawyers in other jurisdictions would be particularly disadvantaged in Tennessee medical malpractice cases, which proceed according to a detailed, Tennessee-specific statutory scheme, and there would be additional costs, such as the necessity of local counsel. Thus, consumers seeking medical malpractice representation in the State of Tennessee typically do not hire lawyers outside the State of Tennessee. From a practical perspective, it is vanishingly rare for a non-Tennessee lawyer to lead a plaintiff-side case in this market. Indeed, because of the particularly stringent requirements and disadvantages for plaintiff-side medical malpractice plaintiffs, there is little incentive for out-of-state attorneys to come into Tennessee and develop this specialty, even with local counsel.

**Harm to Plaintiff and Competition**

83.     Defendants' conduct has harmed and continues to harm Mr. Manookian: In September 19, 2018, the BPR "temporarily" but indefinitely suspended him from practicing law in the State of Tennessee. Since then, Mr. Manookian has been harmed

and will continue to be harmed by significant economic and financial loss, the loss of current and future business, and reputational damage.

84. Defendants additionally harmed Mr. Manookian by punishing him for his constitutionally protected, out-of-court speech and retaliating against him for exercising his First Amendment right to petition the government for the redress of grievances. Defendants deprived Mr. Manookian of due process and equal protection under the law by abusing facially unconstitutional procedures that allowed them to suspend him in a procedurally defective *ex parte* proceeding and despite their actual and perceived conflicts of interests regarding his suspension.

85. Defendants' conduct has also harmed market competition. Unlike most exclusions of a single competitor, Mr. Manookian's exclusion appreciably harms competition in the medical malpractice industry because he is one of only approximately twenty participants in the market for plaintiff-side medical malpractice representation in Tennessee and because he is among the most successful of those lawyers and makes up much of the volume of complex medical malpractice claims. His suspension has a genuine and significant negative impact on competition.

86. Thus, Mr. Manookian has suffered antitrust injury that flows from the defendants' harm to the market.

**State Action Immunity Does Not Apply**

87. The BPR is not a sovereign state entity within the federal system, but instead is a quasi-public, quasi-private entity that is primarily composed of practicing

lawyers who compete with Mr. Manookian. Defendants are participants in the relevant markets, and some of them fiercely compete with Mr. Manookian in medical malpractice cases. Indeed, they have obtained direct and immediate competitive advantages as a result of Mr. Manookian's exclusion.

88.   Defendants cannot invoke state-action immunity for their anticompetitive conduct because their conduct was not clearly articulated and affirmatively expressed as state policy, and it is not sufficiently supervised by the State of Tennessee as sovereign. To the contrary, defendants violated their own rules in excluding Mr. Manookian from the market and withheld critical, relevant information from the Tennessee Supreme Court regarding their anticompetitive behavior.

89.   The Tennessee Supreme Court's summary approval of the BPR's petition for dissolution and recommendations against dissolution do not constitute active supervision. Under U.S. Supreme Court case law, a state supervisor must have—and must actually exercise—the power to review the challenged decision and must analyze its anticompetitive effect. Here, even if the Tennessee Supreme Court wanted to conduct such a review, it would not have been able to do so because defendants failed to disclose critical material facts to the court, including, among other things: (1) that the current and former chairs of the board—the position that authorizes temporary suspension petitions—are direct competitors of Mr. Manookian; (2) that one of them directly benefitted competitively and monetarily

from Mr. Manookian's suspension; and (3) that Mr. Manookian is one of only approximately 20 plaintiff-side medical malpractice lawyers in the state, and among the most competitively successful.

**FIRST CLAIM**
**42 U.S.C. § 1983 – First Amendment Violation**

90. Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as if fully set forth at length herein.

91. The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for redress of grievances." The First Amendment is incorporated and binding against the states under the Fourteenth Amendment's Privileges and Immunities Clause.

92. The U.S. Supreme Court has held that

> disciplinary rules governing the legal profession cannot punish activity protected by the First Amendment, and that First Amendment protection survives even when the attorney violates a disciplinary rule he swore to obey when admitted to the practice of law.

*Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1054 (1991).

93. It has also said that state entities may only act to punish

> "true threats" [which] encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.

*Virginia v. Black*, 538 U.S. 343, 359 (2003).

94.   Defendants' conduct has unlawfully restrained and punished Mr. Manookian's freedom of speech. The BPR's petition for temporary suspension, and its communications and actions relating to its enforcement, deprived Mr. Manookian of his protected property and liberty interests based on the content of his out-of-court speech.

95.   The speech in question is Mr. Manookian's email to Phillip North. The BPR claims that it "took it as threatening," but it failed to distinguish a true threat from constitutionally protected speech.

96.   Defendants cannot, as a matter of law, establish that Mr. Manookian's speech was a true threat that was unequivocal, unconditional, immediate, and specific as to the person threatened and conveyed a gravity of purpose and the imminent prospect of execution. It cannot establish that Mr. Manookian communicated any serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.

97.   Defendants drew inferences from Mr. Manookian's speech that are not permissible under the true threat doctrine. Mr. Manookian's speech, viewed in its context, does not establish that Mr. Manookian intended to commit violence against Phillip North, his family, or anyone else.

98.   Mr. Manookian and Phillip North voluntarily attended depositions and other events without controversy after Mr. Manookian's purported threat. Mr. North

and Mr. Manookian have been in the same room on at least four occasions since the email.

99.    Moreover, defendants sought Mr. Manookian's suspension under pretext. The actual purpose of defendants' conduct was to retaliate against Mr. Manookian for exercising his First Amendment rights and remove him from the competitive market for legal services. More specifically, defendants retaliated against Mr. Manookian for exercising his right to petition the government by suing Judge Binkley for defamation and issuing the BPR a lawful subpoena.

100.    Defendants' actions cannot survive strict scrutiny. They had no compelling government interest in seeking a temporary suspension against Mr. Manookian. Moreover, temporarily suspending Mr. Manookian from the practice of law without due process or any meaningful adversarial hearing was not the least restrictive means of accomplishing any legitimate governmental objective.

101.    Mr. Manookian has suffered significant damages as a result of defendants' conduct, including direct economic losses of millions of dollars and additional damage to his reputation which, before defendants' conduct, was a reputation for being one of the state's most skilled and effective medical malpractice litigators.

102.    Mr. Manookian requests that the Court enter an order declaring defendants' conduct to be unlawful and that it enjoin defendants, in their official capacities, from continuing their retaliatory and unconstitutional course of conduct.

Moreover, Mr. Manookian requests compensatory damages against defendants sued in their individual capacities.

103. Defendants' actions were intended to have, have had, and continue to have a chilling effect on Mr. Manookian's constitutionally protected speech; harming both Mr. Manookian and undermining recipients' right to hear and receive information. Unless defendants are enjoined, Mr. Manookian will suffer irreparable harm because he cannot exercise his constitutionally protected First Amendment rights without credible fear of continued and future reprisal.

**SECOND CLAIM**
**42 U.S.C. § 1983 – Due Process Violation**

104. Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as if fully set forth at length herein.

105. Lawyers have a protected property right in their law license such that attempts to restrict it require significant due process protections. *See Barry v. Barchi*, 443 U.S. 55, 64 (1979); *Mackey v. Montrym*, 443 U.S. 1, 10 n.7 (1979).

106. In Tennessee, the right to earn a living is a fundamental right and a property right.

107. Tennessee Rule of Professional Conduct Rule 9, § 12.3 is unconstitutional on its face and as applied because it deprives Mr. Manookian and others to whom it is applied of their property rights without due process of law.

108.   As applied here, defendants deprived Mr. Manookian of his property right to practice law without a constitutionally adequate process, without presenting admissible evidence, and without meeting an adequate burden of proof.

109.   Defendants and the BPR violated their own rules when petitioning for and approving Mr. Manookian's suspension, because the BPR failed to support the petition with an affidavit attesting to personal knowledge of each of the facts alleged.

110.   Defendants relied on unauthenticated documents and hearsay devoid of context and circumstances that would disprove the BPR's self-serving narrative.

111.   Defendants deprived Mr. Manookian of due process by suspending his license with the participation and leadership of BPR members who had a clear conflict-of-interest in that they and their clients directly benefited from Mr. Manookian's suspension.

112.   More than seven months have passed since defendants "temporarily" suspended Mr. Manookian's law license. In that time, defendants have not proceeded with the underlying disciplinary proceedings that they claim formed the basis for Mr. Manookian's temporary suspension.

113.   Defendants have twice rejected Mr. Manookian's petitions for dissolution by shifting the burden of proof for "good cause" to dissolve the suspension upon him.

114.   The evidence presented by Mr. Manookian demonstrated that the basis for his suspension is not supportable.

115. There is no emergent threat to the public justifying Mr. Manookian's drastic, indefinite suspension.

116. Tennessee Rule of Professional Conduct Rule 9, § 12.3 unconstitutionally requires a temporary suspension to remain in place until such time as the BPR exercises its unfettered discretion to dissolve the suspension or until such time as the aggrieved lawyer meets a burden to show "good cause" for dissolution of the suspension.

117. Tennessee Rule of Professional Conduct Rule 9, § 12.3 provides no meaningful opportunity to be heard, and it contains no requirement that the underlying charges be prosecuted.

118. Thus, as occurred here, Tennessee Rule of Professional Conduct Rule 9, § 12.3 allows defendants to deprive any lawyer of his or her property interest indefinitely without ever having to meet their evidentiary burden in an adversarial proceeding.

119. Tennessee Rule of Professional Conduct Rule 9, § 12.3 is facially unconstitutional because there is no set of circumstances where the rule would provide adequate due process protections. It is also unconstitutional as applied to Mr. Manookian based on the defendants' failure to adhere to its own published processes and the actual and perceived conflicts of interest regarding him.

120. Mr. Manookian has suffered significant damages as a result of defendants' conduct, including direct economic losses of millions of dollars.

121. Mr. Manookian requests that the Court enter an order declaring that Rule 9, § 12.3 is unconstitutional both facially and as applied. He further requests that the Court enjoin defendants from utilizing the "good cause" standard of § 12.3 or otherwise placing the burden of proof on Mr. Manookian or others; enjoin defendants from taking emergent action against his law license without substantial, sworn evidence; enjoin defendants from violating their own procedural rules; and enjoin the defendants from suspending Mr. Manookian's law license based upon any evidence that is not admissible under the rules of evidence.

**THIRD CLAIM**
**42 U.S.C. § 1983 – Equal Protection Violation**

122. Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as if fully set forth at length herein.

123. The Fourteenth Amendment to the United States Constitution provides that a State shall not "deny to any person within its jurisdiction the equal protection of the laws."

124. Defendants "temporarily" but indefinitely suspended Mr. Manookian from practicing law, claiming that he represented a substantial threat of harm to the public.

125. Defendants' real purpose in suspending Mr. Manookian's law license was: (1) to retaliate against Mr. Manookian for exercising his constitutionally protected rights to free speech and to petition the government for the redress of

grievances; and (2) to retaliate against Mr. Manookian to exclude one of the state's most successful medical malpractice lawyers from the market to the direct competitive and pecuniary benefit of the current and former chairpersons of the BPR.

126. By doing so, defendants intentionally singled Mr. Manookian out for disparate treatment. Defendants' intentional disparate treatment of Mr. Manookian was not rationally based on any legitimate government interest.

127. Defendants' conduct was driven by animus and ill will.

128. Mr. Manookian has suffered significant damages as a result of defendants' conduct, including direct economic losses of millions of dollars and damage to his reputation.

129. Mr. Manookian requests that the Court enter an order declaring Defendants' conduct to be unlawful and enjoin defendants, in their official capacities, from unconstitutionally retaliating against Mr. Manookian.

130. Mr. Manookian requests compensatory damages against defendants sued in their individual capacities.

**FOURTH CLAIM**
**15 U.S.C. § 1 – Conspiracy to Restrain Trade**

131. Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as if fully set forth at length herein.

132. Defendants' conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, because the BPR, along with individual market-participant defendants, entered

into an agreement to exclude one of the state's most competitively successful medical malpractice lawyers, Mr. Manookian, from the market.

133. This agreement afforded direct competitive and pecuniary benefits to the current and former chairpersons of the BPR.

134. Defendants' agreement included their decision to sanction and punish Mr. Manookian with a "temporary" but indefinite suspension that excluded him from the market; to actively publicize that decision to the media; and to resist all efforts by Mr. Manookian to petition for dissolution of the suspension.

135. Defendants—Mr. Manookian's market competitors—reached an agreement to engage and did in fact engage in multiple overt acts to remove a fierce competitor from the market for pretextual reasons.

136. Defendants' conduct is a per se illegal violation of Section 1 of the Sherman Act because it involves a horizontal agreement among competitors to allocate markets and boycott and exclude a competitor, Mr. Manookian.

137. Alternatively, defendants' conduct is unlawful under the rule of reason or quick-look analysis.

138. Defendants have sufficient market and monopoly power over the relevant service markets to appreciably restrain free competition in these markets. In fact, they have that power as a matter of law. Defendants' exercise of that power did, in fact, significantly restrain one or more markets, which harmed competition in a way that was not otherwise correctable because of significant entry barriers.

139.    Defendants' conduct and agreements harm competition in the relevant markets by excluding Mr. Manookian from competing with them.

140.    Defendants' conduct and agreements have and will increase prices—including by decreasing settlement values—and decrease the quality and quantity of services in the relevant service markets.

141.    As a result of defendants' anticompetitive conduct, Mr. Manookian has and will continue to be injured through significant economic and financial loss, the loss of current and future business, reputational damage, and the inability or difficulty to obtain funds already earned. Thus, Mr. Manookian has suffered antitrust injury that flows from the defendants' harm to the market.

142.    Defendants' conduct and agreements were intended to and did substantially harm interstate commerce. Although the geographic market is local—plaintiff medical malpractice lawyers in Tennessee—defendants' anticompetitive conduct affects interstate commerce as many of the players affected by this market are national, or at least interstate, companies including hospitals and insurance companies. Health care markets themselves involve interstate commerce.

143.    Defendants' agreements and conduct do not qualify for state-action immunity, nor are they reasonably related to any efficiencies or other benefits sufficient to justify their harmful effects on competition in the relevant markets.

144.    The anticompetitive harm from defendants' conduct substantially outweighs any efficiency and competitive benefits.

145. Plaintiff is entitled to recover treble damages under 15 U.S.C. § 15 and injunctive relief under 15 U.S.C. § 26.

**REQUEST FOR RELIEF**

WHEREFORE, Mr. Manookian requests that this Court:

A. Enter judgment against defendants;

B. Declare that Tennessee Rule of Professional Conduct 9, § 12.3 is unconstitutional facially and as applied;

C. Declare that defendants' conduct violates 15 U.S.C. § 1;

D. Enjoin defendants from continuing their unlawful acts;

E. Order defendants to dissolve Mr. Manookian's suspension;

F. Award Mr. Manookian damages for violations of his constitutional rights, including, but not limited to, actual damages and punitive damages;

G. Award Mr. Manookian trebled damages under 15 U.S.C. § 15.

H. Award Mr. Manookian his costs and expenses of this action, including his reasonable attorneys' fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. §§ 15, 26 and 42 U.S.C. § 1988;

I. Award Mr. Manookian pre- and post-judgment interest at the applicable rates on all amounts awarded; and

J. Order any other such relief as the Court deems appropriate.

**Ex. 8**

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims.

DATED: April 29, 2019

By:

/s/ Daniel Horwitz

Daniel Horwitz
Tennessee Bar No. 032176
1803 Broadway, Suite #531
Nashville, TN 37203
(615) 739-2888
daniel.a.horwitz@gmail.com

*Local Pro Bono[1] Counsel for Plaintiff*

Jarod Bona (pending *phv*)
Aaron Gott (pending *phv*)
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
(858) 964-4589
jarod.bona@bonalawpc.com
aaron.gott@bonalawpc.com

*Counsel for Plaintiff*

1. Any attorney's fee awarded to Mr. Manookian and earned by Mr. Horwitz shall be donated to the First Amendment Center.

**EXHIBIT "9"**

**Ex. 9**

JOHNSON FISTEL, LLP
Frank J. Johnson, Esq. (SBN 174882)
FrankJ@johnsonfistel.com
Kristen O'Connor, Esq. (SBN 305113)
KristenO@johnsonfistel.com
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Local Counsel for Plaintiff*

SPRAGENS LAW PLC
John Spragens, TN Bar No. 31455
(Pro Hac Vice forthcoming)
john@spragenslaw.com
311 22nd Ave. No.
Nashville, TN 37203
Telephone: (615) 983-8900
Facsimile: (615) 682-8533

*Lead Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

BRIAN P. MANOOKIAN,

Plaintiff,

v.

BONA LAW P.C., JAROD BONA, DAVID CODELL, AARON GOTT, LUKE HAASKAMP, AND LUIZ BLANQUEZ,

Defendants.

Case No.: '21CV0562 WQHBLM

**COMPLAINT FOR (1) LEGAL NEGILIGENCE AND (2) BREACH OF FIDUCIARY DUTY**

**JURY TRIAL DEMANDED**

For his complaint, Plaintiff Brian P. Manookian alleges the following upon actual knowledge with respect to himself and his own acts, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1. The Defendants (collectively "the Bona Parties") are lawyers and a law firm that hold themselves out to be specialists in the areas of anti-trust and appellate law. The Plaintiff is an individual that retained the Bona Parties to file a federal antitrust lawsuit ("the Antitrust Suit") on his behalf which sought recovery of significant economic, non-economic, and punitive damages as a result of wrongful conduct perpetrated on Mr. Manookian by certain third parties.

2. The Antitrust Suit was well-founded in fact and law, and the Bona Parties repeatedly attested to the same by presenting and signing pleadings in the matter. The Antitrust Suit was ultimately dismissed by the United States Sixth Circuit Court of Appeals because the Bona Parties missed a mandatory filing deadline by over one hundred and twenty (120) days.

3. This lawsuit seeks compensatory and punitive damages against the Bona Parties. The Bona Parties failure to recognize and meet a mandatory filing deadline constitutes legal malpractice, legal negligence, and breach of fiduciary duties.

## JURISDICTION AND VENUE

4. The Court has original jurisdiction over this matter pursuant to 28 U.S. Code § 1332 because the amount in controversy exceeds seventy-five thousand dollars ($75,000) and is between citizens of different States.

5. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this district.

**Ex. 9**

## PARTIES

6. Plaintiff Brian Manookian is a U.S. citizen and resident of the State of Tennessee.

7. Defendant Bona Law P.C. ("Bona Law") is a professional corporation licensed to do business in the State of California. Bona Law may be served with process at 4275 Executive Square, Suite 200, La Jolla, California, 92037 through its registered agent for service of process, Jarod Bona.

8. Defendant Jarod Bona is a United States citizen and resident of the State of California. Defendant Bona is an attorney licensed to practice law in the State of California. He may be served with process at 4275 Executive Square, Suite 200, La Jolla, California, 92037.

9. Defendant David Codell is a United States citizen and resident of the State of California. Defendant Codell is an attorney licensed to practice law in the State of California. He may be served with process at 145 South Orange Drive, Los Angeles, California, 90036.

10. Defendant Aaron Gott is a United States citizen and resident of the State of Minnesota. Defendant Gott is an attorney licensed to practice law in the State of Minnesota. Aaron Gott practices law in the United States Southern District of California. He may be served with process at 315 1st Avenue Northeast, Apartment 1951, Minneapolis, Minnesota, 55413.

11. Defendant Luke Haaskamp is a United States citizen and resident of the State of Minnesota. Defendant Haaskamp is an attorney licensed to practice law in the State of Minnesota. Luke Haaskamp practices law in the United States Southern District of California. He may be served with process at 5261 East Abbeyfield Street, Long Beach, CA 90815.

12. Defendant Luiz Blanquez is a United States citizen and resident of the State of California. Defendant Blanquez is an attorney licensed to practice law in the State of California. Luis Blanquez practices law in the United States

Southern District of California. He may be served with process at 4275 Executive Square, Suite 200, La Jolla, California, 92037.

13. Each Defendant (collectively "the Bona Parties") acted as the principal of or agent for each other Defendant as to the acts, violations, and common course of conduct alleged in this complaint.

14. Defendants and their agents participated personally in the unlawful, negligent, and tortious conduct challenged in this complaint and, to the extent they did not personally participate, they authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts complained of in this complaint.

**SUBSTANTIVE ALLEGATIONS**

15. Mr. Manookian is a highly skilled and successful lawyer who has practiced law in Tennessee for over a decade. He graduated with honors from Vanderbilt Law School on scholarship in 2007 where he served as an editor for the Vanderbilt Law Review.

16. Since approximately 2015, Mr. Manookian has focused his legal practice on the representation of plaintiffs injured by the medical malpractice of physicians, hospitals, and health care providers. His practice was highly lucrative. Mr. Manookian annually recovered tens of millions of dollars on behalf of his clients and was highly compensated as a result.

17. On March 20, 2019, Mr. Manookian retained the Bona Parties to represent him in the Antitrust Suit. The Antitrust Suit alleged, among other things, that Mr. Manookian's competitors had acted to illegally exclude him from the market for legal services, thereby resulting in millions of dollars of damages to Mr. Manookian in the form of actual, demonstrable lost income as well as additional reputational damage.

18.  In furtherance of their arrangement, Mr. Manookian and Defendant Jarod Bona executed an attorney-client engagement agreement, and Mr. Manookian paid a fee to the Bona Parties.

19.  The Antitrust Suit was filed on April 29, 2019 in the United States District Court for the Middle District of Tennessee.  The case was styled *Manookian v. Flippin, et al.* and assigned Case No. 19-cv-00350.  The Complaint in that matter accurately sets forth the claims the Bona Parties were retained to prosecute, and to which they certified had factual and legal merit.

20.  The allegations in the Antitrust Suit were well-founded in fact and law.  The Bona Parties undertook an investigation of the factual and legal bases for the Antitrust Suit prior to its filing and concluded that it had merit and was non-frivolous.

21.  The Bona Parties repeatedly certified the merits of the Antitrust Suit; consistently expressing the same to Mr. Manookian.  Toward that end, the Bona Parties issued a press release upon the filing of the Antitrust Suit publicly proclaiming its meritorious nature and further posted at least one article regarding the meritorious nature of the Antitrust Suit to the Bona Law website.

22.  On February 28, 2020, the United States District Court for the Middle District of Tennessee issued an order ("the Negligently Appealed Order"), among other things, dismissing Mr. Manookian's claims for damages in the Antitrust Suit.

23.  Shortly after the issuance of the Negligently Appealed Order, the Bona Parties assured Mr. Manookian that the Order was legally unsound and should be appealed.  The Bona Parties expressly stated to Mr. Manookian in at least two (2) phone calls that United States District Court Judges are frequently unfamiliar with the nuances of antitrust law and that the Negligently Appealed Order would, in the view of the Bona Parties, be overturned on appeal.

24. The Bona Parties subsequently assured Mr. Manookian on multiple occasions that the Negligently Appealed Order was not final and therefore not subject to the thirty (30) day deadline for appeal.

25. As a result, the Bona Parties only filed a Notice of Appeal for the Negligently Appealed Order one hundred and seventy-seven (177) days later.

26. On January 5, 2021, the United States Court of Appeals for the Sixth Circuit issued an opinion finding that the Bona Parties, on behalf of Mr. Manookian, had missed the deadline for filing the Notice of Appeal by one hundred and seventy-seven (177) days.

27. As a result, Mr. Manookian's substantial claims for damages (the merit of which the Bona Parties attested to in scores of emails, press releases, laudatory articles, and federally filed pleadings) have been forever waived, lost, and foregone.

28. Following the issuance of the Sixth Circuit's opinion, David Codell and Jarod Bona wrote to Brian Manookian falsely and fraudulently characterizing the Sixth Circuit's holding in an attempt to evade liability for their own negligence and gross recklessness. The Bona Parties additionally stated that any further attempts to appeal would be futile.

**FIRST CLAIM**

**Legal Negligence**

29. Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as if fully set forth at length herein.

30. An attorney-client relationship existed between Brian Manookian and each of the Bona Parties.

31. As Brian Manookian's legal counsel, the Bona Parties owed Mr. Manookian a duty of reasonable care for all matters on which the Bona Parties acted on Mr. Manookian's behalf.

32. The Bona Parties breached the applicable standard of care by committing the acts or omissions described above.

33. The negligence of the Bona Parties has directly and proximately caused damage to Brian Manookian in an amount to be determined at trial but not less than twenty million dollars ($20,000,000).

**SECOND CLAIM**

**Breach of Fiduciary Duty**

34. Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as if fully set forth at length herein.

35. The Bona Parties, as licensed legal professionals, owed a fiduciary duty to Brian Manookian under which they were required to represent him with the utmost care, diligence, honesty, and competency.

36. The Bona Parties breached their fiduciary duties to Brian Manookian by committing the acts described above.

37. As a direct and proximate cause of the breaches of fiduciary duties owed Brian Manookian, the Bona Parties have caused damages to Mr. Manookian in an amount to be determined at trial but not less than twenty million dollars ($20,000,000).

**REQUEST FOR RELIEF**

WHEREFORE, Mr. Manookian requests that this Court:

A. Enter judgment against Defendants for direct and consequential damages not less than twenty million dollars ($20,000,000);

B. Enter judgment against Defendants for punitive damages;

C. Award Mr. Manookian pre- and post-judgment interest at the applicable rates on all amounts awarded; and

D. Order any other such relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims.

Dated: March 30, 2021

**JOHNSON FISTEL, LLP**

By: */s/ Frank J. Johnson*

FRANK J. JOHNSON

KRISTEN O'CONNOR
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
frankj@johnsonfistel.com
kristeno@johnsonfistel.com

*Local Counsel for Plaintiff*

**SPRAGENS LAW PLC**
John Spragens, TN Bar No. 31455
*(Pro Hac Vice forthcoming)*
311 22nd Ave. N.
Nashville, TN 37203
Telephone: (615) 983-8900
Facsimile: (615) 682-8533
john@spragenslaw.com

*Lead Counsel for Plaintiff*

# EXHIBIT "10"

**Ex. 10**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF TENNESSEE**

**NASHVILLE DIVISION**

BRIAN P. MANOOKIAN,

*Plaintiff*,

vs.

FLOYD FLIPPIN et al.,

*Defendants*.

Civil Action No. 3:19-cv-00350

Judge William L. Campbell, Jr.
Magistrate Judge Alistair Newbern

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS**

**Ex. 10**

Plaintiff Brian P. Manookian hereby responds to defendants' motion to dismiss his complaint.

Mr. Manookian's complaint makes well-supported allegations that defendants violated Mr. Manookian's clearly established First Amendment, equal protection, and due process rights. ***Critically, defendants' motion to dismiss does not address the merits of those claims in any regard.*** Accordingly, defendants have waived, for purposes of their motion to dismiss, any arguments regarding the merits of Mr. Manookian's constitutional claims.

Defendants' motion does seek, however, to have Mr. Manookian's claims dismissed based on a series of immunity arguments. For the reasons provided below, each of those immunity arguments is unpersuasive.

It is undisputed for purposes of defendants' motion that Mr. Manookian is a highly successful and specialized Tennessee lawyer—one of only about twenty lawyers who compete as medical malpractice victim advocates in the state. *See* ¶ 78.[1] Mr. Manookian has been one of the industry's top practitioners in his field in Tennessee with a stellar reputation among his peers—in particular, for his work in a challenging area: representing victims without financial resources against large, institutional corporate defendants. *See* ¶¶ 21–24.

Defendants are all members of the Tennessee Board of Professional Responsibility (BPR)—a quasi-public, quasi-private entity that regulates the practice of law by attorneys in Tennessee. *See* ¶¶ 5–16. The members of the BPR are

1. Paragraph references are to the complaint filed April 29, 2019.

themselves attorneys who compete for business with the professionals they also regulate. *Id.* In particular, two of the defendant BPR members are malpractice defense attorneys, and one was opposing counsel against Mr. Manookian in pending cases at times relevant to the allegations in the complaint. *See* ¶ 27.

As the complaint alleges in detail, in 2018, the BPR took the astonishing step of petitioning the Tennessee Supreme Court on an *ex parte* basis to temporarily suspend Mr. Manookian from the practice of law on a supposedly "emergency" basis just one day after he filed a defamation lawsuit against a state-court judge and served a subpoena on the BPR related to that lawsuit. *See* ¶¶ 29–30. Among the purported bases of the suspension was a constitutionally protected email that Mr. Manookian sent to another lawyer. *See* ¶ 31. After Mr. Manookian filed this lawsuit, the suspension was lifted, with conditions. As detailed in the complaint, however, the BPR continues to take action against Mr. Manookian. ¶¶ 62–70.

All of defendants' arguments for dismissal of the complaint fail. First, defendants assert, with respect to Mr. Manookian's antitrust claims, that the order suspending Mr. Manookian was an act of a sovereign entitled to state-action immunity under *Parker v. Brown*, 317 U.S. 341 (1943). Defendants fail to demonstrate entitlement to that limited form of immunity because, among other reasons, the role of the Tennessee Supreme Court in the actions that Mr. Manookian challenges was too routine to satisfy *Parker*'s active supervision requirement, and material information was withheld from that court. Moreover, the complaint includes antitrust claims against defendants in their individual capacities, not simply their

official capacities, and alleges that defendants violated the antitrust laws not merely because of the BPR's actions, but also in their roles as competitors and prospective competitors who used their unique positions on the BPR as a means to help them restrain trade.

Second, defendants assert that Eleventh Amendment sovereign immunity bars damages suits against BPR members in their official capacities—an argument that overlooks the fact that Mr. Manookian's complaint seeks damages against them in their individual capacities. *See* ¶¶ 5–13.

Third, defendants contend that they are protected against all claims in both their individual and official capacities by absolute quasi-prosecutorial and quasi-judicial immunity. Under governing case law, however, absolute immunity of the sort defendants invoke depends on the existence of adequate due process protections that were utterly lacking here, while actual bias and conflicts of interests were present.

Fourth, defendants argue that qualified immunity bars damages claims against them in their individual capacities. It is defendants' burden to demonstrate qualified immunity. Yet defendants cannot cite to any authority (because none exists) that the doctrine of qualified immunity applies to antitrust claims, and defendants do not make any qualified immunity argument whatsoever about Mr. Manookian's constitutional claims.

Fifth, defendants invoke *Younger v. Harris* abstention as a purported ground to bar this federal court from adjudicating Mr. Manookian's claims. Among the numerous reasons why defendants' appeals to *Younger* abstention fail are that

*Younger* abstention does not apply to antitrust claims because federal courts have exclusive jurisdiction over such claims and no state tribunal or body can afford effective relief; Mr. Manookian has credibly alleged that defendants are financially biased, which case law makes clear precludes applicability of *Younger* abstention; Mr. Manookian's claims include claims that the individual defendants violated antitrust law in their capacities as competitors, not simply as BPR members; and *Younger* abstention cannot apply to Mr. Manookian's claims for either damages or prospective relief. *See* ¶¶ 49–51, 71–73.

Sixth, and finally, defendants unsuccessfully call upon another doctrine—the *Rooker-Feldman* doctrine—to contend that this federal court must dismiss Mr. Manookian's complaint. But the complaint includes challenges to defendants' actions and seeks forms of relief (including a constitutional challenge to Tennessee Supreme Court Rule 9) that are not related to the types of completed state-court judicial actions to which the *Rooker-Feldman* doctrine is limited.

For all these reasons, as explained below, this Court should deny defendants' motion and permit all of Mr. Manookian's claims to proceed on the merits.

## I.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and "will survive a motion to dismiss if the plaintiff alleges facts that 'state a claim to relief that is plausible on its face' and that, if accepted as true, are sufficient to 'raise a right to relief above the speculative level.' " *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544,

555, 570 (2007)). "In reviewing a complaint, [a court] construe[s] it in the light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all reasonable inferences in favor of the plaintiff." *Mills v. Barnard*, 869 F.3d 473, 479 (6th Cir. 2017) (citation and internal quotation marks omitted). Dismissal is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Guzman v. U.S. Dep't of Homeland Sec.*, 679 F.3d 425, 429 (6th Cir. 2012) (citation omitted).

## II. DEFENDANTS DO NOT MEET THEIR BURDEN TO SHOW THAT THEY ARE EXEMPT FROM THE SHERMAN ACT

The bulk of defendants' antitrust arguments focuses on the Tennessee Supreme Court's role in routinely approving temporary suspensions, often without modification or apparent meaningful review. Defendants appear to argue that because the temporary suspension for which they petitioned was entered by the Tennessee Supreme Court, they either are not liable or are entitled to the *ipso facto* state-action immunity that a state supreme court would be entitled to under certain circumstances. That proposition is wholly unsupported by precedent, however, as only the state itself is *ipso facto* exempt from the operation of the Sherman Act. Other actors must meet the state-action immunity test, and defendants do not.

Defendants' alternative argument is that the Tennessee Supreme Court's act of granting the petition for temporary suspension satisfies the active supervision requirement. But that court action does not meet the "constant requirements" for active supervision: the supervisor must actually exercise its independent authority to review the non-sovereign's decision for its specific anticompetitive effects. *N.C.*

*State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1107 (2015). The complaint credibly alleges that the Tennessee Supreme Court did not do so. *See* ¶¶ 87–89.[2]

Defendants notably fail to address the other requirement for state action immunity—clear articulation—an essential element for which defendants bear the burden. Because defendants failed even to attempt to meet their burden, this Court should deny their motion to dismiss.

**A. State-Action Immunity Is Limited and Disfavored**

The federal antitrust laws are the "central safeguard for the Nation's free market structures" and have been for more than a century. *N.C. Dental*, 135 S. Ct. at 1109. They "guarantee[] each and every business, no matter how small, . . . the freedom to compete." *United States v. Topco Assocs.*, 405 U.S. 596, 610 (1972). This "national policy in favor of competition," *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 106 (1980), is so important to the national interest that Congress trusts its adjudication to the federal courts alone.

States do not have the power to set aside the well-settled judgment of Congress, but they do have the residual power to regulate under the Tenth Amendment. So the Court carved out a narrow exemption for state action: the Sherman Act does not "bar States from imposing market restraints 'as an act of government.' " *FTC v. Phoebe*

---

2. There is abundant evidence to support this allegation. For instance, the BPR's desired temporary suspension order was entered verbatim and in acknowledged violation of the Tennessee Supreme Court's own rules requiring that the underlying allegations be supported by affidavit, and subsequent hearing panel recommendations were approved verbatim by the Tennessee Supreme Court before the hearing record was reviewed or even could have been reviewed by the Justices who approved them.

*Putney Health Sys, Inc.*, 568 U.S. 216, 224–25 (2013) (quoting *Parker*, 317 U.S. at 350, 352). Established in *Parker*, this narrow exemption is now referred to as the state-action immunity, although it is technically an exemption from liability and not an immunity from suit. *Id.*

Like all antitrust exemptions, state-action immunity is strictly limited, narrowly circumscribed, and "disfavored." *Phoebe Putney*, 568 U.S. at 225 (quoting *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992)); *see also Shames v. Cal. Travel & Tourism Comm'n*, 626 F.3d 1079, 1084 (9th Cir. 2010) ("The state-action immunity doctrine is 'disfavored,' and is to be interpreted narrowly, as 'a broad interpretation of the doctrine may inadvertently extend immunity to anticompetitive activity which the states did not intend to sanction.' ") (citations omitted). Its ***sole*** purpose is to protect the sovereign states' interests to regulate. *Ticor Title*, 504 U.S. at 635–36.

A defendant "may not invoke *Parker* immunity unless the actions in question are an exercise of the State's sovereign power." *N.C. Dental*, 135 S. Ct. at 1110. Thus, a defendant invoking *Parker* immunity must prove this affirmative defense by showing that the defendant (1) acted pursuant to a clearly articulated state policy to displace competition, and (2) was actively supervised by the state. *Midcal*, 445 U.S. at 105.

### B. The BPR Is Not Entitled to *Ipso Facto* State Action Immunity

Defendants argue that Mr. Manookian's exclusion was an act of the Tennessee Supreme Court—not them—and that state-action immunity bars Mr. Manookian's claim because the Tennessee Supreme Court is "sovereign."

As an initial matter, because Mr. Manookian did not sue the Tennessee Supreme Court, the question whether that court is entitled to *ipso facto* state-action immunity as a sovereign arm of the state is not at issue here because only that court could claim it. Furthermore, a state supreme court is *ipso facto* immune ***only when acting in a legislative capacity***, which was not the case here. *N.C. Dental*, 135 S. Ct. at 1110 ("State legislation and 'decisions of a state supreme court, acting legislatively rather than judicially,' . . . '*ipso facto* are exempt from the operation of the antitrust laws' because they are an undoubted exercise of state sovereign authority.") (quoting *Hoover v. Ronwin,* 466 U.S. 558, 567–68 (1984)).

In any event, defendants' argument attempts to sidestep the complaint's allegations—which must be taken as true for purposes of this motion—that defendants were market competitors who undertook a course of conduct that was designed to exclude Mr. Manookian from the industry. Defendants initiated the "emergency" proceedings to suspend Mr. Manookian to short-circuit the typical, adversarial process with procedural safeguards and substantive review by the judiciary. ¶¶ 30–34. They wrote the recommendation. ¶ 28. They sought a temporary suspension that amounted to a *de facto* temporary disbarment based on non-emergency, pretextual allegations and concealed material facts to achieve their ends. ¶¶ 43–47. And they did this because they know such emergency petitions are routinely immediately approved by the Tennessee Supreme Court on a summary basis without conducting any hearing, without affording an opportunity to respond, and without prior judicial review. ¶ 28.

A group boycott, by definition, involves joint efforts by competitors to disadvantage another competitor by "either directly denying or ***persuading or coercing***" others to "cut off access to a supply, facility, or market necessary to enable the boycotted [competitor] to compete." *N.W. Wholesale Stationers, Inc. v. P. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985) (emphasis added). Defendants' use of third parties to effect their scheme is irrelevant to their liability. The extent of the defendants' involvement forms the basis for their antitrust liability.

### C. The BPR's Members Are Market Participants

There is no doubt that the BPR's members are market participants for state action purposes. In a footnote, defendants suggest otherwise, including because two defendants ***defend*** malpractice actions while Mr. Manookian represents plaintiffs. Mem. in Supp. of Mot. to Dismiss Compl. ("Mem.") at 5 n.2. But the Federal Trade Commission has rejected similar arguments made by professional licensing boards:

> The Board's argument is very similar to one that we explicitly rejected in *N.C. Dental*. That case involved a rule issued by the State Board of Dental Examiners that barred non-dentists from performing teeth whitening services; in opposing summary decision, the board argued that Complaint Counsel had 'presented no evidence that the individual dentist members of the Board . . . derived substantial revenues in their private practice from teeth whitening services.' *N.C. Dental*, 151 F.T.C. [607,] 627 [(2011)]. We rejected this argument, holding that 'the determinative factor in requiring supervision is not the extent to which individual members may benefit from the challenged restraint, but rather the fact that the Board is controlled by participants in the dental market.' *Id.* . . . In affirming our decision, the Supreme Court likewise did not focus on the degree to which dental board members actually provided teeth whitening services. Rather, its decision turned on the fact that the dental board members participated in 'the occupation the board regulates' . . . . *N.C. Dental*, 135 S. Ct. at 1114.

*In re La. Real Estate Appraisers Bd.*, 2018 WL 1836646, at *18 (F.T.C. Apr. 10, 2018). For active supervision purposes, a broader occupational market—for instance, lawyers or dentists—controls the inquiry even though the relevant service market may be much narrower, such as plaintiffs' medical malpractice lawyers or teeth whitening service providers. *Id.* Active market participants need not be shown to have an individual pecuniary motive.

**D. Defendants Do Not Assert That They Acted Pursuant to a Clearly Articulated State Policy to Displace Competition**

Defendants flatly ignore the first element that they have the burden to establish in order to be entitled to state action immunity: that they acted pursuant to a clearly articulated state policy to displace competition. For this reason alone, the Court should deny defendants' motion.

**E. Active Supervision Requires Procedures Absent Here**

To establish state action immunity, defendants must establish active state supervision. Defendants argue that the Tennessee Supreme Court's routine, deferential approval of defendants' decision to impose a temporary suspension on Mr. Manookian is sufficient to meet this requirement. But the law requires procedures sufficient to provide an assurance that the conduct at issue can fairly be attributed to the state, as sovereign. Defendants do not meet that requirement.

The active supervision requirement "stems from the recognition that 'where a private party is engaging in anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State.' " *Patrick v. Burget*, 486 U.S. 94, 100 (1988) (citation omitted). That danger is

at its zenith where state agencies are controlled by active market participants, "who possess singularly strong private interests" and thus "pose the very risk of self-dealing [that the active] supervision requirement was created to address." *N.C. Dental*, 135 S. Ct. at 1114. Simply put, "active market participants cannot be allowed to regulate their own markets free from antitrust accountability." *Id.* at 1111.

In *Ticor Title*, the Supreme Court rejected a formulation of the active supervision requirement similar to what defendants advocate for here—that is, a formulation under which the requirement could be met simply by showing "some basic level of [state] activity directed towards seeing that the private actors carry out the state's policy and not simply their own policy." 504 U.S. at 637. The Supreme Court held that such a formulation was "insufficient to establish the requisite level of active supervision"; instead, the Court held, where anticompetitive conduct is engaged in "as an initial matter by private parties, subject only to a veto if the State chooses to exercise it, the party claiming the immunity must show that state officials have undertaken the necessary steps to determine the specifics of the [anticompetitive] scheme." *Id.* at 637–38.

The Supreme Court since has further expanded on the basic prerequisites for active supervision. While it remains a "flexible and context-dependent" inquiry, and supervision "need not entail day-to-day involvement in an agency's operations or micromanagement of its every decision," the supervision mechanisms must "provide realistic assurance that a nonsovereign actor's anticompetitive conduct promotes state policy, rather than merely the party's individual interests." *N.C. Dental*, 135 S.

Ct. at 1116 (internal quotation marks omitted). The Supreme Court mandates several "constant requirements" for active supervision to ensure actual state involvement. First, "[t]he supervisor must review the substance of the anticompetitive decision, not merely the procedures followed to produce it." Second, "the supervisor must have the power to veto or modify particular decisions to ensure they accord with state policy." Third, "the 'mere potential for state supervision is not an adequate substitute for a decision by the State.' " *Id.*

In the professional licensing board context, the Federal Trade Commission has identified three elements to be considered in the active supervision analysis: "(1) the development of an adequate factual record, including notice and an opportunity to be heard; (2) a written decision on the merits; and (3) a specific assessment—both quantitative and qualitative—of how the private action comports with the substantive standard established by the legislature." *La. Real Est. Appraisers*, 2018 WL 1836646, at *9. While "no single one of these elements is necessarily a prerequisite for active supervision, . . . the absence of all of the factors would support a conclusion that the state had not adequately supervised the private actors' activity." *Id.* (citations and internal quotation marks omitted).

None of these elements is met here. The factual allegations of the complaint—which control on a motion to dismiss—include allegations that the Tennessee Supreme Court's routine role in approving Mr. Manookian's temporary suspension was insufficient for active supervision under controlling law. ¶¶ 88–89. Instead, the court summarily approved the suspension based on a deferential standard on an

incomplete record without notice or an opportunity to respond. *Id.* Further, because defendants concealed material facts that had substantial bearing on the petition to temporarily suspend Mr. Manookian, the Tennessee Supreme Court ***could not*** have conducted the required active supervision even if it had wanted to do so. *Id.*

Defendants attempt to circumvent the specifics of this case—and the four corners of the complaint—by citation to other instances in which temporary suspensions were modified by that court. As a threshold matter, all materials outside the four corners of the complaint must be disregarded at this juncture. Further, the question is not whether active supervision has ever occurred, but whether active supervision occurred ***here***. The complaint alleges it did not. The Supreme Court's active supervision jurisprudence makes clear that the supervisor "must review the substance of the anticompetitive decision" at issue; "the mere potential for state supervision is not an adequate substitute for a decision by the state." *N.C. Dental*, 125 S. Ct. at 1116 (citations omitted).

### F. Damages Are Authorized by the Clayton Act

Defendants also argue that even if state-action immunity does not apply to them, "Mr. Manookian can point to no authority where individual liability for money damages for violations of the antitrust laws has been imposed on members of a state professional regulatory board." Mem. at 5 n.2.

That authority, however, is the Clayton Act, 15 U.S.C. § 15(a), which provides:

> Except as provided in subsection (b) [which limits relief to "actual damages" against foreign states and their instrumentalities], any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides

> or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

Defendants provide no authority for the proposition that persons sued in their individual capacities for violations of Sherman Act, Section 1 are immune from money damages. The Supreme Court has never recognized such an immunity, and immunities and exemptions are disfavored in antitrust law. *See City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 399 (1978) (stating immunities, exemptions, and repeals by implication are not presumed because "the antitrust laws establish overarching and fundamental policies" and noting that only *Noerr-Pennington* and state-action immunity are "sufficiently weighty" to apply).

And while the Supreme Court has recognized in dicta that "agency officials, including board members, may, ***under some circumstances*** enjoy immunity from damages liability," it has yet to find any such circumstances. *N.C. Dental*, 135 S. Ct. at 1115 (emphasis added). Instead, the Court has suggested that if states want to allow active market participants the authority to regulate their competitors, they should either actually provide the active supervision required or "provide for the defense and indemnification of agency members in the event of litigation." *Id.*

Any other result would conflict with longstanding Congressional antitrust enforcement policy. The Clayton Act does "not merely . . . provide private relief, but [serves] the high purpose of enforcing the antitrust laws." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130–31 (1969). The Act expresses a policy that "private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws." *Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*, 381 U.S.

311, 318 (1965). The policy is most effective where private antitrust litigation is "an ever-present threat to deter" anticompetitive acts. *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).

## III. THE CLAIMS AGAINST DEFENDANTS ARE NOT BARRED BY OTHER IMMUNITIES

### A. Sovereign Immunity Does Not Justify Dismissal

Defendants make much of the point that Eleventh Amendment sovereign immunity bars suits for damages against defendants in their official capacities. *See* Mem. at 11. But the complaint seeks damages against defendants in their ***individual capacities and injunctive relief against defendants in their official capacities***, ¶¶ 5–13, which the Eleventh Amendment does not bar.

Defendants do not, and could not, contend that any broad doctrine of sovereign immunity holds that officials in their individual capacities cannot be sued for damages. And *Ex parte Young*, 209 U.S. 123 (1908), and its progeny have long made plain that state officials—to the extent that these defendants are even properly regarded as state officials given that they are also sued in their capacity as private lawyers—can be sued for injunctive relief. *See, e.g.*, *Edelman v. Jordan*, 415 U.S. 651, 664 (1974) (*Ex parte Young* authorizes prospective relief against state officials sued in their official capacities.). Thus, no broad, general doctrine of Eleventh Amendment sovereign immunity bars Mr. Manookian's complaint.

### B. Neither Absolute Quasi-Prosecutorial nor Quasi-Judicial Immunity Warrants Dismissal of the Complaint

There is no merit to defendants' arguments that they are entitled to absolute quasi-prosecutorial or quasi-judicial immunity from suit for all claims. Defendants themselves admit that the case law that they rely upon for such arguments presupposes "procedural safeguards [that] protect the due-process rights of persons subject to a board's jurisdiction." Mem. at 12. As explained above in the context of the Sherman Act, however, there are no adequate due process rights involved in a process in which the Tennessee Supreme Court ratifies the defendants' decisions without modification and without even reviewing the underlying hearing record.

Footnote 6 of defendants' memorandum is telling on this point. In that footnote, defendants concede that due process typically mandates a hearing before deprivation of a property right or a liberty interest. Defendants cite, however, to a Sixth Circuit opinion explaining that the failure to provide a pre-deprivation hearing passes constitutional muster "where a government official reasonably believed that immediate action was necessary to eliminate an emergency situation and the government provided adequate post-deprivation process." *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 486 (6th Cir. 2014). Here, however, Mr. Manookian's license was suspended over a matter that defendants themselves did not regard as an "emergency" situation until Mr. Manookian sued a state judge and issued the BPR a subpoena, ¶¶ 29–34, and the Tennessee Supreme Court's role in routinely reviewing the actions of the BPR—often without modification and on a

summary basis—regarding temporary suspension proceedings cannot be deemed adequate post-deprivation process.

Finally, defendants' argument for absolute immunity—whether quasi-judicial or quasi-prosecutorial—is further undermined by their assertion in footnote 7 of their memorandum that "[i]n temporary suspension proceedings under Section 12.3 Board members have no meaningful involvement in the process leading to an initial Supreme Court ruling and no involvement in the decisional process." If that is the case, then, as defendants themselves recognize, there is no need for an absolute immunity doctrine to protect them. *See* Mem. at 12 (conceding that those who enjoy absolute immunity are "members of licensing and disciplinary boards that perform investigatory, prosecutorial, or judicial functions").

### C.   Defendants Cannot Show that the Complaint Should Be Dismissed Based on Qualified Immunity, and Qualified Immunity Does Not Apply to Antitrust Claims

There is no merit to defendants' arguments that they are entitled to qualified immunity against this suit for damages. The test for qualified immunity is objective, and "government officials performing discretionary functions generally are shielded from liability for civil damages [only] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Further, "the burden is on the official claiming immunity to demonstrate his entitlement." *Dennis v. Sparks*, 449 U.S. 24, 29 (1980). Defendants cannot meet that burden.

Qualified immunity arose primarily in the context of actions under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*,

403 U.S. 388 (1971), involving violations of individuals' statutory or constitutional rights. Notably, defendants cite to no authority for the proposition that qualified immunity can apply to antitrust law. There are also good reasons why it does not.

First, immunity from the antitrust laws is not lightly implied. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 348 (1963) ("It is settled law that 'immunity from the antitrust laws is not lightly implied.' This canon of construction, which reflects the felt indispensable role of antitrust policy in the maintenance of a free economy, is controlling here." (citations omitted)). Second, ***state action*** immunity is a disfavored exception accommodated only when necessitated by principles of federalism. *See N.C. Dental*, 135 S. Ct. at 1110 ("Given the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws, 'state action immunity is disfavored, much as are repeals by implication.' ") (quoting *Phoebe Putney*, 568 U.S. at 225).

In any event, defendants' argument (Mem. at 15) that they did not act in violation of any clearly established right because they acted in accordance with Tennessee Supreme Court Rule 9 ignores the gravamen of Mr. Manookian's claims—that defendants violated clearly established ***federal*** law. Qualified immunity protects reasonable mistakes by officials. It does not protect unreasonable defiance (or even ignorance) of federal antitrust law, particularly when tainted by unlawful bias and actual conflicts of interest based on a pecuniary motive.

In evaluating defendants' meritless assertion of qualified immunity, it is important to bear in mind that Mr. Manookian's antitrust claims are against

defendants as competitors in the legal profession who have acted in restraint of trade. What makes their conduct a clear violation of the antitrust laws is not their status as BPR members, but their status as competitors. Defendants cannot reasonably claim that they did not know that a violation of antitrust law clearly contravenes statutory rights given that such a violation is a clearly defined federal felony. 15 U.S.C. § 1 ("Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony."). Further, as the Supreme Court has made plain, "[e]very violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972) (citations omitted).

Accordingly, as an objective matter, no reasonable person would fail to understand that defendants' concerted efforts to reduce competition by suspending Mr. Manookian's license without cause were impermissible, and defendants cannot show that the complaint should be dismissed based on qualified immunity.

## IV.   *YOUNGER* ABSTENTION DOES NOT APPLY HERE

### A.   *Younger* Abstention Does Not Apply to the Antitrust Claims Because of Exclusive Federal-Court Jurisdiction

Defendants' *Younger* abstention argument similarly suffers from a fatal flaw: *Younger* does not apply to federal antitrust claims because federal courts have exclusive jurisdiction over them. 15 U.S.C. § 15; *Miller v. Granados*, 529 F.2d 393, 395 (5th Cir. 1976) (holding that "it is obvious" that *Younger* abstention cannot apply to a federal antitrust claim because federal antitrust relief "cannot be obtained in

state court"); *accord Metro. Hosp. v. Thornburgh*, 667 F. Supp. 208, 214 (E.D. Pa. 1987); *Gutstein v. McDermott*, 554 F. Supp. 966, 970–71 (M.D. Pa. 1983).

A requirement for *Younger* abstention is that "the state court has broad and comprehensive concurrent jurisdiction to adjudicate the claims asserted in the federal action." *Andrea Theatres, Inc. v. Theatre Confections, Inc.*, 787 F.2d 59, 62 (2d Cir. 1986). Thus, "abstention is clearly improper when a federal suit alleges claims within the exclusive jurisdiction of the federal courts." *Id.*; *see also Ticket Ctr., Inc. v. Banco Popular De Puerto Rico*, 399 F. Supp. 2d 79, 85 (D. P.R. 2005) ("[F]ederal courts do not have discretion to abstain from deciding federal antitrust issues pending resolution of a state suit between the same parties and involving the same transactions."); *Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 559–60 (1983) (explaining that abstention "would have been improper if there was no jurisdiction in the concurrent state actions to adjudicate the claims at issue in the federal suits"). Permitting abstention for exclusive federal claims would "run counter to Congress' determination . . . that federal courts should be the primary fora for handling such claims." *Andrea Theatres*, 787 F.2d at 63. Thus, *Younger* does not apply to federal antitrust claims, which should be adjudicated in federal court.

### B. *Younger* Abstention Does Not Apply to Any of Mr. Manookian's Claims Because the BPR Members Are Financially Biased

Even if *Younger* abstention could apply to the federal antitrust claims, it would not apply to any of Mr. Manookian's claims—constitutional or antitrust—because he alleges that defendants were biased in their dealings with him. ¶¶ 48–70; *see Gibson v. Berryhill*, 411 U.S. 564, 575–77 (1973) (holding *Younger* abstention inapplicable

where state proceeding involves review of licensing determination by biased board members). In such a case, the "predicate for a *Younger v. Harris* dismissal [is] lacking," regardless of whether "judicial review, *de novo* or otherwise, is forthcoming at the conclusion of the administrative proceedings." *Gibson*, 411 U.S. at 577; *see also Simopoulos v. Virginia State Bd. of Med.*, 644 F.2d 321, 326 (4th Cir. 1981) (*Younger* abstention precluded where board is biased, which denies "plaintiff a fair state administrative tribunal"). The Supreme Court stated in *Gibson* that "those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes." 411 U.S. at 579. The complaint alleges that defendants were competitors or potential competitors with pecuniary interests to exclude Mr. Manookian. ¶¶ 48–70. Regardless of any denial of bias that defendants may offer in their reply brief, the complaint's allegations control for purposes of the motion to dismiss. *See Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007).

### C. *Younger* Does Not Apply to the Individual Defendants

Even if *Younger* could apply, its scope would be limited because the complaint alleges claims against lawyers in their individual capacities as competitors, in addition to claims in their official capacity. ¶¶ 5–13. The complaint alleges that individual BPR members violated the antitrust laws not merely because of the BPR's actions, but also in their roles as competitors and prospective competitors who used their unique positions on the BPR as a tool to help them restrain trade. Thus, even if *Younger* abstention could apply, the lawsuit against these individual BPR members, in their individual capacities, would survive.

### D. *Younger* Would Not Apply to Claims for Prospective Relief or Damages

*Younger* abstention—even when it does apply—is limited in its scope to claims for certain injunctive and declaratory relief. *Wooley v. Maynard*, 430 U.S. 705, 710 (1977) (*Younger* precludes federal courts from exercising certain "equitable jurisdiction to enjoin ongoing state prosecutions"); *Simopoulos*, 644 F.2d at 331. But the Supreme Court specifically held in *Wooley* that *Younger* abstention does not extend to federal requests for prospective equitable relief, for example, to "preclude further prosecution" that violates a plaintiff's rights. *Wooley*, 430 U.S. at 711.

Here, Mr. Manookian specifically seeks prospective relief unrelated to the proceedings that have already occurred. For example, he requests that the Court "enjoin defendants from utilizing the 'good cause' standard of § 12.3 or otherwise placing the burden of proof on Mr. Manookian or others; enjoin defendants from taking emergent action against his law license without substantial, sworn evidence; enjoin defendants from violating their own procedural rules; and enjoin defendants from suspending Mr. Manookian's law license based upon any evidence that is not admissible under the rules of evidence." ¶¶ 102, 121. In addition, *Younger* abstention is inappropriate with respect to Mr. Manookian's antitrust damages claims against defendants in their individual capacities, as pursuit of those damages claims will not interfere with any state proceedings. *See Carras v. Williams*, 807 F.2d 1286, 1292 (6th Cir. 1986).

### E. *Younger* Does Not Apply Where No Proceedings Are Ongoing

*Younger* abstention also applies only to ongoing state court proceedings. At the time of the filing of the complaint, the temporary suspension had already been entered. That is, the proceedings concluded when the order was entered. Defendants concede this in their briefing. *See* Mem. at 17. Since the filing of the complaint, the Tennessee Supreme Court has dissolved Mr. Manookian's temporary suspension. Because the temporary suspension was not brought in conjunction with any underlying disciplinary action, *see* ¶ 51, the proceedings regarding the now-dissolved suspension are not ongoing now.

## V. *ROOKER-FELDMAN* DOES NOT WARRANT DISMISSAL

Defendants inappositely contend (Mem. at 17) that the *Rooker-Feldman* doctrine requires this Court to dismiss Mr. Manookian's complaint, without acknowledging that the complaint seeks multiple forms of relief for multiple harms—some past, some prospective, some under the exclusive jurisdiction of federal courts. The *Rooker-Feldman* doctrine is an extremely limited doctrine that simply recognizes that, within the federal court system, only the U.S. Supreme Court—not federal district courts—can exercise appellate review over final state-court judgments. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292 (2005). Not every action challenged in the complaint can be deemed part of a completed state-court judicial action.[3] To the extent that the complaint seeks a declaration that Rule 9

3. The Tennessee Supreme Court itself has explained, "The Board simply is not a judicial system; thus, a Board member is not an officer of a judicial system." *Moncier v. Bd. of Prof'l Responsibility*, 406 S.W.3d 139, 159 (Tenn. 2013); *cf. Verizon Md., Inc.*

(including Section 12.3) is unconstitutional and seeks to enjoin anticompetitive conduct forbidden by federal law over which federal courts have exclusive jurisdiction, *Rooker-Feldman* stands as no basis for dismissal.

## VI. CONCLUSION

For the foregoing reasons, Mr. Manookian respectfully requests that the Court deny defendants' motion to dismiss the complaint. If the Court were to grant the motion in any respect, then Mr. Manookian respectfully requests an opportunity to file an amended complaint.

Respectfully submitted,

Date: July 5, 2019

/s/Aaron Gott
Aaron Gott

Jarod Bona (admitted *pro hac vice*)
Aaron Gott (admitted *pro hac vice*)
David C. Codell, Of Counsel
(*pro hac vice* application forthcoming)
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
(858) 964-4589
jarod.bona@bonalawpc.com
aaron.gott@bonalawpc.com
david@codell.com

*Counsel for Plaintiff*

Daniel Horwitz
Tennessee Bar No. 032176
1803 Broadway, Suite #531
Nashville, TN 37203
(615) 739-2888
daniel.a.horwitz@gmail.com

*Local Pro Bono*[4]
*Counsel for Plaintiff*

*v. Pub. Serv. Comm'n*, 535 U.S. 635, 644 n.3 (2002) ("The doctrine has no application to judicial review of executive action, including determinations made by a state administrative agency.").

4. Any attorney's fee awarded to Mr. Manookian and earned by Mr. Horwitz shall be donated to the First Amendment Center.

## CERTIFICATE OF SERVICE

On the 5th of July 2019, I hereby certify that I caused a true and correct copy of the **Memorandum of Law in Opposition to Motion to Dismiss** to be delivered via the Court's electronic filing system to all counsel who have consented to receive notice of filings in the above-captioned matter.

______________________________
Gabriela Hamilton

**EXHIBIT "11"**

**Ex. 11**

**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE NASHVILLE DIVISION**

| | | |
|---|---|---|
| **BRIAN P. MANOOKIAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **NO. 3:19-cv-00350** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **FLOYD FLIPPIN et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

Before the Court is Defendants' Motion to Dismiss. (Doc. No. 23). Plaintiff filed a Response (Doc. No. 28), Defendants filed a Reply (Doc. No. 31), and Plaintiff filed a Sur-Reply (Doc. No. 37-1). Also pending before the Court is Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction. (Doc. No. 44). Defendants filed a Response (Doc. No. 49) and Plaintiff filed a Reply (Doc. No. 56). The Court previously denied Plaintiff's motion for a temporary restraining order. (Doc. No. 47).

For the reasons stated in the accompanying memorandum, Defendants' Motion to Dismiss (Doc. No. 23) is **GRANTED, in part**. Plaintiff's antitrust claim in Court IV is subject to *Parker* immunity and is **DISMISSED WITH PREJUDICE**. The claims for damages against Defendants under 42 U.S.C. § 1983 in Counts I, II, and III are barred by quasi-judicial immunity and are **DISMISSED WITH PREJUDICE**. The remaining claims for injunctive and declaratory relief are **STAYED** pursuant to *Younger v. Harris*, 401 U.S. 37 (1971). In light of the ruling on Defendants' Motion to Dismiss, Plaintiff's Motion for Preliminary Injunction (Doc. No. 44) is **MOOT**.

**Ex. 11**

All claims having been stayed or dismissed, the Clerk is directed to administratively close the file, subject to reopening upon motion by either party. The parties shall notify the Court within 30 days of the conclusion of the state proceedings.

It is so **ORDERED**.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE NASHVILLE DIVISION**

| | | |
|---|---|---|
| **BRIAN P. MANOOKIAN,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | **NO. 3:19-cv-00350** |
| **v.** | **)** | |
| | **)** | **JUDGE CAMPBELL** |
| **FLOYD FLIPPIN et al.,** | **)** | |
| | **)** | |
| **Defendants.** | **)** | |

**MEMORANDUM**

Before the Court is Defendants' Motion to Dismiss. (Doc. No. 23). Plaintiff filed a Response (Doc. No. 28), Defendants filed a Reply (Doc. No. 31), and Plaintiff filed a Sur-Reply (Doc. No. 37-1). Also pending before the Court is Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction. (Doc. No. 44). Defendants filed a Response (Doc. No. 49) and Plaintiff filed a Reply (Doc. No. 56). The Court previously denied Plaintiff's motion for a temporary restraining order (Doc. No. 47) and now considers the Motion for Preliminary Injunction.

Plaintiff Brian Manookian is an attorney whose license to practice law in Tennessee was temporarily suspended on September 21, 2018, by the Supreme Court of Tennessee. The Tennessee Supreme Court found that Plaintiff represented a "substantial threat to the public." Order of Temp. Suspension, *In re: Brian Phillip Manookian, BPR #026455*, No. M2018-01711-SC-BAR-BP (Tenn. Sept. 21, 2018) (Doc. No. 24-1).

Plaintiff's claims the Board of Professional Responsibility of the Supreme Court of Tennessee ("BPR") filed the petition for temporary suspension in retaliation for Plaintiff's suit against a state court judge filed one day earlier. In addition, he claims the temporary suspension

is a conspiracy by Defendants, who are individual members of the BPR, to restrain trade and exclude Plaintiff from the legal market in Tennessee. Plaintiff filed this case on April 29, 2019, asserting claims under 42 U.S.C. § 1983 for violation of his rights to free speech, due process, and equal protection, and a claim for conspiracy to restrain trade under the Sherman Act, 15 U.S.C. § 1.

## I. PROCEDURAL BACKGROUND

After filing this case, the disciplinary proceedings at the Tennessee Supreme Court and before the BPR have proceeded.[1] After the September 21, 2018 Order of Temporary Suspension, Plaintiff sought dissolution of the temporary suspension three times—on November 21, 2018, February 27, 2019, and April 9, 2019. At the direction of the Tennessee Supreme Court, a panel held hearings on Plaintiff's petitions for dissolution and issued reports and recommendations. The Tennessee Supreme Court adopted the recommendations of the panels, denying the first two petitions, and granting the third petition on May 17, 2019, subject to Plaintiff's "ongoing compliance with conditions set forth in the panel's Report and Recommendation." Shortly after the initial order of temporary suspension was dissolved, on June 24, 2019, the BPR filed a petition for reinstatement of the temporary suspension. The Tennessee Supreme Court referred the matter for a hearing to the panel that had heard Plaintiff's second and third petitions for dissolution and ordered the panel to submit a report and recommendation on the petition for reinstatement of the temporary suspension. The BPR filed a supplemental petition on August 6, 2019. This petition was referred for hearing and report and recommendation to the same panel. After several delays,

[1] The procedural background of the underlying disciplinary proceeding is summarized from the Tennessee Supreme Court's October 11, 2019 Order Reinstating Temporary Suspension. *In re Brian Phillip Manookian, BPR #026455*, No. M2019-00630-SC-BAR-BP (Tenn. Oct. 11, 2019) (recounting procedural history) and from the Order Denying Petition for Dissolution of Order of Temporary Suspension, *In re Brian Phillip Manookian, BPR #026455*, No. M2019-00630-SC-BAR-BP (Tenn. Oct. 17, 2019). The details of the complaints in the disciplinary proceeding are not relevant to the Court's opinion.

the panel conducted a hearing on September 26, 2019, and filed its report and recommendation on October 7, 2019. Plaintiff filed a "Motion to Dismiss Supplemental Petition to Reinstate Temporary Suspension and Objection to the Report and Recommendation" and a supplement to the motion to dismiss. In these motions he argued that the petition does not provide a sufficient basis to reinstate the temporary suspension, that two members of the panel should have recused themselves because they are defendants in this action, and that Tennessee Supreme Court Rule 9, section 12.3, governing attorney disciplinary enforcement, is unconstitutional. The Tennessee Supreme Court denied Plaintiff's motion to dismiss and adopted the panel's finding that Plaintiff "violated a condition of the Order Granting Petition for Dissolution of Order of Temporary Suspension." The court also found Plaintiff "poses a threat of substantial harm to the public" and determined that it "should reinstate the temporary suspension of [Plaintiff's] law license."

The same day the Tennessee Supreme Court issued the Order reinstating Plaintiff's temporary suspension, Plaintiff again petitioned that Court for dissolution of the temporary suspension, which the Court denied on October 17, 2019. In the October 17, 2019 Order, the Tennessee Supreme Court stated, "The most recent hearing demonstrated ample basis for determining that Mr. Manookian poses a threat of substantial harm to the public and for the reinstatement of his temporary suspension." The Court acknowledged pending disciplinary charges and directed that "Mr. Manookian and the Board shall proceed with all due speed toward ultimate resolution of the petition for discipline currently pending before the Board." *Id*.

On October 26, 2019, Plaintiff filed with this Court a Motion for Temporary Restraining Order and/or Preliminary Injunction. (Doc. No. 44). Through that motion, Plaintiff asked the Court to restrain Defendants from "again 'temporarily' suspending Mr. Manookian's law license without due process" and enjoin Defendants from "further retaliating against him for his protected First

Amendment activity." (*Id*.) The Court denied Plaintiff's motion for a temporary restraining order on grounds that Plaintiff did not show immediate irreparable harm. (Doc. No. 47).

Plaintiff filed this case against the attorney members of the BPR in their official and individual capacities. He alleges the actions of the BPR constitute a violation of federal antitrust regulations, and violations of his rights to free speech, due process and equal protection. He alleges that the temporary suspension mechanism in Tennessee Supreme Court Rule 9, section 12.3 is unconstitutional on its face and as applied to him. Defendants' moved to dismiss the complaint on grounds of sovereign immunity, *Parker* immunity, and quasi-judicial immunity, and argue that the *Younger* abstention doctrine bars involvement in ongoing attorney disciplinary proceedings.

## II. STANDARD OF REVIEW[2]

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take all the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. In reviewing a motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

In considering a Rule 12(b)(6) motion, the Court may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits

---

[2] Defendants' Motion to Dismiss is filed pursuant to both Rule 12(b)(1) and 12(b)(6). The Court did not reach the sovereign immunity defense and accordingly decided the Motion under the standard prescribed by Rule 12(b)(6).

attached to Defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims. *Bassett v. National Collegiate Athletic Assn*., 528 F.3d 426, 430 (6th Cir. 2008); *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007) (on a motion to dismiss the Court may consider documents referenced in a plaintiff's complaint that are central to plaintiff's claims, matters of which a court may take judicial notice, documents that are a matter of public record, and letters that constitute decisions of a government agency). The Court has considered the record of the disciplinary proceedings before the Supreme Court of Tennessee as referred to in the Complaint and as public records.

## III. ANALYSIS

Defendants assert a variety of abstention and immunity defense as a bar to Plaintiff's claims. Defendants argue: (1) the *Younger v. Harris* abstention doctrine bars claims arising out of the ongoing state disciplinary proceeding; (2) claims for damages in their official capacity are barred by sovereign immunity; (3) claims for damages in their individual capacity are barred by quasi-judicial immunity; and (4) antitrust claims are barred by *Parker* immunity.[3]

### A. *Parker* Immunity Bars Plaintiff's Antitrust Claim

Plaintiff claims "the BPR, along with individual market-participant defendants, entered into an agreement to exclude one of the state's most competitively successful medical malpractice lawyers, Mr. Manookian, from the market." (Comp., Doc. No. 1, ¶ 132). Plaintiff claims the alleged agreement was the decision to "punish" Plaintiff with a temporary suspension of his law license, to publicize the suspension to the media, and to "resist all efforts by Mr. Manookian to

---

[3] Defendants also raise the *Rooker-Feldman* Doctrine as a bar to review of state court decisions "[t]o the extent the state disciplinary proceedings have been concluded." As the state disciplinary proceedings have not concluded and the Court finds Plaintiff's claims are otherwise barred, the Court does not reach the *Rooker-Feldman* issue.

petition for dissolution of the suspension." (*Id*., ¶ 134). Plaintiff seeks treble damages under 15 U.S.C. § 15 and injunctive relief under 15 U.S.C. § 26. (*Id*., ¶ 145).

Defendants urge dismissal of Plaintiff's Sherman Act claims on the ground that the action complained of—the temporary suspension—was an act of the Tennessee Supreme Court and entitled to sovereign immunity under the Eleventh Amendment and state-action immunity under *Parker*. Plaintiff argues that the BPR is not entitled to state-action immunity because it did not act pursuant to clearly articulated state policy and was not actively supervised by the Supreme Court.

In *Parker v. Brown*, 317 U.S. 341 (1943), the Supreme Court, relying on principles of federalism and state sovereignty, interpreted the antitrust laws to confer immunity on anticompetitive conduct by the States when acting in their sovereign capacity. *N.C. State Bd. of Dental Examiners*, 135 S.Ct. 1101, 1110 (2015). Without *Parker* immunity, "federal antitrust law would impose an impermissible burden on the States' power" to subordinate market competition to "other values a State may deem fundamental." *Id*. at 1109. "[A] decision of a state supreme court, acting legislatively rather than judicially, is exempt from Sherman Act liability as state action." *Hoover v. Ronwin*, 466 U.S. 558, 568 (1984) (citing *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 790 (1975)); *see also*, *N.C. State Bd*. 135 S.Ct. at 1110 ("State legislation and 'decision[s] of a state supreme court, acting legislatively rather than judicially,' … '*ipso facto* are exempt from the operation of the antitrust laws' because they are an undoubted exercise of state sovereign authority.").

If the action is not "an exercise of state sovereign authority," but is instead a non-sovereign state agency controlled by active market participants, state-action immunity applies only if the actions meets the two-part *Midcal*[4] test as articulated by the Supreme Court in *N.C. State Board*.

---

4 *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc*., 445 U.S. 97 (1980).

135 S.Ct. at 1112.  Under *Midcal*, "[a] state law or regulatory scheme cannot be the basis for antitrust immunity unless, first, the State has articulated a clear … policy to allow the anticompetitive conduct, and second, the State provides active supervision of [the] anticompetitive conduct."  *Id*. (quoting *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 634 (1992)).

Here, the conduct complained of is that of the Tennessee Supreme Court.  The Tennessee Supreme Court issued the Order of Temporary Suspension.  "Where the conduct is that of the sovereign itself, … the danger of unauthorized restraint of trade does not arise." *Hoover*, 466 U.S. at 569.  The Tennessee Supreme Court Rules specify that the Disciplinary Counsel may petition the court for an order of temporary suspension, but only the Tennessee Supreme Court can temporarily suspend an attorney. Tenn.Sup. Ct. R. 9, § 12.3.  At best, Defendants' authority under the Rules was limited to petitioning for an order of temporary suspension and filing reports and recommendations with the Tennessee Supreme Court.[5]  Ultimate action on the petition or report and recommendation is vested solely with the Tennessee Supreme Court.

The Supreme Court considered a similar circumstance in *Hoover v. Ronwin*, 466 U.S. 558 (1984).  In *Hoover*, the plaintiff alleged anticompetitive conduct with regard to bar admission on the part of individual members of Arizona Supreme Court's Committee on Examinations and Admission.  The Supreme Court found that although the Arizona Supreme Court had "necessarily delegated the administration of the admissions process to the Committee," because the court itself had made the final decision to admit or deny admission to practice, the "conduct [the plaintiff] challenges was in reality that of the Arizona Supreme Court" and "is therefore exempt from

---

[5]     The Rules do not even appear to confer this much authority on the members of the BPR.  The Rules provide that a petition for temporary suspension may be made by Disciplinary Counsel, who reports to the BPR.  Tenn. Ct. App. R. 9, §§ 7.1, 12.3.  The Board or a panel conducts hearings on a petition for dissolution of temporary suspension and files a report and recommendation with the Tennessee Supreme Court. Id. at § 12.3(d).

Sherman Act liability under the state-action doctrine of *Parker v. Brown*." *Id*. at 573. In *Hoover*, the Supreme Court stated that it did not need to address issues of "clear articulation" and "active supervision" when the conduct at issue was in fact that of the Supreme Court. *Id*. at 569.

The Court finds that the *Midcal* test does not apply because the anticompetitive activity complained of was that of the Tennessee Supreme Court which is *ipso facto* exempt from the antitrust laws. Plaintiff cannot evade state-action immunity by suing only the members of the BPR and not the sovereign entity. "If a government actor is independently responsible for causing the alleged antitrust injury, 'once [it] is determined to be immune …, the immunity should be extended to include private parties acting under [its] direction." *Edinboro College Park Apartments v. Edinboro Univ*., 850 F.3d 567, 574 (3d Cir. 2017) (quoting *Zimomra v. Alamo Rent-A-Car, Inc*. 111 F.3d 1495, 1500 (10th Cir. 1997)). "Otherwise, plaintiffs could sue only the private parties and by winning antitrust judgments against then, could thwart state policies as if there were no state [i]mmunity." *Id*. (quoting *A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc*., 263 F.3d 239, 256 (3d Cir. 2001)); *see also*, *Hoover*, 466 U.S. 569 (alleged anticompetitive conduct by individual members of the bar admissions committee was subject to Parker immunity because the actions complained of were taken by the state supreme court, a sovereign entity).

Although Plaintiff has brought suit against the individual members of the BPR, the anticompetitive action complained of—temporary suspension and dissolution of temporary suspension—was that of the Tennessee Supreme Court, which is immune from antitrust laws under the claims presented in this case.

**B.  Absolute Quasi-Judicial Immunity Bars Claims Against Defendants**

Defendants assert they are absolutely immune to suits for damages under the doctrine of quasi-judicial immunity.  The Court agrees.[6]

Judges are entitled to absolute judicial immunity from suits for money damages for all actions taken in the judge's official capacity, unless they were taken in the complete absence of jurisdiction.  *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994).  "[S]uch immunity has also been extended to non-judicial officers performing 'quasi-judicial' duties."  *Quatkemeyer v. Kentucky Bd. of Med. Licensure*, 506 F. App'x 342, 345 (6th Cir. 2012).  "Quasi-judicial immunity extends to those persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune." *Bush*, 38 F.3d at 847.  Quasi-judicial immunity has been extended to members of professional licensing or disciplinary boards that perform investigatory, prosecutorial or judicial functions.  *See Moncier v. Jones*, 557 F. App'x 407, 409 (6th Cir. 2014) (holding that Chief Disciplinary Counsel for the Board was entitled to quasi-judicial immunity); *Quatkemeyer*, 506 F. App'x at 345-49 (members of the Board of Medical Licensure, an agency of the state, were entitled to quasi-judicial immunity); *Watts v. Burkart*, 978 F.2d 269, 276 (6th Cir. 1992) (members of state medical licensing board entitled to absolute immunity).

In *Moncier v. Jones*, the Sixth Circuit affirmed dismissal of claims for damages against the Chief Disciplinary Counsel of the Tennessee Board of Professional Responsibility, when the conduct alleged to have violated the plaintiff's civil rights occurred when the defendant was

---

[6]     Plaintiff only seeks damages against Defendants in their individual capacities for the Section 1983 claims.  However, to the extent damages are sought against Defendants in their official capacities, such claims are barred by the Eleventh Amendment.  *See Moncier v. Jones*, 557 F. App'x 407, 409 (6th Cir. 2014) ("[T]he Eleventh Amendment bars official-capacity claims for damages against state officials") (citing *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989)).

performing her official role as Chief Disciplinary Counsel. 557 F. App'x 407, 409 (6th Cir. 2014). The same conclusion is warranted here. The conduct alleged to have violated Defendant's civil rights—petitioning the Tennessee Supreme Court for temporary suspension of Plaintiff's law license, conducting hearings at the direction of the Court, and drafting reports and recommendations—falls squarely within the duties and obligations delegated by the Tennessee Supreme Court. *See* Tenn. R. App. P. 9, § 4. Accordingly, Defendants are entitled to absolute quasi-judicial immunity from Plaintiff's claims for damages against them personally.

**C. The *Younger v. Harris* Abstention Doctrine Bars Involvement in the Ongoing State Disciplinary Proceedings**

Defendants argue the Court should abstain from review of the merits of this case pursuant to *Younger v. Harris,* 401 U.S. 37 (1971). "In *Younger*, the United States Supreme Court counseled federal courts to abstain from enjoining certain pending state court criminal proceedings." *Danner v. Bd of Prof'l Responsibility of the Tenn. Sup. Ct*, 277 F. App'x 575, 577 (6th Cir. 2008). "This doctrine is borne out of a 'proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Id*. (quoting *Younger*, 401 U.S. at 44). The doctrine has been extended to ongoing civil proceedings and ongoing state administrative proceedings. *Id*. (citing *Huffman v. Pursue, Ltd*., 420 U.S. 592 (1975); *Middlesex Cty Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982)). *Younger* counsels that a federal district court should abstain when: "(1) the underlying proceedings constitute an ongoing state judicial proceeding; (2) the proceedings implicate important state interests; and (3) there is an adequate opportunity to raise constitutional challenges in the course of the underlying proceeding." *Danner*, 277 F. App'x at 578.

Plaintiff does not challenge that the State has an important interest in regulating the practice of law or that there is adequate opportunity to raise constitutional challenges in the courts of the underlying proceeding.[7] Instead, Plaintiff argues that *Younger* abstention does not apply because the underlying proceedings are not "ongoing judicial proceedings," and that the claims at issue fall within an exception to the application of *Younger* because the members of the BPR are biased.

State bar disciplinary proceedings are "judicial proceedings." *See Danner*, 277 F. App'x at 578-79; *Fieger v. Thomas*, 74 F.3d 740 (6th Cir. 1996) (holding a board was enforcing rules of professional conduct was performing an adjudicative function and thus satisfied the first requirement for *Younger*); *Berger v. Cuyahoga Bar Ass'n*., 983 F.2d 718 (6th Cir. 1993) (ruling that when a state supreme court is the ultimate decision maker in attorney discipline proceedings, those proceedings are judicial in nature for *Younger* purposes); *Squire v. Coughlan*, 469 F.3d 551 (6th Cir. 2006) (investigations into judicial misconduct are an adjudicative function for *Younger* purposes). In *Danner*, the Sixth Circuit specifically considered disciplinary proceedings of the Tennessee Board of Professional Responsibility and held that "the Tennessee disciplinary proceedings at issue are judicial in nature." 277 F. App'x at 579.

If the state proceeding was pending at the time of the filing, the matter is considered "ongoing." *Id*. at 579. The action "remains pending until the litigant has exhausted his state appellate remedies." *Id*. (quoting *Huffman*, 520 U.S. at 609). Plaintiff argues that the proceedings are not "ongoing" because the Order of Temporary Suspension has already been entered and that because the temporary suspension was "not brought in conjunction with any underlying

---

[7] During the course of the underlying disciplinary proceedings before the Tennessee Supreme Court, Plaintiff raised and the Tennessee Supreme Court rejected the constitutional challenge to Rule 9, § 12.3. *See* Order Reinstating Temp. Suspension, *In re Brian Phillip Manookian*, BPR #026455, No. M2019-00630-SC-BAR-BP (Tenn. Oct. 11, 2019).

disciplinary action, the proceedings regarding the now-dissolved suspension are not ongoing now." (Pl. Resp., Doc. No. 28 at 23). This argument is flatly contradicted by the long procedural history in the disciplinary proceeding recounted by the Tennessee Supreme Court. *See In re Manookian*, BPR #026455, No. M2019-00630-SC-BAR-BP (Tenn. Oct. 11, 2019). This history shows that not only was the disciplinary proceeding pending at the time the complaint was filed, it is still pending. Moreover, the October 17, 2019 Order Denying Petition for Dissolution of Order of Temporary Suspension clearly indicates that the temporary suspension is part of an underlying disciplinary complaint that is unresolved. *In re Manookian*, BPR #026455, No. M2019-00630-SC-BAR-BP (Tenn. Oct. 17, 2019) (ordering the parties to "proceed with all due speed toward ultimate resolution of the petition for discipline currently pending before the Board").

Even Plaintiff recognizes, in the context of a claim preclusion, that the proceedings are not yet final, arguing that "there has simply not been a final state-court judgment for preclusion purposes because the underlying disciplinary charges—including those from the original suspension have not been heard." (Pl. Reply, Doc. No. 56 at 1). The Court does not suggest Plaintiff is disingenuous in his arguments. Rather, the evolution of Plaintiff's argument reflects the ongoing nature of the disciplinary proceedings at issue and underscores the rationale for abstention from those proceedings.

Plaintiff maintains that even if the prerequisites for *Younger* abstention have been met, the following exceptions to the doctrine allow the case to proceed: bad faith, harassment, and bias. Plaintiff alleges the initial temporary suspension was initiated in retaliation for Plaintiff's filing a lawsuit against a state court judge and issuing a subpoena to the BPR and that thereafter "Defendants and their agents have engaged in an unprecedented, aggressive pursuit of [Plaintiff] since he first sued a state court judge and served a subpoena on the board in the fall of 2018.

Specifically they have: (i) pursued a temporary suspension based on protected out-of-court speech; (ii) failed to bring or adjudicate underlying disciplinary charges for months, asserted that [Plaintiff] had the burden of proof to dissolve the suspension; (iii) engaged in extensive gamesmanship to prevent hearings that would actually put them to their proof; (iv) brought new disciplinary petitions immediately after a suspension was dissolved; (v) filed a new petition to reinstate the temporary suspension based on flagrantly baseless allegations of noncompliance and fabricated misconduct complaints; (vi) refused to recuse themselves; and (vii) disregarded evidence that contradicted their preordained result."  (Pl. Br. on Mot. for Prelim. Inj., Doc. No. 43 at 13).  The allegations of bias are directed at the alleged financial incentive for the Board Members to remove Plaintiff as competition in the legal market, and the three-member panel that held a hearing on the petition to reinstate temporary suspension when two of the members of the panel are defendants in this case.

"While bias is an exception to *Younger* abstention, it is an extraordinary one, and the petitioner alleging such must offer 'actual evidence to overcome the presumption of honesty and integrity in those serving as adjudicators.'" *Danner*, 277 F. App'x at 580.  *Younger* "requires more than mere allegation and more than a conclusory finding to bring a case within the harassment exception.  It appears that such a finding must be supported by specific evidence from which it can be inferred that state officials have been enforcing the statute against the plaintiffs in bad faith for purposes of harassment." *Grandco Corp. v. Rochford*, 536 F.2d 197, 203 (7th Cir. 1976)).  Exceptions to *Younger* abstention have been interpreted narrowly. *Zalman v. Armstrong*, 802 F.2d 199, 205 (6th Cir. 1986).

Importantly, the body that effected the temporary suspension was not the BPR, but the Tennessee Supreme Court.  The Rules provide that a petition for temporary suspension is made by Disciplinary Counsel to the Tennessee Supreme Court and that "the Court may issue an order …

temporarily suspending said attorney."  Tenn. R. App. P. 9, § 12.3.  As the temporary suspension was not ultimately carried out by the BPR, any alleged bias imputed to the BPR is irrelevant, or, at a minimum, would be cured when the Tennessee Supreme Court reviews the petition.  Here, the Tennessee Supreme Court specifically found on more than one occasion that Plaintiff posed a threat of substantial harm to the public that justified the temporary suspension of his law license. There is no allegation that the Tennessee Supreme Court reached this conclusion because of its bias against Plaintiff.

The case cited by Plaintiff, *Gibson v. Berryhill*, 411 U.S. 564 (1973), involved a level of institutional bias not established by Plaintiff's conclusory allegations against individual BPR members.  *Gibson* involved a state optometry board on which only independent optometrists were eligible to serve.   Plaintiffs were licensed optometrists employed by corporations (i.e. not independent optometrists) who sought to enjoin license revocation hearings before the state optometry board on charges of unprofessional conduct.  The alleged unprofessional conduct was employment by a corporation.  At the time, almost half of the state's optometrists were employed by corporations.  The Supreme Court noted that *Younger* "presupposes the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved" and that the state board was "incompetent by reason of bias to adjudicate the issues pending before it." *Id*. at 577-78.  The board, which was composed entirely of independent optometrists, sought to revoke the licenses of "all optometrists in the State who were employed by business corporations …, and that these optometrists accounted for nearly half of all the optometrists practicing in Alabama." *Id*. at 578.  The Supreme Court affirmed that "the pecuniary interest of the members of the Board of Optometry had sufficient substance to disqualify them, given the context in which the case arose." *Id*. at 579.

The facts alleged here do not present such an extreme circumstance.  First, unlike in the *Gibson* where the Board of Optometry had the authority to suspend licenses, the temporary suspensions at issue are made by the Tennessee Supreme Court in the first instance on petition by the Disciplinary Counsel and later on report and recommendation by a three-member panel.  At no point in the proceedings to date did the BPR temporarily suspend Plaintiff's law license, nor could it.  More importantly, however, the pecuniary interest of the board in *Gibson* is not present here. In *Gibson*, the board effectively sought to revoke licenses of half of the optometrists in the state when those to be excluded from practice were also categorically excluded from participation on the board.

The BPR does not have a pecuniary interest comparable to that of the board in *Gibson* that would disqualify them from hearing the disciplinary charges.  The temporary suspension is directed at a single attorney, not an entire category of practitioners; nor is the Rule of Professional Conduct on which Plaintiff's suspension was based a rule that affects Plaintiff but not any of the members of the BPR.   Nor is there any indication that the members of the BPR have a pecuniary interest in Plaintiff's suspension sufficient to render the BPR incompetent to adjudicate complaints against Plaintiff.   There are over 18,000 licensed attorneys in Tennessee.[8]  It strains credulity to conclude that the individual member of the BPR would benefit substantially from the removal of a single attorney, no matter how successful he is.

Moreover, it appears from the record in the disciplinary proceedings before the Tennessee Supreme Court, that Plaintiff is able to raise complaints of bias before the Tennessee Supreme Court.  Indeed, in his objections to the report and recommendation of the panel recommending

---

[8]    *See* American Bar Association National Lawyer Population Survey (2019), available at https://www.americanbar.org/content/dam/aba/administrative/market_research/national-lawyer-population-by-state-2019.pdf

reimposition of the temporary suspension, Plaintiff objected to the alleged bias of members of the panel. The Tennessee Supreme Court considered and overruled the objection.

Finally, Plaintiff argues that *Younger* abstention does not apply to claims for prospective equitable relief. Plaintiff claims he "specifically seeks prospective relief unrelated to the proceedings that have already occurred." (Pl. Resp., Doc. No. 28 at 22). He requests: (1) that the Court "enjoin defendants from utilizing the 'good cause' standard of § 12.3 or otherwise placing the burden of proof on Mr. Manookian or others"; (2) "enjoin defendants from violating their own procedural rules"; and (3) "enjoin defendants from suspending Mr. Manookian's law license based upon any evidence that it not admissible under the rules of evidence." Although in some circumstances, *Younger* does not preclude prospective equitable relief, the injunctive relief sought here directly and unequivocally applies to the ongoing disciplinary proceedings and is precisely the sort of interference in ongoing state proceedings *Younger* seeks to avoid.

The case cited by Plaintiff, *Wooley v. Maynard*, 430 U.S. 705, 710 (1977), involved an entirely different procedural posture. In *Wooley*, the Plaintiff did not seek prospective relief regarding an ongoing case, but to enjoin future prosecution under a state statute he argued was unconstitutional. The *Wooley* plaintiff had been convicted of violating the state statute multiple times and served time in jail rather than pay a fine, but he did not seek to overturn his previous convictions or expunge his criminal record or any other action that would touch upon the concluded criminal proceedings. Instead, the plaintiff sought to enjoin the state from prosecuting him again. In contrast, the underlying proceeding Plaintiff seeks to affect is still ongoing. As Plaintiff stated, "[T]he Rule contemplates that further proceedings should be adjudicated … the charges underlying the original suspension have not yet been decided." (Pl. Reply, Doc. No. 56 at 1).

Based on the foregoing, the Court finds that abstention pursuant to *Younger v. Harris* is warranted.

## IV. CONCLUSION

For the reasons stated, Defendants' Motion to Dismiss (Doc. No. 23) is **GRANTED, in part**. Plaintiff's antitrust claim in Court IV is subject to *Parker* immunity and is **DISMISSED WITH PREJUDICE**. The claims for damages against Defendants under 42 U.S.C. § 1983 in Counts I, II, and III are barred by quasi-judicial immunity and are **DISMISSED WITH PREJUDICE**. The remaining claims for injunctive and declaratory relief are **STAYED** pursuant to *Younger v. Harris*. *See Quackenbush*, 517 U.S. at 721 (recognizing the court's power to stay cases based on abstention principles where the relief sought is equitable in nature). In light of the ruling on Defendants' Motion to Dismiss, Plaintiff's Motion for Preliminary Injunction (Doc. No. 44) is **MOOT**.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE

**EXHIBIT "12"**

**Ex. 12**

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **BRIAN P. MANOOKIAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **NO. 3:19-cv-00350** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **FLOYD FLIPPIN et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

Pending before the Court is Plaintiff's Motion for Entry of Judgment on Certain Dismissed Claims Under Fed. R. Civ. P. 54(b). (Doc. No. 60). Through the motion, Plaintiff seeks entry of judgment under Fed. R. Civ. P. 54(b) to allow for immediate appeal of the Court's February 28, 2020 Order (Doc. No. 59). On August 24, 2020, Plaintiff entered a Notice of Appeal. (Doc. No. 65). Accordingly, the Motion for Entry of Judgment (Doc. No. 60) is **MOOT**.

It is so **ORDERED**.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE

# EXHIBIT "13"

**Ex. 13**

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

BRIAN P. MANOOKIAN,

*Plaintiff*,

vs.

FLOYD FLIPPIN et al.,

*Defendants*.

Civil Action No. 3:19-cv-00350

Judge William L. Campbell, Jr.

**MOTION FOR ENTRY OF JUDGMENT
ON CERTAIN DISMISSED CLAIMS UNDER FED. R. CIV. P. 54(b)**

Plaintiff Brian P. Manookian requests that this Court enter an order of judgment under Rule 54(b), Federal Rules of Civil Procedure, as to the claims it dismissed with prejudice in its February 28, 2020 order.

1. On February 28, 2020, this Court entered an order dismissing four claims with prejudice and staying the remaining claims under *Younger v. Harris*:

> For the reasons stated in the accompanying memorandum, Defendants' Motion to Dismiss (Doc. No. 23) is **GRANTED, in part**. Plaintiff's antitrust claim in Count IV is subject to *Parker* immunity and is **DISMISSED WITH PREJUDICE**. The claims for damages against Defendants under 42 U.S.C. § 1983 in Counts I, II, and III are barred by quasi-judicial immunity and are **DISMISSED WITH PREJUDICE**. The remaining claims for injunctive and declaratory relief are **STAYED** pursuant to *Younger v. Harris*, 401 U.S. 37 (1971). In light of the ruling on Defendants' Motion to Dismiss, Plaintiff's Motion for Preliminary Injunction (Doc. No. 44) is **MOOT**.

2. Since the Court stayed the action under *Younger v. Harris*, final judgment was not entered. Therefore, the order does not qualify as a final decision

under 28 U.S.C. § 1291, a collateral order, or an interlocutory order under 28 U.S.C. § 1292. *Summers v. Leis*, 368 F.3d 881, 889 (6th Cir. 2004).

3. A district court may direct the entry of final judgment as to one or more but fewer than all of the claims in a case "only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). The Court should "balance the needs of the parties against the interests of efficient case management," considering the following factors:

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense and the like.

*In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 275 (6th Cir. 2019) (quoting *Gen. Acquisition v. Gencorp, Inc.*, 23 F.3d 1022, 1027 (6th Cir. 1994)).

4. The Court should enter final judgment as to all the dismissed claims because the only matter precluding final judgment is an indefinite stay of the only claims that were not dismissed.

5. The first factor favors entry of final judgment on the dismissed claims because there is an insignificant relationship between the adjudicated claims and the unadjudicated claims. They are legally distinct (and the antitrust claim is also factually distinct): the dismissed claims were dismissed on grounds that do not apply to the remaining claims, and the remaining claims were stayed on grounds that do not apply to the dismissed claims. State action immunity applies only to

antitrust claims, quasi-judicial immunity applies only to damages claims, *Younger v. Harris* abstention applies only to injunctive relief, *Wooley v. Maynard*, 430 U.S. 705, 710 (1977) (*Younger* precludes federal courts from exercising certain "equitable jurisdiction to enjoin ongoing state prosecutions"), and *Younger v. Harris* abstention can never apply to federal antitrust claims. *See* Opp. Mot. Dismiss at 19–20. Put another way, reversal by the Court of Appeals would not affect this Court's decision on the remaining claims that it stayed.

6.     The second factor favors final judgment because future developments in this Court would not affect the grounds on which the dismissed claims were adjudicated and thus could not be mooted by further proceedings.

7.     Similarly, the third factor favors entry of final judgment on the dismissed claims because their grounds for dismissal do not apply to the remaining injunctive and declaratory relief claims, and thus the Court of Appeals will not have to decide the same legal issues twice.

8.     The fourth factor favors final judgment because there are no claims or counterclaims that could later require set-off of the dismissed claims for which final judgment is sought.

9.     Finally, other considerations also heavily favor entry of final judgment as to the dismissed claims. The case has effectively been terminated but Mr. Manookian's right to appeal on grounds independent from any remaining claims is delayed indefinitely. Moreover, as it must in dismissing a complaint under Rule 12(b)(6), the Court accepted as true that Mr. Manookian has suffered millions of

dollars in damages, but that he cannot recover those damages as a matter of law under two immunity doctrines. At the same time, he is not allowed to earn a living until defendants conclude their proceedings, and this Court has abstained from providing relief from those proceedings independent of the merits of the claims (which were not even disputed by defendants). Thus, there is a danger that Mr. Manookian will suffer economic hardship and injustice through delay of entry of final judgment.

10. For all these reasons, there is no just reason for delay with respect to entry of judgment as to the dismissed claims, as provided in Rule 54(b), Federal Rules of Civil Procedure.

11. Under Local Rule 7.01, the undersigned submits that he has met and conferred with opposing counsel regarding this motion. Opposing counsel indicated that defendants object to the relief requested in this motion.

**CONCLUSION**

For these reasons, Mr. Manookian respectfully requests that this Court find that there is no just reason for delay with respect to entry of judgment as to the claims dismissed with prejudice and enter an order of judgment as to those claims.

Respectfully submitted,

Date: March 30, 2020

*s/ Aaron Gott*
AARON GOTT
Jarod Bona (admitted *pro hac vice*)
David Codell (admitted *pro hac vice*)
Aaron Gott (admitted *pro hac vice*)
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037

(858) 964-4589
jarod.bona@bonalawpc.com
david.codell@codell.com
aaron.gott@bonalawpc.com

*Counsel for Plaintiff*

Daniel Horwitz
Tennessee Bar No. 032176
1803 Broadway, Suite #531
Nashville, TN 37203
(615) 739-2888
daniel.a.horwitz@gmail.com

*Local Pro Bono[1] Counsel for Plaintiff*

1. Any attorney's fee awarded to Mr. Manookian and earned by Mr. Horwitz shall be donated to the First Amendment Center.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and exact copy of the Motion for

Entry of Judgment on Certain Dismissed Claims Under Rule 54(b) was served on

the persons listed below by means of this Court's filing system.

Talmage M. Watts
Senior Assistant Attorney General
Attorney General's Office – Tax
Division
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-6431 telephone
talmage.watts@ag.tn.gov

*Counsel for Defendants*

Daniel Horwitz
Tennessee Bar No. 032176
1803 Broadway, Suite #531
Nashville, TN 37203
(615) 739-2888
daniel.a.horwitz@gmail.com

*Local Pro Bono Counsel for Plaintiff*

on the 30th day of March 2020.

                                                        *s/Aaron Gott*
                                                        AARON GOTT

**EXHIBIT "14"**

No. 20-5979

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 10, 2020
DEBORAH S. HUNT, Clerk

BRIAN MANOOKIAN,

Plaintiff-Appellant,

v.

FLOYD S. FLIPPIN, in his official and individual capacities, et al.,

Defendants-Appellees.

O R D E R

Plaintiff Brian Manookian appeals the district court's order of February 28, 2020, granting in part the motion to dismiss—filed by Defendants Floyd S. Flippin, Dana L. Dye, John Daniel Kitch, Joe Michael Looney, Odell Horton, Jr., Ruth T. Ellis, Jody Pickens, Bridget J. Willhite, and Jimmie Carpenter Miller—and denying as moot his motion for a preliminary injunction. On August 24, 2020, Manookian filed his notice of appeal. In civil cases, the notice of appeal must be filed within thirty days of the order appealed from. Fed. R. App. P. 4(a)(1)(A).

Manookian is **ORDERED** to **SHOW CAUSE** within twenty-one (21) days of the entry of this order why his appeal should not be dismissed for lack of jurisdiction. Following receipt of a response or the expiration of the response period, whichever occurs first, Defendants shall have ten (10) days in which to file a reply. Thereafter, the issue will be referred to the court for disposition.

ENTERED PURSUANT TO RULE 45(a)
RULES OF THE SIXTH CIRCUIT

Deborah S. Hunt, Clerk

**EXHIBIT "15"**

**Ex. 15**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| BRIAN P. MANOOKIAN,<br>*Plaintiff and Appellant,*<br>vs.<br>FLOYD FLIPPIN et al.,<br>*Defendants and Appellees.* | Case No. 20-5979 |

**Appellant Brian Manookian's Response to Order to Show Cause**

Appellant Brian Manookian agrees that this Court does not have jurisdiction to decide this protective appeal. The appeal was timely brought under Fed. R. App. P. 54 to ensure that Manookian did not forfeit his right to appeal these claims in the event this Court were to determine he was precluded from doing so on a later appeal.

## I. BACKGROUND

On February 28, 2020, the district court entered an order dismissing four of Manookian's claims with prejudice and staying his remaining claims under *Younger v. Harris*: The district court stated as follows:

> For the reasons stated in the accompanying memorandum, Defendants' Motion to Dismiss (Doc. No. 23) is **GRANTED, in part**. Plaintiff's antitrust claim in Count IV is subject to *Parker* immunity and is **DISMISSED WITH PREJUDICE**. The claims for damages against Defendants under 42 U.S.C. § 1983 in Counts I, II, and III are barred by quasi-judicial immunity and are **DISMISSED WITH PREJUDICE**. The remaining claims for injunctive and declaratory relief are **STAYED** pursuant to *Younger v. Harris*, 401 U.S. 37 (1971). In light of the ruling on Defendants' Motion to Dismiss, Plaintiff's Motion for Preliminary Injunction (Doc. No. 44) is **MOOT**.

D. Dkt. 59 at 1.

The district court did not enter judgment in light of the stay, and it did not set its decision out in a "separate statement" as would be required for a judgment under Rule 58(a), Federal Rules of Civil Procedure. Since the order did not qualify as a final order under 28 U.S.C. § 1291, Manookian filed a motion for entry of final judgment on the dismissed claims under Rule 54(b), Federal Rules of Civil Procedure. D. Dkt. 60.

The district court did not rule on Manookian's motion by the deadline under Rule 4(a)(7)(A)(ii), Federal Rules of Appellate Procedure. He filed this protective appeal because the appellees argued—incorrectly—that the order was appealable as a final order and Manookian's deadline had—at the time of their opposition to the 54(b) motion—passed. *See id*. Shortly after filing his notice of appeal, the district court denied his Rule 54(b) motion as moot. D. Dkt. 67. Thereafter, this Court issued an order for Manookian to show cause why the appeal should not be dismissed September 10, 2020.

## ARGUMENT

Manookian agrees that this Court does not have jurisdiction to hear this appeal because the district court's order was not a final order, but if it were a final order, this appeal would be timely under Rule 4(a)(7)(A)(ii), Federal Rules of Appellate Procedure, because the order was not set out in a separate statement for the purposes of Rule 58(a), Federal Rules of Civil Procedure. Accordingly, this Court should hold that while this protective appeal was timely, it nevertheless lacks jurisdiction to hear it because the district court has not entered an appealable final order. Instead,

Manookian can appeal the district court's orders upon entry of either judgment under Rule 54(b) on the dismissed claims or upon the entry of final judgment on all claims.

## II. The District Court's Order Was Not Immediately Appealable Absent a Rule 54(b) Order

In the district court, defendants argued that the district court's order was appealable as a final order because "the stay order effectively put plaintiff out of court," relying on case law holding that abstention-based stay orders are appealable if a concurrent state-court proceeding would operate automatically by *res judicata* effectively to end the federal litigation. *See, e.g.*, *RSM Richter, Inc. v. Behr Am., Inc.*, 729 F.3d 553, 556 (6th Cir. 2013); D. Dkt. 61 at 2–3. But that argument required an erroneous assumption: that Manookian would either lose in the disciplinary proceedings or win in such a way that the federal courts would have nothing to adjudicate. That assumption is incorrect. There is a solid possibility that after the disciplinary proceedings conclude, plaintiff will have continuing claims in federal court.

*First*, the state proceedings continue, as the district court's ruling and defendants acknowledge. D. Dkt. 58 at 12 ("[T]he temporary suspension is part of an underlying disciplinary complaint that is unresolved."); D. Dkt. 61 at 6 (noting that plaintiff's "First Amendment rights are presently under consideration by a hearing panel" and that "[a]ny other claims . . . for which he seeks injunctive and declaratory relief here may be raised in the remaining state disciplinary proceedings").

*Second*, there is a strong possibility that plaintiff will ***prevail*** in those proceedings. Indeed, less than a year ago, the Tennessee Supreme Court granted a

petition by plaintiff to dissolve a temporary suspension of his law license that was then in effect, subject to conditions. *See* D. Dkt. 58 at 2. There are several grounds on which plaintiff could prevail. For example, the Tennessee Supreme Court could rule that there was no underlying basis for the complaints against him; could rule on other state-law grounds in his favor; or could rule in his favor on one of his several constitutional claims without reaching his other constitutional claims. If any of those outcomes were to occur, there would still be matters for the district court to adjudicate—namely, whether he is entitled to additional declaratory or injunctive relief based on any constitutional claim that the Tennessee Supreme Court should choose not to reach. A ***victory*** on one or two of those constitutional grounds or on non-constitutional state-law grounds in the state proceedings would not operate necessarily (1) to preclude all claims or issues in federal court, (2) to preclude consideration of remedies that may differ from what the Tennessee Supreme Court may order or have power to order under state law, or (3) to render plaintiff's remaining claims moot.[1] The abstention order does not put plaintiff "out of court." D. Dkt. 61 at 1.

## III. This Appeal Is Timely Under Rule 4(a)(7)(A)(ii) Because Any Arguable Judgment by the District Court Was Not Set Forth in a Separate Statement

Even if the appellees' opposition to the Rule 54(b) motion were correct—which they were not—that the order effectively put plaintiff "out of court," they were

1. *Cf. Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 661–62 (1993) ("[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." (citation omitted)).

incorrect in contending the order was an order subject to a 30-day appeal deadline instead of the 180-day deadline resulting from Rule 4(a)(7)(A)(ii), Federal Rules of Appellate Procedure. That rule provides that Rule 58(a)'s requirement that a judgment be set out in a "separate statement" applies to orders that are appealable (with exceptions not applicable here). If an order is not one that is set forth in a "separate statement," as that term has been construed by the federal courts, then the order is not deemed entered until "150 days have run from entry of the judgment or order in the civil docket," and the thirty-day time-limit to notice an appeal runs from that later date. Although the district court's order is a document distinct from its lengthier memorandum, it is not set forth in a separate statement for purposes of Rule 58.

For an order to constitute a separate statement, the order "should be as minimal as possible to comply with Rule 58's requirements"—that is, stating who prevailed and what relief is ordered—"and should include little more." *In re Cendant Corp. Sec. Litig.*, 454 F.3d 235, 245 (3d Cir. 2006), as amended (Aug. 30, 2006); *see Otis v. City of Chi.*, 29 F.3d 1159, 1163 (7th Cir. 1994) (en banc) ("[T]he district court should have entered a judgment . . . stating something like: 'The suit is dismissed with prejudice, and plaintiff shall take nothing by her complaint.' "). Rule 58 "must be mechanically applied in order to avoid . . . uncertainties as to the date on which a judgment is entered." *United States v. Indrelunas*, 411 U.S. 216, 221–22 (1973). Further, Rule 58 "should be interpreted to prevent loss of the right of appeal, not to facilitate loss." *Bankers Tr. Co. v. Mallis*, 435 U.S. 381, 386 (1978). The order does

not resemble a separate statement.

*First*, the order begins with a full paragraph that both (1) lists five different filings before the Court and (2) recites part of the procedural history of the case:

> Before the Court is Defendants' Motion to Dismiss. (Doc. No. 23). Plaintiff filed a Response (Doc. No. 28), Defendants filed a Reply (Doc. No. 31), and Plaintiff filed a Sur-Reply (Doc. No. 37-1). Also pending before the Court is Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction. (Doc. No. 44). Defendants filed a Response (Doc. No. 49) and Plaintiff filed a Reply (Doc. No. 56). The Court previously denied Plaintiff's motion for a temporary restraining order. (Doc. No. 47).

D. Dkt. 59 at 1. In addition, the second paragraph concludes by reciting another ruling not relevant to any judgment that might be entered: "In light of the ruling on Defendants' Motion to Dismiss, Plaintiff's Motion for Preliminary Injunction (Doc. No. 44) is MOOT." *Id.* Including such information about the parties' filings and the rulings of the district court on motions not relevant to a final judgment indicates that the order is not a separate statement under Rule 58.

In *Hyland v. Liberty Mutual Fire Insurance Co.*, 885 F.3d 482 (7th Cir. 2018), the judgment stated that one party's summary judgment motion had been "GRANTED in full" and that the other party's motion for partial summary judgment was "DENIED." *Id.* at 483. Among other criticisms, the Seventh Circuit stressed that "[j]udgments ***must not*** recite the pleadings and other papers that led to the decision." *Id.* (emphasis added); *id.* ("[T]his judgment omits what must be included and includes what ***must be omitted***" (emphasis added).). The recitation of filings and other rulings are inconsistent with the order being a Rule 58 separate statement.

*Second*, the order states the legal bases for the judgment. Rather than simply

state who won and what relief was ordered, the order—as is typical for an ordinary order, but not for a separate statement—repeatedly states legal bases for its rulings, albeit briefly. *See* D. Dkt. 60 at 1 (reciting that "Count IV is ***subject to Parker immunity***"; that the damages claims in "Counts I, II, and III are ***barred by quasi-judicial immunity***"; and that "the remaining claims for injunctive and declaratory relief are STAYED ***pursuant to Younger v. Harris***" (emphases added)). However, "[t]o satisfy the separate-document requirement, a judgment must be a self-contained document . . . stating who has won and what relief has been awarded, ***but omitting the reasons for the disposition*** (which should appear in the court's opinion)." 19 Moore's Federal Practice - Civil § 201.10 (2020) (quoting *Otis*, 29 F.3d at 1163 (emphasis added)).

*Third*, the final paragraph states "the Clerk is directed to administratively close the file, ***subject to reopening upon motion by either party***." D. Dkt. 59 at 2 (emphasis added). That type of statement does not appear in a separate statement, given that "Rule 58 is designed to produce a distinct indication that the case is at an end." *Otis*, 29 F.3d at 1163; *see also Reid v. White Motor Corp.*, 886 F.2d 1462, 1466–67 (6th Cir. 1989) ("[W]here the failure to comply with the separate document rule has created confusion which sabotages appellate jurisdiction, the separate document requirement should continue to be mechanically applied.").

Manookian thus reasonably and correctly determined that the order is not a separate statement under Rule 58 and therefore filed his motion for entry of judgment under Rule 54(b) in order to be able to appeal. And when the district court did not

rule on that motion, Manookian was forced to file this protective appeal to preserve his appellate rights.

**CONCLUSION**

For the reasons explained above, Manookian agrees that the Court lacks jurisdiction over this appeal. He timely filed it in accordance with Fed. R. App. P. 4(a)(7)(A)(ii) so that he would not forfeit his right to appeal in light of arguments made by appellees in the district court and the district court's silence on his Rule 54(b) motion. This Court should therefore hold that no final order has been entered and, therefore, that this Court lacks jurisdiction to hear this appeal.

Respectfully submitted,

Date: October 1, 2020

*s/ David C. Codell*
DAVID C. CODELL

BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, California 92037
(858) 964-4589
david.codell@codell.com

*Counsel for Appellant*

**EXHIBIT "16"**

**Ex. 16**

FILED
Jan 05, 2021
DEBORAH S. HUNT, Clerk

No. 20-5979

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| BRIAN MANOOKIAN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| FLOYD S. FLIPPIN, in his official and individual capacities, et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: SUHRHEINRICH, GILMAN, and LARSEN, Circuit Judges.

Plaintiff Brian Manookian appeals the district court's memorandum opinion of February 28, 2020, granting in part a motion to dismiss, staying his remaining claims seeking equitable relief under *Younger v. Harris*, 401 U.S. 37 (1971), and denying as moot his motion for a preliminary injunction. The clerk ordered Manookian to show cause why his appeal should not be dismissed as untimely. Manookian responds that, although his appeal is timely, dismissal is appropriate because he appeals a non-final, non-appealable order. Defendants—all attorneys and members of the Board of Professional Responsibility of the Tennessee Supreme Court—reply that the appeal is untimely and must be dismissed.

Although Manookian asserts otherwise, the district court's memorandum opinion was final and appealable. A final decision is one "that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Firestone Tire & Rubber Co. v. Risjord*,

449 U.S. 368, 373 (1981) (internal quotation marks and citation omitted). In the absence of a final order, we generally lack jurisdiction over an appeal. *See Marvin v. City of Taylor*, 509 F.3d 234, 251 (6th Cir. 2007). Although "a stay is not ordinarily a final decision" under § 1291, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 10 n.11 (1983), it may be "final for purposes of appellate jurisdiction" if it puts a litigant "effectively out of court." *Id.* at 9−10; *see also Idlewild Bon Voyage Liquor Corp. v. Epstein*, 370 U.S. 713, 715 n.2 (1962) (per curiam). Such is the case where "the district court would be bound, as a matter of res judicata, to honor the state court's judgment" on any stayed claims. *RSM Richter, Inc. v. Behr Am., Inc.*, 729 F.3d 553, 556 (6th Cir. 2013) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 713 (1996)).

Here, there is no dispute that Manookian may assert the only remaining claims—constitutional claims seeking injunctive and declaratory relief—in the ongoing Tennessee state proceedings. *See* Tenn. Sup. Ct. R. 9, § 1.3; *Danner v. Bd. of Prof'l Resp. of the Tenn. Sup. Ct.*, 277 F. App'x 575, 579 (6th Cir. 2008). Manookian would, therefore, be precluded from litigating them in the district court. *See Creech v. Addington*, 281 S.W.3d 363, 376 (Tenn. 2009); *see also Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985). Accordingly, the district court's stay under *Younger* "is effectively a final decision and . . . the district court order is final for purposes of appellate review." *Herrera v. City of Palmdale*, 918 F.3d 1037, 1043 (9th Cir. 2019) (citing *Moses H. Cone*, 460 U.S. at 10 n.11).

In a civil case, subject to exceptions not applicable here, a notice of appeal must be filed within thirty days after entry of the order or judgment appealed from. Fed. R. App. P. 4(a)(1)(A). For appeals from the grant of summary judgment, this thirty-day period begins to run from the date a separate judgment is entered on the docket or, if a separate judgment is not

**Ex. 16**

entered, 150 days after entry of the order or judgment. *See* Fed. R. App. P. 4(a)(7)(A)(i)−(ii); Fed. R. Civ. P. 58(a)(1)−(5).

The issue in this case thus becomes whether the district court's order, entered on the same day as its memorandum opinion, qualifies as a judgment. "[T]o satisfy the separate document requirement, a judgment must, generally speaking, be a self-contained document, saying who has won and what relief has been awarded, but omitting the reason for the disposition, which should appear in the court's opinion." *Local Union No. 1992 of Int'l Bhd. Of Elec. Workers v. Okonite Co.*, 358 F.3d 278, 284 (3d Cir. 2004) (internal quotation marks and citation omitted). "[T]he separate judgment should be as minimal as possible to comply with Rule 58's requirements" because "minimal judgments make clear when the time to appeal is at hand." *In re Cendant Corp. Sec. Litig.*, 454 F.3d 235, 245 (3d Cir. 2006); *Okonite Co.*, 358 F.3d at 284; *see also Bankers Tr. Co. v. Mallis*, 435 U.S. 381, 386 (1978) (per curiam) ("Technical application of the separate-judgment requirement is necessary in that context to avoid the uncertainties that once plagued the determination of when an appeal must be brought."). Further, Rule 58 "should be interpreted to prevent the loss of the right of appeal, not to facilitate loss." *Mallis*, 435 U.S. at 386 (citation omitted).

Here, the district court's seventeen-page memorandum set out the facts, claims, and legal analysis in depth. The accompanying two-page order set out only the motions and responses thereto, and brief rulings on each. The order has a separate caption, and it is separately paginated from the memorandum opinion. The district court judge separately signed the final page of each, each is separately file stamped, and the clerk of court docketed them as separate, discrete documents. The district court's succinct outline of the relief granted omits its reasoning except for a brief bit of conclusory analysis and, thus, does not run afoul of the separate-document

requirement. *See Kidd v. Dist. of Columbia*, 206 F.3d 35, 39 (D.C. Cir. 2000). Its denomination as an "order" rather than a "judgment" does not upend the separate-document requirement. *See Okonite Co.*, 358 F.3d at 285−86; *United States v. Johnson*, 254 F.3d 279, 285 n.7 (D.C. Cir. 2001); *Beaudry Motor Co. v. Abko Props., Inc.*, 780 F.2d 751, 754−55 (9th Cir. 1986); *see also* Fed. R. Civ. P. 54(a) (defining a "judgment" as "includ[ing] a decree and any order from which an appeal lies"); Fed. R. App. P. 4(a)(7) (providing that a "judgment or order is entered for purposes of . . . Rule 4(a)" when it is entered in compliance with Rules 58 and 79(a)). Because the district court's order was sufficient to constitute a separate judgment, the time to file a notice of appeal began to run when it was filed. Manookian's notice of appeal, filed 177 days later on August 24, 2020, is untimely.

The appeal is therefore **DISMISSED** as untimely.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk

**EXHIBIT "17"**

**Ex. 17**

# Selected docket entries for case 20−5979

Generated: 04/02/2021 16:08:57

| Filed | Document Description | Page | Docket Text |
|---|---|---|---|
| 08/26/2020 | 1 Case Opening Letter | 3 | Civil Case Docketed. Notice filed by Appellant Brian Manookian. Transcript needed: y. (SSS) |
| 08/26/2020 | | | The case manager for this case is: Sharday Swain (SSS) |
| 09/10/2020 | 3 | | SHOW CAUSE order filed: Manookian is ORDERED to SHOW CAUSE within twenty−one (21) days of the entry of this order why his appeal should not be dismissed for lack of jurisdiction. Following receipt of a response or the expiration of the response period, whichever occurs first, Defendants shall have ten (10) days in which to file a reply. Thereafter, the issue will be referred to the court for disposition. Response due by 10/01/2020 for Aaron Gott. (SSS) |
| | 3 Cover Letter | 6 | |
| | 3 show cause order filed | 7 | |
| 09/17/2020 | 4 appearance form | 8 | APPEARANCE filed for Appellant Brian Manookian by David C. Codell. Certificate of Service: 09/17/2020. [20−5979] (DCC) |
| 09/17/2020 | 5 corporate disclosure | 9 | CORPORATE DISCLOSURE STATEMENT filed by Attorney Mr. David C. Codell for Appellant Brian Manookian Certificate of Service: 09/17/2020. [20−5979] (DCC) |
| 09/28/2020 | | | TRANSCRIPT ORDER filed − no hearings held in District Court. Filed by Mr. David C. Codell for Brian Manookian. Certificate of Service: 09/27/2020. [20−5979] (DCC) |
| 10/01/2020 | 7 showcause response | 11 | RESPONSE filed to the show cause, [3]. Response filed by Attorney Mr. David C. Codell for Appellant Brian Manookian. Certificate of Service: 10/01/2020. [20−5979] (DCC) |
| 10/05/2020 | 8 civil appeal statement of parties and issues | 20 | CIVIL APPEAL STATEMENT OF PARTIES AND ISSUES filed by Attorney Mr. David C. Codell for Appellant Brian Manookian.. Certificate of Service: 10/05/2020. [20−5979] (DCC) |
| 10/09/2020 | 9 reply | 24 | REPLY filed by Mr. Jonathan Neil Wike for Dana L. Dye, Ruth T. Ellis, Floyd S. Flippin, Odell Horton, Jr., John Daniel Kitch, Joe Michael Looney, Jimmie Carpenter Miller, Jody Pickens and Bridget J. Willhite regardingCertificate of Service: 10/09/2020. [20−5979] (JNW) |
| 10/13/2020 | 10 appearance form | 34 | APPEARANCE filed for Appellees Dana L. Dye, Ruth T. Ellis, Floyd S. Flippin, Odell Horton, Jr., John Daniel Kitch, Joe Michael Looney, Jimmie Carpenter Miller, Jody Pickens and Bridget J. Willhite by Jonathan N. Wike. Certificate of Service: 10/13/2020. [20−5979] (JNW) |
| 01/05/2021 | 11 | | ORDER filed: The appeal is therefore DISMISSED as untimely. Richard F. Suhrheinrich, Ronald Lee Gilman and Joan L. Larsen, Circuit Judges. (SSS) |

**Ex. 17**

| | |
|---|---|
| 11 Cover Letter | 35 |
| 11 judge order filed | 36 |

Ex. 17

# U.S. District Court
# Middle District of Tennessee (Nashville)
# CIVIL DOCKET FOR CASE #: 3:19-cv-00350

Manookian v. Flippin et al
Assigned to: District Judge William L. Campbell, Jr
Case in other court: 6CCA, 20-05979
Cause: 15:25 Clayton Act

Date Filed: 04/29/2019
Date Terminated: 02/28/2020
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

**Plaintiff**

**Brian Manookian** represented by

**Aaron Gott**
Bona Law PC
4275 Executive Square
Suite 200
La Jolla, CA 92037
(858) 964-4589
Email: aaron.gott@bonalawpc.com
*TERMINATED: 12/09/2020*

**Daniel A. Horwitz**
Law Office of Daniel A. Horwitz
1803 Broadway
Suite 531
Nashville, TN 37203
(615) 739-2888
Email: daniel.a.horwitz@gmail.com
*ATTORNEY TO BE NOTICED*

**David C. Codell**
Bona Law PC
4275 Executive Square
Suite 200
La Jolla, CA 92037
(858) 964-4589
Email: david@codell.com

*TERMINATED: 12/09/2020*

**Jarod Bona**
Bona Law PC
4275 Executive Square
Suite 200
La Jolla, CA 92037
(858) 964-4589
Email:
jarod.bona@bonalawpc.com
*TERMINATED: 12/09/2020*

V.

**Defendant**

**Floyd Flippin**
*in his official and individual capacities*

represented by

**Jonathan N. Wike**
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202
(615) 741-3491
Email: Jon.Wike@ag.tn.gov
*ATTORNEY TO BE NOTICED*

**Talmage M. Watts**
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202-0207
(615) 741-6424
Fax: (615) 532-2571
Email: talmage.watts@ag.tn.gov
*TERMINATED: 06/29/2020*

**Defendant**

**Dana Dye**
*in her official and individual capacities*

represented by

**Jonathan N. Wike**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Talmage M. Watts**
(See above for address)

**Defendant**

**John Kitch**
*in his official and individual capacities*

represented by **Jonathan N. Wike**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Talmage M. Watts**
(See above for address)
*TERMINATED: 06/29/2020*

**Defendant**

**Joe Looney**
*in his official and individual capacities*

represented by **Jonathan N. Wike**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Talmage M. Watts**
(See above for address)
*TERMINATED: 06/29/2020*

**Defendant**

**Odell Horton, Jr.**
*in his official and individual capacities*

represented by **Jonathan N. Wike**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Talmage M. Watts**
(See above for address)
*TERMINATED: 06/29/2020*

**Defendant**

**Ruth Ellis**
*in her official and individual capacities*

represented by **Jonathan N. Wike**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Talmage M. Watts**
(See above for address)
*TERMINATED: 06/29/2020*

**Defendant**

**Jody Pickens**

represented by **Jonathan N. Wike**

*in her official and individual capacities*

(See above for address)
*ATTORNEY TO BE NOTICED*

Ex. 17

**Talmage M. Watts**
(See above for address)
*TERMINATED: 06/29/2020*

**Defendant**

**Bridget J. Willhite**
*in her official and individual capacities*

represented by **Jonathan N. Wike**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Talmage M. Watts**
(See above for address)
*TERMINATED: 06/29/2020*

**Defendant**

**Jimmie Miller**
*in her official and individual capacities*

represented by **Jonathan N. Wike**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Talmage M. Watts**
(See above for address)
*TERMINATED: 06/29/2020*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/05/2021 | 70 | ORDER of USCA as to 65 Notice of Appeal filed by Brian Manookian.The appeal is therefore DISMISSED as untimely. Richard F. Suhrheinrich, Ronald Lee Gilman and Joan L. Larsen, Circuit Judges. (SSS) (bs) (Entered: 01/05/2021) |
| 12/09/2020 | 69 | ORDER granting 68 Motion to Withdraw as Attorney. Attorney Aaron Gott; Jarod Bona and David C. Codell terminated. Signed by District Judge William L. Campbell, Jr on 12/9/2020. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(kc) (Entered: 12/09/2020) |
| 12/08/2020 | 68 | MOTION to Withdraw as Attorney by Brian Manookian. (Attachments: # 1 Attachment Declaration of Jarod Bona, # 2 |

| | | |
|---|---|---|
| | | Attachment [Proposed] Order)(Gott, Aaron) (Entered: 12/08/2020) |
| 09/04/2020 | 67 | ORDER: Pending before the Court is Plaintiff's Motion for Entry of Judgment on Certain Dismissed Claims Under Fed. R. Civ. P. 54(b). (Doc. No. 60 ). Through the motion, Plaintiff seeks entry of judgment under Fed. R. Civ. P. 54 (b) to allow for immediate appeal of the Court's February 28, 2020 Order (Doc. No. 59 ). On August 24, 2020, Plaintiff entered a Notice of Appeal. (Doc. No. 65 ). Accordingly, the Motion for Entry of Judgment (Doc. No. 60 ) is MOOT. Signed by District Judge William L. Campbell, Jr on 9/4/2020. (vh) (Entered: 09/04/2020) |
| 08/26/2020 | 66 | USCA Case Number 20-5979 for 65 Notice of Appeal filed by Brian Manookian. (Sharday S. Swain - Case Manager) (bs) (Entered: 08/26/2020) |
| 08/24/2020 | 65 | NOTICE OF APPEAL as to 59 Order Administratively Closing Case,,,, by Brian Manookian. Filing fee $ 505, receipt number 0650-3201452. (Gott, Aaron) (Entered: 08/24/2020) |
| 06/29/2020 | 64 | NOTICE by Dana Dye, Ruth Ellis, Floyd Flippin, Odell Horton, Jr., John Kitch, Joe Looney, Jimmie Miller, Jody Pickens, Bridget J. Willhite *Notice of Withdrawal of Counsel* (Watts, Talmage) (Entered: 06/29/2020) |
| 06/23/2020 | | TN State Bar status verified as active for Jonathan N. Wike. (vh) (Entered: 06/23/2020) |
| 06/23/2020 | | NOTICE TO FILER re DE# 63 : This document has been scanned. Documents generated from a word processor (Word or WordPerfect) should NOT be scanned, but rather printed directly to PDF via a PDF writer. Document must be text searchable. You do not have to refile this document, however, future scanned pleadings of this nature may require refiling. (vh) (Entered: 06/23/2020) |
| 06/22/2020 | 63 | NOTICE of Appearance by Jonathan N. Wike on behalf of All Defendants (Wike, Jonathan) (Entered: 06/22/2020) |
| 04/20/2020 | 62 | REPLY MEMORANDUM re 60 MOTION to Enforce Judgment on Certain Dismissed Claims Under Fed. R. Civ. P. 54(b) filed by Brian Manookian. (Gott, Aaron) Modified on 4/21/2020 (vh). (Entered: 04/20/2020) |
| 04/13/2020 | 61 | RESPONSE in Opposition re 60 MOTION to Enforce Judgment *on Certain Dismissed Claims Under Fed. R. Civ. P. 54(b)* filed by |

| | | Dana Dye, Ruth Ellis, Floyd Flippin, Odell Horton, Jr., John Kitch, Joe Looney, Jimmie Miller, Jody Pickens, Bridget J. White. (Attachments: # 1 Exhibit 1 Respondent's Pretrial Brief in state proceedings)(Watts, Talmage) (Entered: 04/13/2020) |
|---|---|---|
| 03/30/2020 | 60 | MOTION to Enforce Judgment *on Certain Dismissed Claims Under Fed. R. Civ. P. 54(b)* by Brian Manookian. (Attachments: # 1 Attachment Proposed Order)(Gott, Aaron) (Entered: 03/30/2020) |
| 02/28/2020 | 59 | ORDER: For the reasons stated in the accompanying memorandum, Defendants' Motion to Dismiss (Doc. No. 23 ) is GRANTED, in part. Plaintiff's antitrust claim in Court IV is subject to Parker immunity and is DISMISSED WITH PREJUDICE. The claims for damages against Defendants under 42 U.S.C. § 1983 in Counts I, II, and III are barred by quasi-judicial immunity and are DISMISSED WITH PREJUDICE. The remaining claims for injunctive and declaratory relief are STAYED. Defendants' Motion to Dismiss, Plaintiff's Motion for Preliminary Injunction (Doc. No. 44 ) is MOOT. All claims having been stayed or dismissed, the Clerk is directed to administratively close the file, subject to reopening upon motion by either party. The parties shall notify the Court within 30 days of the conclusion of the state proceedings. Signed by District Judge William L. Campbell, Jr on 2/28/2020. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(vh) (Entered: 02/28/2020) |
| 02/28/2020 | 58 | MEMORANDUM OPINION OF THE COURT. Signed by District Judge William L. Campbell, Jr on 2/28/2020. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(vh) (Entered: 02/28/2020) |
| 11/20/2019 | 57 | ORDER: Pending before the Court is Plaintiff's Motion for Extension of Time to File a Reply (Doc. No. 54 ), in which Plaintiff requests an extension to November 20, 2019, to file his Reply regarding the pending Motion for a preliminary injunction (Doc. No. 44 ). Plaintiff represents that Defendant does not object to the request. The Motion is GRANTED. Signed by District Judge William L. Campbell, Jr on 11/20/2019. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(jm) (Entered: 11/20/2019) |
| 11/18/2019 | 56 | REPLY to Response to Motion re 44 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *[Corrected* |

| | | |
|---|---|---|
| | | *Version]* filed by Brian Manookian. (Gott, Aaron) (Entered: 11/18/2019) |
| 11/18/2019 | 55 | CERTIFICATE OF SERVICE by Brian Manookian re 53 Reply to Response to Motion *[Corrected]* (Gott, Aaron) (Entered: 11/18/2019) |
| 11/18/2019 | 54 | Consent MOTION for Extension of Time to File *Reply*, MOTION for Extension of Time to File Response/Reply as to 44 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction by Brian Manookian. (Attachments: # 1 Attachment Stipulated Order)(Gott, Aaron) (Entered: 11/18/2019) |
| 11/18/2019 | | NOTICE TO FILER re DE# 53 : Pursuant to Local Rule 5.01, Certificates of Service shall identify by name the person served, what was served, the method of service, and date of service. Counsel did not include all Counsel on the certificate of service. Please FILE a conformed Certificate of Service for this document. (jm) (Entered: 11/18/2019) |
| 11/17/2019 | 53 | REPLY to Response to Motion re 44 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by Brian Manookian. (Gott, Aaron) (Entered: 11/17/2019) |
| 11/13/2019 | 52 | ORDER granting 51 Motion for Leave to File Oversized Reply Memorandum. Signed by District Judge William L. Campbell, Jr on 11/13/2019. (jm) (Entered: 11/13/2019) |
| 11/12/2019 | 51 | MOTION for Leave to File Oversized Reply Memorandum re 49 Response in Opposition to Motion,, *(unopposed application)* by Brian Manookian. (Attachments: # 1 Attachment [Proposed] Order)(Gott, Aaron) (Entered: 11/12/2019) |
| 11/08/2019 | 50 | ORDER: I hereby RECUSE myself from all matters in this civil action. Signed by Magistrate Judge Barbara D. Holmes on 11/8/2019. (jm) (Entered: 11/12/2019) |
| 11/08/2019 | 49 | RESPONSE in Opposition re 44 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by Dana Dye, Ruth Ellis, Floyd Flippin, Odell Horton, Jr., John Kitch, Joe Looney, Jimmie Miller, Jody Pickens, Bridget J. Willhite. (Attachments: # 1 Exhibit 1 Supp Motion to Dismiss Pet to Reinstate, # 2 Exhibit 2 Petition for Dissolution, # 3 Exhibit 3 Response of BPR to Pet for Diss, # 4 Exhibit 4 Order Denying Petition for Dissolution)(Watts, Talmage) (Entered: 11/08/2019) |

| | | |
|---|---|---|
| 10/30/2019 | 48 | ORDER: On October 29, 2019, the Court issued an Order denying Plaintiff's motion for a temporary restraining order and ordering Defendants to respond to the motion for preliminary injunction. (Doc. No. 47 ). In the Order, the Court mistakenly stated that Plaintiff omitted to mention that the Tennessee Supreme Court reinstated the temporary suspension of his law license on October 11, 2019. The Plaintiff did include that fact in his memorandum of law. (Doc. No. 44-1 at 9). The Court apologizes for the mistake. The result of the Order remains unchanged. Signed by District Judge William L. Campbell, Jr on 10/30/2019. (jm) (Entered: 10/30/2019) |
| 10/30/2019 | | Magistrate Judge Barbara D. Holmes added. Magistrate Judge Alistair Newbern no longer assigned to case. (jm) (Entered: 10/30/2019) |
| 10/29/2019 | 47 | ORDER: The Plaintiff has not shown he will suffer immediate, irreparable harm such that it would be improper to wait until after a preliminary injunction hearing to consider the requested injunctive relief. Defendants shall respond to Plaintiff's motion for a preliminary injunction within the time allowed by the Local Rules. The hearing on Plaintiff's request for a preliminary injunction will be set by separate order. Signed by District Judge William L. Campbell, Jr on 10/29/2019. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(jm) (Entered: 10/29/2019) |
| 10/29/2019 | 46 | ORDER granting in part 42 Motion for Leave to File Document Under Seal. Plaintiff shall refile Exhibit B not under seal. Signed by District Judge William L. Campbell, Jr on 10/29/2019. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(jm) (Entered: 10/29/2019) |
| 10/28/2019 | 45 | ORDER OF RECUSAL: I recuse myself from all further proceedings in this matter. The Clerk's Office is DIRECTED to assign the case to a different Magistrate Judge through random selection. Signed by Magistrate Judge Alistair Newbern on October 28, 2019. (AN) (Entered: 10/28/2019) |
| 10/26/2019 | 44 | MOTION for Temporary Restraining Order , MOTION for Preliminary Injunction by Brian Manookian. (Attachments: # 1 Attachment Plaintiffs Memorandum in Support of Motion for |

| | | |
|---|---|---|
| | | Temporary Restraining Order and/or Preliminary Injunction (Redacted Version), # 2 Attachment Declaration of Aaron Gott, # 3 Exhibit A (under seal), # 4 Exhibit B (under seal), # 5 Exhibit C (under seal), # 6 Exhibit D (under seal), # 7 Exhibit E (under seal), # 8 Exhibit F (under seal), # 9 Exhibit G (under seal), # 10 Attachment Proposed Order)(Gott, Aaron) (Entered: 10/26/2019) |
| 10/26/2019 | 43 | Sealed Document filed by Brian Manookian. (Attachments: # 1 Attachment Declaration of Aaron Gott, # 2 Exhibit A-Report and Recommendation, # 3 Exhibit B-Order, # 4 Exhibit C-Second Supplemental Petition, # 5 Exhibit D-Petition to Reinstate, # 6 Exhibit E-Excerpts of Transcript Proceedings, # 7 Exhibit F-Report and Recommendation, # 8 Exhibit G-Order)(Gott, Aaron) (Entered: 10/26/2019) |
| 10/25/2019 | 42 | MOTION for Leave to File Document Under Seal by Brian Manookian. (Attachments: # 1 Attachment Proposed Order)(Gott, Aaron) (Entered: 10/26/2019) |
| 10/25/2019 | 41 | REPLY to Response to Motion re 39 MOTION postponement of production of insurance agreements filed by Dana Dye, Ruth Ellis, Floyd Flippin, Odell Horton, Jr., John Kitch, Joe Looney, Jimmie Miller, Jody Pickens, Bridget J. Willhite. (Watts, Talmage) (Entered: 10/25/2019) |
| 10/18/2019 | 40 | RESPONSE in Opposition re 39 MOTION postponement of production of insurance agreements filed by Brian Manookian. (Attachments: # 1 Exhibit Defendants' Initial Disclosures, # 2 Exhibit Email From Defendants' Counsel)(Horwitz, Daniel) (Entered: 10/18/2019) |
| 10/16/2019 | 39 | MOTION postponement of production of insurance agreements by Dana Dye, Ruth Ellis, Floyd Flippin, Odell Horton, Jr., John Kitch, Joe Looney, Jimmie Miller, Jody Pickens, Bridget J. Willhite. (Watts, Talmage) (Entered: 10/16/2019) |
| 09/30/2019 | 38 | ORDER granting 36 Motion for Leave to File Sur-reply. Signed by District Judge William L. Campbell, Jr on 9/30/19. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(dt) (Entered: 09/30/2019) |
| 09/20/2019 | 37 | MEMORANDUM in Support of 36 MOTION for Leave to to File Sur-Reply in Opposition to Motion of All Defendants to Dismiss Complaint filed by Brian Manookian . (Attachments: # 1 Attachment Surreply in Opposition to Motion of All Defendants to |

| | | Dismiss Complaint)(Gott, Aaron) (Entered: 09/20/2019) |
|---|---|---|
| 09/20/2019 | 36 | MOTION for Leave to to File Sur-Reply in Opposition to Motion of All Defendants to Dismiss Complaint by Brian Manookian. (Gott, Aaron) (Entered: 09/20/2019) |
| 08/01/2019 | 35 | ORDER granting 34 Motion for David C. Codell to Appear Pro Hac Vice. Signed by Kirk L. Davies on 8/1/19. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(Davies, Kirk) (Entered: 08/01/2019) |
| 07/26/2019 | 34 | MOTION for attorney David C. Codell to Appear Pro Hac Vice (paid $100 PHV fee; receipt number 0650-2960304) by Brian Manookian. (Attachments: # 1 Attachment David Codell Certificate of Good Standing)(Horwitz, Daniel) (Entered: 07/26/2019) |
| 07/17/2019 | 33 | NOTICE by Dana Dye, Ruth Ellis, Floyd Flippin, Odell Horton, Jr., John Kitch, Joe Looney, Jimmie Miller, Jody Pickens, Bridget J. Willhite re 31 Reply to Response to Motion (Watts, Talmage) (Entered: 07/17/2019) |
| 07/16/2019 | 32 | INITIAL CASE MANAGEMENT ORDER. Signed by Magistrate Judge Alistair Newbern on 7/16/2019. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(jm) (Entered: 07/16/2019) |
| 07/16/2019 | | Minute Entry for proceedings held before Magistrate Judge Alistair Newbern: Initial Case Management Conference held on 7/16/2019. (Hearing lasted :19)(tm) (Entered: 07/16/2019) |
| 07/12/2019 | 31 | REPLY to Response to Motion re 23 MOTION to Dismiss filed by Dana Dye, Ruth Ellis, Floyd Flippin, Odell Horton, Jr., John Kitch, Joe Looney, Jimmie Miller, Jody Pickens, Bridget J. Willhite. (Watts, Talmage) (Entered: 07/12/2019) |
| 07/11/2019 | 30 | PROPOSED CASE MANAGEMENT ORDER *(JOINT)* filed by Brian Manookian. (Gott, Aaron) (Entered: 07/11/2019) |
| 07/08/2019 | 29 | CERTIFICATE OF SERVICE by Brian Manookian re Annotation - Deficiency Notice, 28 Response in Opposition to Motion *to Dismiss* (Gott, Aaron) (Entered: 07/08/2019) |
| 07/08/2019 | | NOTICE TO FILER re DE# 28 : Pursuant to Local Rule 5.01, Certificates of Service shall identify by name the person served, |

| | | |
|---|---|---|
| | | what was served, the method of service, and date of service. Counsel did not include all Counsel on the certificate of service. Please FILE a conformed Certificate of Service for this document. (jm) (Entered: 07/08/2019) |
| 07/08/2019 | | NOTICE TO COUNSEL David C. Codell: WITHIN 21 DAYS, counsel shall file a Motion to Appear Pro Hac Vice, a Certificate of Good Standing signed by the Clerk of a United States District Court or a U. S. appellate court where admitted, and pay a fee of $100.00 (LR 83.01(b)). PHV due by 7/29/2019. (jm) (Entered: 07/08/2019) |
| 07/08/2019 | | CA State Bar status verified as active for David C. Codell. (jm) (Entered: 07/08/2019) |
| 07/05/2019 | 28 | RESPONSE in Opposition re 23 MOTION to Dismiss filed by Brian Manookian. (Gott, Aaron) (Entered: 07/05/2019) |
| 06/25/2019 | 27 | ORDER granting 26 Motion for Extension of Time to File Response as to 23 MOTION to Dismiss. Signed by District Judge William L. Campbell, Jr on 6/25/2019. (jm) (Entered: 06/25/2019) |
| 06/24/2019 | 26 | Consent MOTION for Extension of Time to File Response/Reply as to 23 MOTION to Dismiss by Brian Manookian. (Attachments: # 1 Attachment Stipulated Order)(Gott, Aaron) (Entered: 06/24/2019) |
| 06/12/2019 | 25 | ORDER: On June 11, 2019, Defendants filed a motion to dismiss. (Doc. No. 23 .) Pursuant to Local Rule 7.01(a)(3), any response is to be filed within 14 days after service of the motion. M.D. Tenn. R. 7.01(a)(3) (response). A reply memorandum not to exceed five pages may be filed within 7 days after service of the response. Id. § 7.01(a)(4) (reply). Any filings made related to the motion to dismiss, including motions for extensions of time or to exceed page limits, shall be decided by Judge Campbell unless referred to the undersigned magistrate judge. Signed by Magistrate Judge Alistair Newbern on 6/12/2019. (jm) (Entered: 06/13/2019) |
| 06/11/2019 | 24 | MEMORANDUM in Support of 23 MOTION to Dismiss filed by Dana Dye, Ruth Ellis, Floyd Flippin, Odell Horton, Jr., John Kitch, Joe Looney, Jimmie Miller, Jody Pickens, Bridget J. Willhite . (Attachments: # 1 Exhibit 1 Order Temp Suspension, # 2 Exhibit 2 Pet for Temp Suspension, # 3 Exhibit 3 First Pet Dissolve Temp Suspension, # 4 Exhibit 4 First Report and Recommendation, # 5 Exhibit 5 First Order Denying Pet to Dissolve Temp Sus, # 6 |

|  |  |  |
|---|---|---|
|  |  | Exhibit 6 Second Pet Dissolve Temp Sus, # 7 Exhibit 7 Second R and R, # 8 Exhibit 8 Second Order Denying Pet to Dissolve Temp Sus, # 9 Exhibit 9 Third Pet Dissolve Temp Sus, # 10 Exhibit 10 Third R and R, # 11 Exhibit 11 Order Dissolving Temp Sus, # 12 Exhibit 12 Bailey Order, # 13 Exhibit 13 Daniel Order, # 14 Exhibit 14 Lockett Order, # 15 Exhibit 15 Kelley Order, # 16 Exhibit 16 Hall Order, # 17 Exhibit 17 Board Policy 12.3, # 18 Exhibit 18 Petition for Discipline, # 19 Exhibit 19 First Supp Pet for Discipline, # 20 Exhibit 20 Second Supp Pet for Discipline) (Watts, Talmage) (Entered: 06/11/2019) |
| 06/11/2019 | 23 | MOTION to Dismiss by Dana Dye, Ruth Ellis, Floyd Flippin, Odell Horton, Jr., John Kitch, Joe Looney, Jimmie Miller, Jody Pickens, Bridget J. Willhite. (Watts, Talmage) (Entered: 06/11/2019) |
| 05/23/2019 | 22 | SUMMONS returned executed by Brian Manookian. Ruth Ellis served on 5/1/2019. (Horwitz, Daniel) (Entered: 05/23/2019) |
| 05/23/2019 | 21 | SUMMONS returned executed by Brian Manookian. Odell Horton, Jr. served on 5/1/2019. (Horwitz, Daniel) (Entered: 05/23/2019) |
| 05/23/2019 | 20 | SUMMONS returned executed by Brian Manookian. John Kitch served on 5/1/2019. (Horwitz, Daniel) (Entered: 05/23/2019) |
| 05/23/2019 | 19 | SUMMONS returned executed by Brian Manookian. Joe Looney served on 5/1/2019. (Horwitz, Daniel) (Entered: 05/23/2019) |
| 05/23/2019 | 18 | SUMMONS returned executed by Brian Manookian. Jody Pickens served on 5/1/2019. (Horwitz, Daniel) (Entered: 05/23/2019) |
| 05/23/2019 | 17 | SUMMONS returned executed by Brian Manookian. Jimmie Miller served on 5/1/2019. (Horwitz, Daniel) (Entered: 05/23/2019) |
| 05/23/2019 | 16 | SUMMONS returned executed by Brian Manookian. Floyd Flippin served on 5/1/2019. (Horwitz, Daniel) (Entered: 05/23/2019) |
| 05/23/2019 | 15 | SUMMONS returned executed by Brian Manookian. Dana Dye served on 5/1/2019. (Horwitz, Daniel) (Entered: 05/23/2019) |
| 05/23/2019 | 14 | SUMMONS returned executed by Brian Manookian. Bridget J. Willhite served on 5/1/2019. (Horwitz, Daniel) (Entered: 05/23/2019) |

| | | |
|---|---|---|
| 05/23/2019 | | TN State Bar status verified as active for Talmage M. Watts. (jm) (Entered: 05/23/2019) |
| 05/22/2019 | 13 | ORDER: Having satisfied the requirements of Local Rule 83.01(b), the motions to appear pro hac vice (Doc. Nos. 10 and 11 ) of Jarod Michael Bona and Aaron Gott are GRANTED. Signed by Vicki R. Kinkade, Chief Deputy Clerk on 5/22/2019. (jm) (Entered: 05/23/2019) |
| 05/21/2019 | 12 | NOTICE of Appearance by Talmage M. Watts on behalf of All Defendants (Watts, Talmage) (Entered: 05/21/2019) |
| 05/20/2019 | | CA State Bar status verified as active for Jarod Bona and Aaron Gott. (jm) (Entered: 05/20/2019) |
| 05/17/2019 | 11 | MOTION for attorney Aaron Gott to Appear Pro Hac Vice (paid $100 PHV fee; receipt number 0650-2915312) by Brian Manookian. (Attachments: # 1 Attachment Gott Certificate of Good Standing)(Horwitz, Daniel) (Entered: 05/17/2019) |
| 05/17/2019 | 10 | MOTION for attorney Jarod Michael Bona to Appear Pro Hac Vice (paid $100 PHV fee; receipt number 0650-2915300) by Brian Manookian. (Attachments: # 1 Attachment Bona Certificate of Good Standing)(Horwitz, Daniel) (Entered: 05/17/2019) |
| 05/09/2019 | 9 | ORDER: By Order entered May 8, 2019, this case has been reassigned to the undersigned for management of the case (Doc No. 8 .) An initial case management conference is set for Tuesday, July 16, 2019, at 1:00 p.m. in Courtroom 774, U.S. Courthouse 801 Broadway, Nashville, Tennessee. The parties shall submit a proposed case management order three business days prior to the conference. Signed by Magistrate Judge Alistair Newbern on 5/9/2019. (jm) (Entered: 05/09/2019) |
| 05/08/2019 | 8 | ORDER: I hereby recuse myself in the above-styled action. This case shall be returned to the Clerk for reassignment of another magistrate judge. The Initial Case Management Conference set for July 9, 2019, at 10:00 a.m. is hereby CANCELLED, to be reset by the Magistrate Judge to whom the case is reassigned. Case reassigned to Magistrate Judge Alistair Newbern for all further proceedings. Signed by Magistrate Judge Jeffery S. Frensley on 5/8/2019. (jm) (Entered: 05/08/2019) |
| 05/07/2019 | 7 | ORDER: This case is REFERRED to the Magistrate Judge for customized case management in accordance with Local Rule 16.01 |

| | | |
|---|---|---|
| | | and 28 U.S.C. § 636(b)(1)(A). Lead counsel for the parties shall attend the initial case management conference. Signed by District Judge William L. Campbell, Jr on 5/7/2019. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(jm) (Entered: 05/07/2019) |
| 05/07/2019 | 6 | (***DISREGARD PER 8 ORDER***) NOTICE of Initial Case Management Conference set for 7/9/2019 at 10:00 AM in Courtroom 783 before Magistrate Judge Jeffery S. Frensley. (jm) Modified on 5/8/2019 (jm). (Entered: 05/07/2019) |
| 05/06/2019 | 5 | ORDER: I hereby recuse myself in this case. The file shall be returned to the Clerk for reassignment to another judge. Case reassigned to District Judge William L. Campbell, Jr for all further proceedings. Signed by District Judge Aleta A. Trauger on 5/6/2019. (jm) (Entered: 05/07/2019) |
| 05/01/2019 | 4 | (***DISREGARD PER 5 ORDER***) NOTICE of Initial Case Management Conference set for 7/1/2019 at 01:30 PM in Chambers 825 before District Judge Aleta A. Trauger. (jm) Modified on 5/7/2019 (jm). (Entered: 05/01/2019) |
| 05/01/2019 | 3 | Summons issued as to Dana Dye, Ruth Ellis, Floyd Flippin, Odell Horton, Jr., John Kitch, Joe Looney, Jimmie Miller, Jody Pickens, and Bridget J. Willhite. (Service copies will be picked up by counsel.) (jm) (Entered: 05/01/2019) |
| 05/01/2019 | | NOTICE TO COUNSEL Jarod Bona and Aaron Gott: WITHIN 21 DAYS, counsel shall file a Motion to Appear Pro Hac Vice, a Certificate of Good Standing signed by the Clerk of a United States District Court or a U. S. appellate court where admitted, and pay a fee of $100.00 (LR 83.01(b)). PHV due by 5/22/2019. (jm) (Entered: 05/01/2019) |
| 05/01/2019 | | TN State Bar status verified as active for Daniel A. Horwitz; CA State Bar status verified as active for Jarod Bona and Aaron Gott. (jm) (Entered: 05/01/2019) |
| 05/01/2019 | 2 | NOTICE/INFORMATION regarding Consent of the Parties to the Magistrate Judge. (jm) (Entered: 05/01/2019) |
| 04/29/2019 | 1 | COMPLAINT against All Defendants (Filing fee $400, Receipt number 0650- 2902667), filed by Brian Manookian. (Attachments: # 1 Attachment Civil Cover Sheet) (jm) (Entered: 04/30/2019) |

**Ex. 17**

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/13/2021 14:28:06 | | | |
| **PACER Login:** | bs238134:3073024:3945627 | **Client Code:** | 33333-33333 |
| **Description:** | Docket Report | **Search Criteria:** | 3:19-cv-00350 |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

**CERTIFICATION OF ELECTRONIC SERVICE**

*Manookian v. Bona Law, et al.*
USDC, Southern District Case No. 21CV0562 WQH BLM

STATE OF CALIFORNIA, COUNTY OF SAN DIEGO

At the time of service, I was over 18 years of age and not a party to the action. My business address is 550 West C Street, Suite 1700, San Diego, CA 92101. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On June 14, 2021, I served the following document(s): **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS - FED RULES CIV. P. R. 12(b)(6)**

I served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

| | |
|---|---|
| Frank J. Johnson, Esq.<br>FrankJ@johnsonfistel.com<br>Kristen O'Connor, Esq.<br>KristenO@johnsonfistel.com<br>JOHNSON FISTEL, LLP<br>655 West Broadway, Suite 1400<br>San Diego, CA 92101<br>Telephone: (619) 230-0063<br>Facsimile: (619) 255-1856<br><br>*Local Counsel for Plaintiff* | John Spragens, Esq.<br>john@spragenslaw.com<br>SPRAGENS LAW PLC<br>311 22nd Ave. No.<br>Nashville, TN 37203<br>Telephone: (615) 983-8900<br>Facsimile: (615) 682-8533<br><br>*Lead Counsel for Plaintiff*<br><br>(Pro Hac Vice forthcoming) |

The documents were served by the following means:

☒ (BY COURT'S CM/ECF SYSTEM) Pursuant to Local Rule, I electronically filed the documents with the Clerk of the Court using the CM/ECF system, which sent notification of that filing to the persons listed above.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on June 14, 2021, at San Diego, California.

Jennifer Cannone

4824-7373-1310.1